UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PATRICIA ANN MASSEY | : | NO.:  3:03CV55 (PCD) |
| | : | |
| v. | : | |
| | : | |
| TOWN OF WINDSOR AND | : | |
| KATHLEEN QUIN IN HER | : | |
| INDIVIDUAL CAPACITY | : | JULY 1, 2004 |

**<u>LOCAL RULE 56(a)1 STATEMENT IN SUPPORT OF  DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT DATED JULY 1, 2004</u>**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56, the defendants, Town of Windsor and Kathleen Quin, submit the following statement of undisputed material facts in support of their Motion for Summary Judgment dated July 1, 2004.  Affidavits and other admissible evidence are attached as exhibits.

1. The plaintiff began working for the Town of Windsor on a part-time basis in the Building and Land Department in February 1996.  <u>See</u> **Exhibit A**, p. 29

2. On September 6, 1998, the plaintiff was hired for the Deputy Town Clerk position. <u>See</u> **Exhibit A**, pp. 31, 53; and **Exhibit B**, ¶5

3. The plaintiff, and five other candidates, interviewed for the position with Kathleen Quin, Nicole LaFortune and Dede Moore.  <u>See</u> **Exhibit A**, p. 52; and **Exhibit B**, ¶6.

4. Kathleen Quin recommended the plaintiff for the position.  <u>See</u> **Exhibit B**, ¶7.

5. Kathleen Quin was the Town Clerk, and the plaintiff's immediate supervisor.  <u>See</u> **Exhibit A**, p. 53; and **Exhibit B**, ¶4.

6. A copy of Deputy Town Clerk job description was provided to the plaintiff during the hiring process.  <u>See</u> **Exhibit A**, p. 54; **Exhibit C**, p. 120; and **Exhibit D**.

7. At the time of the plaintiff's hire as Deputy Town Clerk, five other women, all Caucasian, worked in the Town Clerk's Office: June Cameron, Alice Williams, Elka Peck, Thelma London, and Kathleen Quin.  See **Exhibit A**, p. 55; and **Exhibit B**, ¶8.

8. Only Kathleen Quin and Thelma London were full time employees of the Town of Windsor.  See **Exhibit B**, ¶9; and **Exhibit E**, No. 6.

9. Thelma London retired in December 1998, but returned to work as a part-time employee two days a week in January 1999.  See **Exhibit A**, pp. 60-61; and **Exhibit B**, ¶9.

10. Alice Williams and June Cameron were retained on a contractual basis to work 20-40 hours a week as needed.  See **Exhibit B**, ¶10; and **Exhibit E**, No. 6.

11. June Cameron remained working through mid-November to train the plaintiff on land records.  See **Exhibit A**, p. 58; and **Exhibit B**, ¶12.

12. Alice Williams continues to work in the Town Clerk's Office.  See **Exhibit B**, ¶13.

13. As of January 2000, Alice Williams also began functioning as the outside auditor - a function that could only be performed by a non-employee.  See **Exhibit A**, p. 132; and **Exhibit B**, ¶14.

14. Elka Peck was a part-time student employee who worked during school vacations and the summer.  See **Exhibit B**, ¶15; and **Exhibit E**, No. 6.

15. The plaintiff was initially hired as a probationary employee for a period of six months.  See **Exhibit A**, pp. 74-75; and **Exhibit B**, ¶21.

16. After receiving a marginal evaluation for the first six months, the plaintiff's probationary period was extended an additional six months. See **Exhibit A**, p.75; **Exhibit B**, ¶21; and **Exhibit F**.

17. Despite continued concerns regarding her performance, the plaintiff was retained after the expiration of the second probationary period. She was advised, however, of the need for improvement. See **Exhibit B**, ¶21; and **Exhibit G**.

18. The Town sent the plaintiff to Town Clerk School to become certified as a Town Clerk. The plaintiff attended classes, passed the exam and received the State of Connecticut designation of Certified Town Clerk in June 2001. See **Exhibit A**, pp. 55, 66, 106; **Exhibit B**, ¶16; **Exhibit C**, p. 96; and **Exhibit H**, No. 3(5).

19. Kathleen Quin also became a Certified Town Clerk after being hired by the Town. See **Exhibit B**, ¶17.

20. Neither Kathleen Quin, nor the plaintiff, nor any other employee, received monetary recognition for obtaining the Town Clerk certification. See **Exhibit A**, p. 106; **Exhibit B**, ¶18; and **Exhibit H**, No. 3(5).

21. No one who worked in the Town Clerk's Office was eligible to function as a moderator during the election process. See **Exhibit B**, ¶19; and **Exhibit C**, p. 20.

22. Kathleen Quin did not send any of the individuals who worked in the Town Clerk's Office to moderator training. See **Exhibit B**, ¶19; and **Exhibit C**, p. 20.

23. High performance management model training was offered in June 2002. Kathleen Quin signed the plaintiff up for the training, and the plaintiff attended the training. See **Exhibit B**, ¶20; and **Exhibit C**, pp. 23-26.

24. The plaintiff and Quin are the only individuals from the Town Clerk's Office who received this training.  See **Exhibit B**, ¶20; and **Exhibit C**, pp. 21-22.

25. In October 1999, Kathleen Quin gave a physician who called the office the plaintiff's home telephone number.  Thelma London had advised Quin that the plaintiff had not been feeling well that day and that she had been trying to contact her doctor all day.  When the physician called, he said that it was important for him to reach the plaintiff and asked for her phone number.  In an effort to help the plaintiff, Quin looked in the phone book and provided the physician with her number.  See **Exhibit A**, pp. 79-80; and **Exhibit B**, ¶21.

26. Later that month, Kathleen Quin met with the plaintiff to discuss continued performance issues.  During that meeting, the plaintiff brought up the incident with the phone number, as well as other issues between her and Quin.  See **Exhibit A**, pp. 84-87; **Exhibit B**, ¶22; and **Exhibit C**, p. 110.

27. After that meeting, Kathleen Quin met with the Town Manager, Leon Churchill, to advise him that the plaintiff continued to make an excessive number of errors and that the plaintiff was angry with her.  See **Exhibit B**, ¶23; and **Exhibit C**, p. 110.

28. Leon Churchill held a meeting with the plaintiff, Kathleen Quin and Dede Moore.  See **Exhibit B**, ¶24.

29. During that meeting, Kathleen Quin addressed the plaintiff's poor performance.  In response, the plaintiff noted that there was nothing in her file documenting such poor performance.  See **Exhibit B**, ¶25. **Exhibit C**, pp. 93-95.

30. Leon Churchill then instructed the plaintiff, Kathleen Quin and Dede Moore to meet on a regular basis.  See **Exhibit B**, 26; and **Exhibit C**, pp. 95-96.

31. The plaintiff, Quin and Moore met on a weekly basis for 2-4 months. See **Exhibit A**, pp. 94-96, 101, 105; **Exhibit B**, ¶27; and **Exhibit H**, No. 3(4).

32. During this time, Kathleen Quin remained at work each day until 7:00 p.m. to review and edit the plaintiff's work. See **Exhibit B**, ¶31.

33. Kathleen Quin returned the documents that contained mistakes to the plaintiff the following day for her to learn from and to make the necessary corrections. See **Exhibit B**, ¶30.

34. The plaintiff exhibited only 40% accuracy during this time. See **Exhibit B**, ¶31.

35. In January 2000, in order to have more time to review the documents, Kathleen Quin implemented the practice of having all land records recorded and indexed by 4:00 p.m. each day. See **Exhibit A**, pp. 136-37; **Exhibit B**, ¶32; and **Exhibit H**, No. 12.

36. This practice applied to both the plaintiff and Quin, the only two individuals in the office who entered land records. See **Exhibit B**, ¶33.

37. The plaintiff and Quin were the only two full-time employees at this time. See **Exhibit A**, pp. 55, 58, 60-61, 132; **Exhibit B**, ¶¶8-15; and **Exhibit E**, No. 6.

38. Kathleen Quin's land records were completed by 4:00 p.m. each day for the plaintiff to review. See **Exhibit B**, ¶33.

39. Accuracy in the Town Clerk's Office is essential. See **Exhibit B**, ¶34.

40. All errors found in the Town Clerk's Office had to be corrected. See **Exhibit A**, p. 140. All land records were reviewed by someone else. See **Exhibit A**, pp. 81-82; and **Exhibit B**, ¶34.

41. At the end of January or early February 2000, Leon Churchill called another meeting with the plaintiff, Kathleen Quin and Dede Moore in October 1999.  See **Exhibit A**, pp. 93, 101; **Exhibit B**, ¶35; and **Exhibit C**, p. 93.

42. At said meeting, Kathleen Quin produced a box of documented errors that the plaintiff had committed, and reported that the plaintiff's performance had not improved. See **Exhibit A**, pp. 79-80; and **Exhibit B**, ¶35.

43. Processing tax conveyance forms, fish and game licensing, and vital statistics are all functions of the Town Clerk's Office.  See **Exhibit A**, pp. 187-88; and **Exhibit B**, ¶36.

44. In an effort to improve the plaintiff's accuracy with land records, however, the plaintiff was not initially asked to perform these functions.  See **Exhibit B**, ¶37.

45. Beginning in May or June 2000, Kathleen Quin did ask the plaintiff to help out with these responsibilities.  See **Exhibit A**, pp. 183-85; **Exhibit B**, ¶37; and **Exhibit E**, No. 28.

46. These functions did not require a significant amount of time.  See **Exhibit B**, ¶38.

47. Processing town wide mail was primarily the responsibility of the town manager's secretary.  The Town Clerk's Office was the fourth in line for the job.  See **Exhibit B**, ¶39.

48. As needed, the plaintiff was required to process the town wide mail.  See **Exhibit A**, p. 184; **Exhibit B**, ¶41; and **Exhibit H**, No. 13.

49. Kathleen Quin likewise processed the town wide mail on occasion.  See **Exhibit B**, ¶40; and **Exhibit C**, p. 85.

6

50. The plaintiff was shown how to perform all of the responsibilities of the Town Clerk's Office, and was provided form instructions regarding each of the jobs. See **Exhibit A**, pp. 190-94; **Exhibit B**, ¶42; and **Exhibit I**.

51. The plaintiff received more instruction than any of the other individuals in the office. See **Exhibit A**, pp. 191-94; and **Exhibit B**, ¶42.

52. In 2000, the plaintiff missed 120 days of work. See **Exhibit B**, ¶44.

53. Kathleen Quin did not know the health condition which kept the plaintiff out of work or when she would return. See **Exhibit B**, ¶44.

54. Toward the end of 2000, Kathleen Quin decided that she needed assistance in the office and therefore advertised for a *second* Deputy Town Clerk. See **Exhibit A**, p. 35; **Exhibit B**, ¶¶45, 46; and E-mail, attached as **Exhibit J**.

55. When the plaintiff returned to work in December 2000, Kathleen Quin advised her that she had interviewed for another Deputy Town Clerk and that they needed to establish performance standards. See **Exhibit B**, ¶48.

56. The plaintiff agreed to the establishment of performance standards. See **Exhibit B**, ¶48.

57. The plaintiff suggested the 95% accuracy standard for land records. See **Exhibit B**, ¶49.

58. On January 1, 2001, the following performance standards were implemented: 90% accuracy on indexing land records for the first two or three months and then 95% accuracy. See **Exhibit A**, pp. 133-34, 139; **Exhibit B**, ¶50; **Exhibit C**, pp. 116-17; and **Exhibit H**, No. 3(2).

59. The performance standards applied to both the plaintiff and Kathleen Quin, the only two individuals who entered land records. See **Exhibit B**, ¶¶51-52.

60. In September 2001, Kathleen Quin instituted bi-weekly performance evaluations for the plaintiff with respect to the accuracy of land records. See **Exhibit A**, pp. 128-29; and **Exhibit B**, ¶55.

61. The plaintiff concedes that being detail oriented is a skill that cannot be trained. See **Exhibit M**.

62. The plaintiff consistently fell below the performance standards established for accuracy of land records. See **Exhibit N**.

63. Kathleen Quin advised the plaintiff both verbally and in writing of her ongoing performance issues and her need to improve. See **Exhibit O**.

64. On December 7, 2001, a pre-termination hearing was held with the plaintiff, Peter Sousa and Elvira Napoleone. See **Exhibit A**, pp. 146-48.

65. Peter Sousa explained that he wanted "to hear [the plaintiff's] side of the story." He also told her that he had been trying to reach her attorney, but that the attorney was not returning his calls. See **Exhibit A**, pp. 147-48.

66. The plaintiff again met with Sousa and Napoleone the following Monday, December 10, 2001. See **Exhibit A**, p. 149; and **Exhibit C**, p. 6.

67. At said meeting, the plaintiff received notice that her employment was being terminated effective December 14, 2001. See **Exhibit A**, p. 149; and **Exhibit P**.

68. The reason given for the plaintiff's termination was poor performance over the last three years. See **Exhibit C**, p. 7; **Exhibit H**, No. 4; and **Exhibit P**.

69. On December 13, 2001, the plaintiff filed a notice of appeal of her termination to the Town Manager. See **Exhibit A**, pp. 150-51; **Exhibit C**, p. 7; and **Exhibit Q**.

70. Leon Churchill held a hearing for the plaintiff's appeal on December 20, 2001. Kathleen Quin was in attendance. See **Exhibit A**, p. 151; **Exhibit B**, ¶58; and **Exhibit C**, p. 8.

71. The plaintiff does not recall what happened at the appeal hearing. See **Exhibit A**, pp. 151-53.

72. The plaintiff did not raise any issues or defenses at the December 10th meeting or the December 20th hearing, stating that she had already set forth her concerns in writing. See **Exhibit B**, ¶58; **Exhibit C**, pp. 8-9; and **Exhibit Q**.

73. The plaintiff did not tell Peter Sousa or Leon Churchill at the December 10th meeting or the December 20th hearing that she felt that she was being discriminated against because of her race, disability or age. See **Exhibit C**, pp. 12-14.

74. The plaintiff subsequently received a letter from Churchill indicating that he was upholding the plaintiff's termination. See **Exhibit A**, pp. 153-54; and **Exhibit R**.

75. The letter from Churchill informed the plaintiff of her right to arbitrate her termination. See **Exhibit A**, p. 164; and **Exhibit R**.

76. The plaintiff knew that she had the right to arbitrate her termination under the Town rules, but chose not to do so. See **Exhibit A**, p. 164; and **Exhibit C**, p. 11.

77. Immediately after her termination on December 10th, the plaintiff filed for unemployment compensation. See **Exhibit A**, pp. 156, 167.

78. The Town of Windsor did not contest the plaintiff's claim and she received unemployment. See **Exhibit A**, pp. 159, 164.

79. The plaintiff does not know what information the Town of Windsor provided to the State of Connecticut Department of Labor. She has no evidence that Kathleen Quin advised the Department of Labor that she was terminated for willful misconduct. See **Exhibit A**, pp. 160, 169-70.

80. Kathleen Quin attests that she never spoke with or contacted anyone at the DOL regarding the plaintiff's termination. See **Exhibit B**, ¶59.

81. On November 20, 1999, the plaintiff found a mouse or a rat in a supply cabinet drawer underneath her desk. She does not know who, if anyone, placed the mouse there. See **Exhibit A**, pp. 179-83; and **Exhibit H**, No.15.

82. Kathleen Quin had no involvement in the placement of a mouse or a rat in the plaintiff's desk drawer. See **Exhibit B**, ¶64.

83. When Kathleen Quin learned of the mouse, she told the plaintiff to leave it there and that she would call building management. The plaintiff immediately grabbed the mouse and discarded it herself. See **Exhibit B**, ¶64.

84. Kathleen Quin regularly communicated with everyone in the office via notes. See **Exhibit A**, pp. 140-41; and **Exhibit B**, ¶65.

85. Kathleen Quin did, on a couple of occasions, interject into the plaintiff's conversations with the public if she heard the plaintiff giving out misinformation. See **Exhibit B**, ¶67.

86. The plaintiff's workstation was located at the front counter, a very busy area next to the cash register. See **Exhibit A**, pp. 91-92; and **Exhibit B**, ¶68.

87. Kathleen Quin sometimes stood next to the plaintiff in order to access the register or assist customers.  See **Exhibit B**, ¶68.

88. The plaintiff never asked to have her workstation relocated.  See **Exhibit A**, p. 92.

89. In August 2001, the plaintiff told Kathleen Quin that she was taking a couple days at the end of the week to go to Washington with a group.  See **Exhibit B**, ¶69.

90. Afterward, Kathleen Quin learned that the plaintiff had asked payroll how many vacation days she had remaining. The answer was two, plus six sick days.  See **Exhibit B**, ¶69.

91. The following Monday, Kathleen Quin received a message from the plaintiff stating that her daughter, who lived in Maryland, had been stung by a bee, and she remained out of work for the entire week.  See **Exhibit B**, ¶69.

92. Despite Quin's request, the plaintiff never provided any documentation to the Town substantiating her daughter's condition or the fact that her daughter reportedly could not be alone.  See **Exhibit A**, pp. 111-13; and **Exhibit B**, ¶70.

93. Nonetheless, the plaintiff's time was counted as sick time.  See **Exhibit B**, ¶71.

94. The plaintiff has not submitted any evidence that the Town treated other individuals differently with respect to this issue.  See **Exhibit A**, pp. 119-21.

95. The plaintiff was fifty-one years old at the time of the filing of this lawsuit.  See Complaint, ¶8.

96. All of the other staff in the Town Clerk's Office were older than the plaintiff with the exception of the part-time student employee, Elka Peck.  See **Exhibit B**, ¶61.

97. The plaintiff's position was filled in March 2002 by Agnus Pier, a 57 year-old woman.  See **Exhibit A**, pp. 178-79; **Exhibit B**, ¶60.

98. The plaintiff has no evidence that her age played a role in the actions taken against her.  See **Exhibit A**, pp. 55-57, 179.

99. Kathleen Quin never directed any racial slurs toward the plaintiff.  See **Exhibit B**, ¶72; and **Exhibit C**, pp. 151-52.

100. The plaintiff first provided medical documentation of an illness to the Town, via Kathleen Quin, in September 2000.  That note simply indicated that the plaintiff was to be excused from work for two weeks due to medical reasons; the medical condition was not identified; and the physician's specialty was noted to be gastroenterology and internal medicine.  See **Exhibit B**, ¶62; **Exhibit C**, pp. 38-41; and **Exhibit S**.

101. The only other note that the plaintiff submitted to Quin likewise did not identify her medical condition.  See **Exhibit B**, ¶62; **Exhibit C**, pp. 62-64; and **Exhibit S**.

102. The plaintiff never informed Kathleen Quin that she was suffering from depression and general anxiety.  See **Exhibit B**, ¶62; and **Exhibit C**, p. 62.

103. The only documentation provided to anyone at the Town indicating that the plaintiff suffered from depression is dated May 30, 2001.  See **Exhibit S**.

104. The plaintiff never requested an accommodation.  See **Exhibit A**, p. 203; **Exhibit B**, ¶63; and **Exhibit H**, No. 19.

105. The plaintiff was never denied medical leave.  See **Exhibit A**, p. 203.

106. The plaintiff's depression and anxiety can be controlled with medication; she has not, however, taken any medication for either condition since 2002.  She can now

"handle" the depression and anxiety and sees her doctor only on an as-needed basis.  <u>See</u> **Exhibit A**, pp. 199-200.

107. The plaintiff filed a complaint with the Commission on Human Rights & Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC") on March 7, 2002.  <u>See</u> **Exhibit E**.

108. The plaintiff never received a release of jurisdiction or right to sue notice f from the CHRO.  <u>See</u> **Exhibit T**, No. 10.

DEFENDANTS,
TOWN OF WINDSOR
AND KATHLEEN QUIN IN HER
INDIVIDUAL CAPACITY


By<u>/s/Alexandria L. Voccio</u>
   Alexandria L. Voccio, ct21792
   Howd & Ludorf
   65 Wethersfield Avenue
   Hartford, CT  06114-1190
   Phone:  (860) 249-1361
   Fax:  (860) 249-1361
   E-mail:  <u>avoccio@hl-law.com</u>

**<u>CERTIFICATION</u>**

        This is to certify that a copy of the foregoing has been sent, handling charges prepaid, via U.S. Mail to the following counsel of record this 1st day of July, 2004.

Cynthia R. Jennings, Esquire  
The Barrister Law Group, LLC  
211 State Street  
Bridgeport, CT 06604

                                    <u>/s/Alexandria L. Voccio</u>  
                                    Alexandria L. Voccio