UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
* * * * * * * * * * * * * * * *
PATRICIA ANN MASSEY,            *
           PLAINTIFF,           *
VS.                             *
TOWN OF WINDSOR AND KATHLEEN QUIN *
IN HER INDIVIDUAL CAPACITY,     *
           DEFENDANTS.          *   CIVIL ACTION NUMBER
* * * * * * * * * * * * * * * *    3:03CV55 (PCD)

---

DEPOSITION OF PATRICIA ANN MASSEY

---

Taken before Frances R. Teti, Licensed Shorthand Reporter and Notary Public within and for the State of Connecticut, pursuant to Federal Rules of Civil Procedure, at the law offices of Howd & Ludorf, 65 Wethersfield Avenue, Hartford, Connecticut, on April 2, 2004, commencing at 10:16 a.m.

A+REPORTING
P.O. Box 831
WALLINGFORD, CT 06492
866.369.9976

2

1  APPEARANCES:
2
3
4  FOR THE PLAINTIFF:
5      THE BARRISTER LAW GROUP, LLC
6      Cynthia R. Jennings, Attorney at Law
7      211 State Street
8      Bridgeport, Connecticut  06604
9
10 FOR THE DEFENDANTS:
11     HOWD & LUDORF
12     David S. Monastersky, Esq.
13     65 Wethersfield Avenue
14     Hartford, Connecticut  06114-1190
15
16 ALSO PRESENT:
17     Kathleen Quin
18
19
20
21
22
23
24
25

3

1                    STIPULATIONS
2
3      IT IS STIPULATED by counsel for the parties
4  that each party reserves the right to make specific
5  objections in open Court to each and every question
6  asked and the answers given thereto by the witness,
7  reserving the right to move to strike out where
8  applicable, except as to such objections as are directed
9  to the form of the question.
10     IT IS STIPULATED by counsel for the parties
11 that the proof of the authority of the Notary Public
12 before whom this deposition is taken is waived.
13     IT IS STIPULATED AND AGREED by counsel for the
14 parties that any defects in the Notice are waived.
15     IT IS FURTHER STIPULATED by counsel for the
16 parties that the reading and signing of the deposition
17 are not waived.
18
19
20
21
22
23
24
25

4

1          (Defendants' Exhibit No. 1,
2           complaint,
3           marked for identification.)
4
5          (Defendants' Exhibit No. 2,
6           Response to Interrogatories,
7           marked for identification.)
8
9          (Defendants' Exhibit No. 3,
10          one-page undated letter,
11          marked for identification.)
12
13         (Defendants' Exhibit No. 4,
14          Response for Production,
15          marked for identification.)
16
17         (Defendants' Exhibit No. 5,
18          Affidavit of Illegal Discriminatory
19          Practice,
20          marked for identification.)
21
22         (Defendants' Exhibit No. 6,
23          Evaluation of Probationary
24          Employees, 9-6-98,
25          marked for identification.)

```
 1     grant that is funding your position lasts?
 2  A. One year.
 3  Q. Okay.  Are you responsible for applying for that
 4     grant for the City of Hartford on behalf of the
 5     Board of Education?
 6  A. No.
 7  Q. Someone else fills out that paperwork and applies
 8     for that grant?
 9  A. Right.
10  Q. But you do some grant work for other programs?
11  A. For -- only if there is additional help necessary.
12  Q. If you're asked?
13  A. If I'm asked.
14  Q. Now, when you were first hired by the Town of
15     Windsor, you were hired in a part-time position; is
16     that correct?
17  A. Correct.
18  Q. That was with the Building and Land Department?
19  A. Correct.
20  Q. That was in 1996?
21  A. Correct.
22  Q. Do you remember the approximate month?
23  A. February.
24  Q. Okay.  And what were your approximate hours per
25     week in that position?
                                                      29

 1  A. My hours varied from 20 hours a week to 40 hours a
 2     week.
 3  Q. Sometimes you were working basically a full-time
 4     schedule?
 5  A. Yes.
 6  Q. Okay.  Was there any reason why you were working
 7     up to 40 hours a week at times for the department?
 8  A. Yes, there were reasons.  The street records --
 9     the street files were out of order, and the then
10     town manager wanted the records moved from one
11     corner of the room to the center of the room; and
12     as the only person working in that capacity as
13     administrative aid, that was a job I took on.
14  Q. Okay.  Who was your supervisor in the Building and
15     Land Department?
16  A. Andy Rizzo.
17  Q. Was he your supervisor the whole time you worked
18     for that department?
19  A. No.  There was -- Andy was the building official.
20     Karen Kiley was the administrative personnel that I
21     reported to.
22  Q. Okay.  So you reported to Karen Kiley, but the
23     chief building official was Andy Rizzo?
24  A. Yes.
25  Q. Okay.  So he was sort of the head of the
                                                      30

 1     department?
 2  A. Right.
 3  Q. But you reported to someone subordinate to him?
 4  A. Yes.
 5  Q. How much were you earning per hour in that job?
 6  A. I started at about $8 per hour, and when I was --
 7     when I accepted the position as deputy town clerk,
 8     I was making approximately $10.15 or thereabouts.
 9  Q. In that position, did you have any benefits?
10  A. No.
11  Q. And then you left that position to take the deputy
12     town clerk position with the Town; is that correct?
13  A. Correct.
14  Q. Prior to your employment with the Town of
15     Windsor --
16        Was it February of 1996?
17  A. February.
18  Q. -- where was your last your immediate employer?
19  A. I worked on a part-time basis for the State of
20     Connecticut Tax Department.
21  Q. What was your position with the State of
22     Connecticut Tax Department?
23  A. Temporary seasonal clerk working with income tax
24     returns.
25  Q. What was your basic seasonal time period?
                                                      31

 1  A. Four months a year.
 2  Q. I take it around tax time?
 3  A. Absolutely.
 4  Q. For how many years did you work for the State of
 5     Connecticut Tax Department?
 6  A. About one year.
 7  Q. So you worked one season basically?
 8  A. One season basically.
 9  Q. Okay.  And that job ended when approximately, the
10     end of the spring of that year?
11  A. Summer.
12  Q. Okay.  It went into the summer?
13  A. Went into the summer.
14  Q. That was 1996?
15  A. On or about 1996.  On or around.
16  Q. Were you working for the State of Connecticut at
17     the same time you were working for the Town of
18     Windsor?  Was there any overlap?
19  A. No.
20  Q. Okay.  So you were hired by the Town of Windsor in
21     February of 1996; correct?
22  A. Yes.
23  Q. So you would have probably been working for the
24     State of Connecticut the year before that; is that
25     correct?
                                                      32
```

```
 1  A.  Until January because I was also an intermittent
 2      employee.
 3  Q.  Okay.  What were you doing as an intermittent
 4      employee?
 5  A.  Processing quarterly tax returns, business tax
 6      returns, monthly sales and use.
 7  Q.  How is it that you were called on an intermittent
 8      basis?  Did they just call you and say we need
 9      some help for some period of time?
10  A.  Yes.
11  Q.  Were you working for the State of Connecticut --
12      when I say "working," -- were you actually called in
13      on that intermittent basis -- when you accepted the
14      position with the Town of Windsor to work in the
15      Building and Land Department?
16  A.  Could you repeat that?
17  Q.  Were you actually working for the State in the Tax
18      Department on an intermittent basis, like actually
19      physically working at that time, when you accepted
20      the position with the Town of Windsor?
21  A.  Yes.
22  Q.  Okay.  What was your last rate of pay at the State
23      of Connecticut?
24  A.  On or about $10.  Nine, $10 per hour.
25  Q.  What is the reason that you left the State of
                                                      33

 1      Connecticut?
 2  A.  It was intermittent.  I was looking for a full-time
 3      position or at least a position that had regular
 4      hours.
 5  Q.  Okay.  Prior to working for the State of
 6      Connecticut, who was your previous employer?
 7  A.  I believe it was the Travelers Data Center on
 8      Windsor Street.
 9  Q.  Did you also work for the Hebrew Home and Hospital?
10  A.  Again, that was part-time and limited hours.
11  Q.  Okay.  Did you work for the Hebrew Home and
12      Hospital at the same time you were working for the
13      State of Connecticut?
14  A.  Yes.
15  Q.  What was your position with the Hebrew Home and
16      Hospital?
17  A.  Outreach worker.
18  Q.  What were your basic duties as an outreach worker?
19  A.  To visit the elderly, to perform shopping -- to
20      take them shopping and that sort of --
21  Q.  Just sort of help them on a daily basis?
22  A.  Helper, yes.
23  Q.  You worked for that organization part-time?
24  A.  Part-time.
25  Q.  Approximately how many hours a week?
                                                      34

 1  A.  About ten hours a week.
 2  Q.  Prior to that is when you worked for the Travelers
 3      Insurance Company?
 4  A.  That's right.
 5  Q.  What was your position with the Travelers?
 6  A.  I was considered a peripheral operator in the
 7      Information Systems Division.
 8  Q.  What is a peripheral operator?
 9  A.  An operator who processes bills for the -- for the
10      insurance firm for the entire industry utilizing
11      computerized equipment.
12  Q.  Were you processing claims?
13  A.  Premium bills.
14  Q.  Premiums?
15  A.  Yes.
16  Q.  So you were processing revenue coming in?
17  A.  Yes.
18  Q.  Okay.  So I take it you just had to match what
19      came in to the proper account or proper
20      policyholder or something like that?
21  A.  Basically just to make sure that there were no
22      errors made by any of the employees who worked in
23      the data processing area; that the computers were
24      on line and working; making sure that the machinery
25      functioned properly; troubleshooting, that sort of
                                                      35

 1      thing.
 2  Q.  Who was your supervisor at the Travelers?
 3  A.  Paul Slucharcyk.
 4  Q.  Do you know how that's spelled?
 5  A.  S-L-U-C-H-A-R-C-Y-K.
 6  Q.  Do you know if he still works for the Travelers?
 7  A.  No, I don't.
 8  Q.  Why did you leave the Travelers Insurance Company?
 9  A.  The operation that I was employed in relocated to
10      Norcross, Georgia.
11  Q.  What was the approximate time that you worked for
12      the Travelers Insurance Company?
13  A.  1990 through 1995.
14  Q.  What was your last rate of pay with Travelers?
15  A.  Approximately 20, 21,000 per year.
16  Q.  Prior to working for the Travelers, where were you
17      employed?
18  A.  The Hartford Insurance Group, I believe.
19  Q.  What was your position with the Hartford Insurance
20      Group?
21  A.  I worked with reinsurance accounting, Premium
22      Collections Unit, and also I worked in the
23      Reinsurance Accounting Unit.
24  Q.  What were your basic duties in those units?
25  A.  Process of treaties on the reinsurance, collection
                                                      36
```

Page 37:

```
 1      of premium, Workers' Comp., for six regionals
 2      throughout the United States.
 3  Q.  Who was your supervisor at the Hartford Insurance
 4      Group?
 5  A.  Judy Morin was one supervisor. I don't recall the
 6      name of the other gentleman.
 7  Q.  Moran, M-O-R-A-N?
 8  A.  M-O-R-I-N.
 9  Q.  What was your salary with Hartford Insurance Group?
10  A.  Approximately 19, 21,000.
11  Q.  Okay. Why did you leave your employment with the
12      Hartford Insurance Group?
13  A.  To attend school full-time.
14  Q.  What were your dates of employment with the
15      Hartford Insurance Group?
16  A.  1986 through 1989 approximately.
17  Q.  And then, approximately a year later, you went to
18      work for the Travelers?
19  A.  I don't remember if there was a break there.
20  Q.  There may not have been a break in between the two?
21  A.  There may not have been a break between the two.
22      I just don't recall. Travelers was 1990. 1986
23      through '89 approximately, so there may not have
24      been a break there.
25  Q.  Okay. But you left the Hartford Insurance Group
```

Page 38:

```
 1      to go to school full-time?
 2  A.  Right.
 3  Q.  Did you go to school full-time?
 4  A.  I did at night, yes.
 5  Q.  So you were going to school full-time at night and
 6      working for the Travelers Insurance Company?
 7  A.  Yes, because I did start with them on a part-time
 8      basis, third shift.
 9  Q.  Okay. When did you become a full-time employee
10      for the Travelers Insurance Company?
11  A.  Approximately six months after I started the job.
12  Q.  Okay. Have you had any other employers during the
13      course of your lifetime?
14  A.  Yes.
15  Q.  What other employers have you had?
16  A.  The Aetna Life Insurance Company.
17  Q.  When did you work for Aetna?
18  A.  1973 through 1982 approximately.
19  Q.  What was your position with the Aetna?
20  A.  I was a contract drafter and — contracts drafter
21      was the first position and a contract specialist.
22  Q.  What does a contract drafter do?
23  A.  Basically draft manuals of administrative
24      procedures for contractholders, for policyholders,
25      for businesses; draft employee booklets in the
```

Page 39:

```
 1      group pension and administration area.
 2  Q.  What did the contract specialist do?
 3  A.  Basically the same positions, except that you get a
 4      bigger desk.
 5  Q.  Why did you leave the Aetna?
 6  A.  I relocated to Florida for a time.
 7  Q.  Did you work in Florida?
 8  A.  Yes.
 9  Q.  Who did you work for in Florida?
10  A.  Becton-Dickinson.
11  Q.  What was that?
12  A.  Becton-Dickinson, a hospital supply firm.
13  Q.  How do you spell Becton?
14  A.  B-E-C-T-O-N dash Dickinson.
15  Q.  They were a hospital supplier?
16  A.  Yes.
17  Q.  And what did you do for that company?
18  A.  Basically the job entailed the packaging of
19      hospital supplies — breathing bags, Heparin —
20      quality-control functions to make sure everything
21      is sanitary, and that's basically what it entailed.
22  Q.  How long did you work for Becton-Dickinson?
23  A.  About a year.
24  Q.  And did you — when — strike that.
25      For how long were you in Florida?
```

Page 40:

```
 1  A.  For approximately one year.
 2  Q.  What year was that?
 3  A.  Oh, boy. 19 — on or about 19 — I want to say
 4      1975, '76.
 5  Q.  Okay. You told me you worked for Aetna from 1973
 6      to 1982; correct?
 7  A.  Then strike that. Then it had to be after that
 8      that I was in Florida for a year.
 9  Q.  Okay. So it would have been after 1982?
10  A.  It would have to be after 1982 if I recall.
11  Q.  Okay. Did you return to Connecticut after being
12      in Florida for a year?
13  A.  Yes, I did.
14  Q.  Okay. Do you remember what year you came back to
15      Connecticut?
16  A.  Approximately 1983.
17  Q.  Okay. When you came back to Connecticut, did you
18      seek employment?
19  A.  Yes, I'm sure I did.
20  Q.  Okay. Let me ask you this: When you came back to
21      Connecticut from Florida, did you work anywhere
22      before starting with the Hartford in 1986?
23  A.  For one year I didn't work. One year after I got
24      back I don't believe I worked.
25  Q.  Okay. Did you work for anyone before taking the
```

**Page 41**

1   position with the Hartford in 1986?
2 A. Perhaps the Card Gallery or a place that was — had
3   flexible hours because I did have a young child,
4   so...
5 Q. You don't recall any specific —
6 A. I don't recall any specific companies.
7 Q. — employer?
8   From where did you graduate high school?
9 A. Ocala, Florida.
10 Q. And what is the name of the high school down there?
11 A. Fessenden, F-E-S-S-E-N-D-E-N.
12 Q. What year was that?
13 A. 1968.
14 Q. What year were you born?
15 A. 1950.
16 Q. Did you grow up in the Ocala area?
17 A. Yes.
18 Q. Are you originally from Florida?
19 A. I am.
20 Q. When did you move to Connecticut?
21 A. Approximately 1969.
22 Q. What brought you to Connecticut?
23 A. I came on vacation.
24 Q. And stayed?
25 A. I had family.

**Page 42**

1 Q. Okay. When you came to Connecticut in 1969, did
2   you — strike that.
3   When you came to Connecticut in 1969, did you
4   get a job in Connecticut?
5 A. Yes.
6 Q. Where did you get a job?
7 A. Pratt & Whitney, United Technologies.
8 Q. For what period of time did you work for Pratt &
9   Whitney?
10 A. Approximately nine to ten months.
11 Q. What did you do with Pratt & Whitney?
12 A. I was an assistant engine tester.
13 Q. And why did you leave Pratt & Whitney?
14 A. I was working the swing shift: One week, 3:30 to
15   12; the next week, 7 to 3:30. I wanted to attend
16   college.
17 Q. Did you attend college when you left Pratt &
18   Whitney?
19 A. I did start to take courses.
20 Q. Okay. Where did you start to take courses?
21 A. University of Hartford.
22 Q. What year did you start at the University of
23   Hartford?
24 A. 1969.
25 Q. Was there any area of study that you were

**Page 43**

1   concentrating in?
2 A. Social work.
3 Q. Okay. Did you ever receive a degree from the
4   University of Hartford?
5 A. No, I did not.
6 Q. For how long did you take course work at the
7   University of Hartford?
8 A. Off and on for about a year.
9 Q. And during that period of time that you were taking
10   courses off and on at the University of Hartford
11   for one year, were you working anywhere?
12 A. Yes.
13 Q. Where were you working?
14 A. Colodaneys.
15 Q. What is Colodaneys?
16 A. It was a dress manufacturer on Capitol Avenue.
17 Q. What were you doing for Colodaneys?
18 A. Packing dresses.
19 Q. After you took courses on and off for a year at the
20   University of Hartford, what did you do?
21 A. I applied and received a scholarship to attend
22   college on a full-time basis.
23 Q. From who did you receive the scholarship?
24 A. Contact.
25 Q. What is Contact?

**Page 44**

1 A. Connecticut — it's an acronym for a group of
2   funders who offer scholarships to low-income
3   students who want to further their education.
4 Q. And was that scholarship for any particular school?
5 A. I had a choice of schools to attend.
6 Q. Which school did you choose?
7 A. Connecticut — Hartford College for Women initially
8   for two years.
9 Q. What two years did you attend the Hartford College
10   for Women?
11 A. 1969 through '71.
12 Q. What was your area of study?
13 A. Psychology.
14 Q. Did you obtain a degree from the Hartford College
15   for Women?
16 A. Yes, I did.
17 Q. What degree did you obtain from them?
18 A. An Associate in arts degree.
19 Q. Did that have any concentration in any area? Was
20   it psychology?
21 A. Abnormal psychology.
22 Q. Did you go on for any further education after the
23   Hartford College for Women?
24 A. Yes.
25 Q. Where did you go next?

```
 1  Q.  What is Inlingua?
 2  A.  It's a language school, foreign language school.
 3  Q.  When did you attend Inlingua?
 4  A.  Approximately 2000, the year 2000.
 5  Q.  What were you studying at Inlingua?
 6  A.  Spanish.
 7  Q.  Did you obtain any certificate or any degree from
 8      Inlingua?
 9  A.  No.
10  Q.  Is that something that the Town of Windsor was
11      paying for?
12  A.  No.
13  Q.  You did that on your own?
14  A.  Yes.
15  Q.  Okay.  Have you had any other formal education
16      that we have not discussed already?
17  A.  The Town Clerk School.
18  Q.  Anything else?
19  A.  Basic business seminars.
20  Q.  Okay.  Now, you have an Associate in arts degree
21      from the Hartford College for Women in abnormal
22      psychology; correct?
23  A.  Psychology.
24  Q.  Psychology.  You have a Bachelor of arts from
25      Connecticut College in urban studies; is that
                                                    49
```

```
 1      correct?
 2  A.  Correct.
 3  Q.  You have a paralegal certificate from the Hartford
 4      College for Women; is that correct?
 5  A.  Correct.
 6  Q.  Do you have any other degrees?
 7  A.  No.
 8  Q.  So you do not have a Master's degree; correct?
 9  A.  No.
10  Q.  Have you ever told anyone that you have a Master's
11      degree?
12  A.  No, I have not.
13  Q.  And when you attended the University of Connecticut
14      School of Social Work, were you working towards a
15      Master's degree?
16  A.  Yes.  I had not matriculated however.
17  Q.  And you only completed one semester there?
18  A.  Yes.
19  Q.  And how many credits do you need from the
20      University of Connecticut School of Social Work to
21      obtain a Master's degree?
22  A.  I'm not sure.  Approximately -- I don't know -- 16
23      or more.
24  Q.  How many credits did you complete at the University
25      of Connecticut School of Social Work towards the
                                                    50
```

```
 1      Master's degree?
 2  A.  I didn't complete it.
 3  Q.  You didn't even complete that one semester?
 4  A.  No.
 5  Q.  Is there a reason why you did not complete that
 6      semester that you were there?
 7  A.  I became ill.
 8  Q.  Okay.  Other than your termination from the Town
 9      of Windsor, have you ever been terminated from any
10      other position?
11  A.  No.
12  Q.  Okay.  You've been laid off from the City of
13      Hartford Board of Ed?
14  A.  Right.
15  Q.  And you've left all your other positions
16      voluntarily?
17  A.  Yes.
18  Q.  Okay.  How was it that you became the deputy town
19      clerk for the Town of Windsor?
20  A.  I was approached by the then personnel director or
21      human resources director, Dede Moore, to apply for
22      the position
23  Q.  Do you know if anyone recommended you to Dede
24      Moore?
25  A.  No, I don't.
                                                    51
```

```
 1  Q.  Did you ever ask Dede Moore if anyone ever
 2      recommended you for the position of deputy town
 3      clerk for the Town of Windsor?
 4  A.  No, I did not.
 5  Q.  Would it surprise you if anyone recommended you for
 6      that position?
 7  A.  No, it would not.
 8  Q.  Did you have to submit an application for the
 9      position of deputy town clerk?
10  A.  Yes.
11  Q.  Other than submitting an application, did you have
12      to do anything else during that hiring process?
13  A.  Submit a writing sample.
14  Q.  All right.  Did you go through any interviews?
15  A.  With Kathleen Quin and Nicole LaFortune and Dede
16      Moore and perhaps a panel.  I'm not sure.
17  Q.  You interviewed with Kathleen Quin, Nicole --
18  A.  -- LaFortune --
19  Q.  -- and Dede Moore?
20  A.  Yes.
21  Q.  When you interviewed with those three individuals,
22      was it a group interview or was it one-on-one?
23  A.  A group interview.
24  Q.  Okay.  And you may have had an interview with a
25      panel, but you can't recall?
                                                    52
```

**Page 53**

1  A.  The individuals I mentioned may have been part of
2      the panel.
3  Q.  There may have been more people on that panel?
4  A.  There may have been more people on the panel.
5  Q.  Those are the only three you can recall?
6  A.  Yes.
7  Q.  Okay. And you were offered the position of deputy
8      town clerk for the Town of Windsor; correct?
9  A.  Correct.
10 Q.  And you accepted the position; correct?
11 A.  Correct.
12 Q.  And you began in approximately September of 1998?
13 A.  Correct.
14 Q.  As the deputy town clerk, who was your immediate
15     supervisor?
16 A.  Kathleen Quin.
17 Q.  And when you were hired to be the deputy town clerk
18     for the Town of Windsor, what were your beliefs in
19     terms of the requirements for your job? What did
20     your job entail when you were hired?
21 A.  The position description I received indicated that
22     the candidate, in terms of training and experience,
23     needed to have a Master's degree. I explained to
24     the then personnel director, human resources
25     director, Dede Moore, that I did not have a

**Page 54**

1      Master's degree. I had a paralegal degree. I
2      had a BA degree. I had experience in title
3      searching, as I had taken courses as a paralegal or
4      in my quest to receive my paralegal training, and
5      that I would need to have a period wherein I could
6      acclimate myself to the requirements of the job in
7      that case.
8  Q.  When you accepted the position as the deputy town
9      clerk, what was your understanding of what you
10     would be required to do as the deputy town clerk?
11 A.  I really wasn't sure what the responsibilities
12     were, only what I read; that I would be abstracting
13     land records basically.
14 Q.  And your belief was, when you were hired as the
15     deputy town clerk for the Town of Windsor, that
16     essentially the job just required you to abstract
17     land records?
18 A.  And acting in the capacity of the town clerk when
19     the town clerk was away from the office, handling
20     and processing forms, birth certificates,
21     notarizing documents. There wasn't a very clear
22     directive as to what that position entailed.
23 Q.  Were you provided with a job description during the
24     hiring process for the deputy town clerk position?
25 A.  Yes.

**Page 55**

1  Q.  Now, you were sent to Town Clerk School by the Town
2      of Windsor; is that correct?
3  A.  Correct.
4  Q.  That's a multistage process?
5  A.  Correct.
6  Q.  Are there five stages to that?
7  A.  At least five modules.
8  Q.  When you were hired — when you were first hired to
9      become the deputy town clerk for the Town of
10     Windsor, were there any other individuals working
11     in the Town Clerk's Office?
12 A.  Yes.
13 Q.  What other individuals were working in the Town
14     Clerk's Office?
15 A.  June Cameron, deputy town clerk; Alice Williams,
16     deputy town clerk; Thelma London — I wasn't quite
17     sure of her title — administrative aid, I
18     believe — I'm not certain — Elka Peck; student
19     assistant.
20 Q.  Anybody else?
21 A.  And Kathleen Quin.
22 Q.  Do you know how old June Cameron is?
23 A.  No.
24 Q.  Do you know if she's older than you?
25 A.  No.

**Page 56**

1  Q.  Do you have any idea if she's older than you?
2  A.  No.
3  Q.  So you have no idea what her age is?
4  A.  No idea.
5  Q.  Okay. Do you know how old Alice Williams is?
6  A.  No.
7  Q.  Do you know if she's older than you?
8  A.  No.
9  Q.  You have no idea how old she is?
10 A.  No idea.
11 Q.  Okay. Thelma London, do you know how old she is?
12 A.  No, not specifically.
13 Q.  Do you know if she's older than you?
14 A.  Yes.
15 Q.  Elka Peck, she was younger than you?
16 A.  Yes.
17 Q.  She was a student?
18 A.  Right.
19 Q.  She was not a full-time employee of the Town of
20     Windsor; is that correct?
21 A.  I don't — I'm not sure. I know that she wasn't
22     there all the time, so I can assume.
23 Q.  Do you know how old Kathleen Quin is?
24 A.  No.
25 Q.  Do you know if she's older than you?

```
 1  A.  No.
 2  Q.  You have no idea how old she is?
 3  A.  No.
 4  Q.  Now, June Cameron, when you first began with the
 5      position of deputy town clerk, was she a full-time
 6      employee?
 7  A.  I don't know.
 8  Q.  Was she there five days a week in the office?
 9  A.  She was there a lot of days a week.  I don't know
10      if she was full-time or part-time.  We didn't
11      discuss that.
12  Q.  Okay.  Was she there five days a week when you
13      first began as the deputy town clerk for the Town
14      of Windsor?
15  A.  I believe so.
16  Q.  Okay.  Was she there full days?
17  A.  I believe so.
18  Q.  Okay.  When you first began with the Town Clerk's
19      Office, was Alice Williams a full-time employee?
20  A.  I believe so.
21  Q.  She was there five days a week?
22  A.  I believe so.
23  Q.  And she was working full days at that time?
24  A.  I believe so when I started.
25  Q.  Okay.  When you started, was Thelma London a
                                                    57
```

```
 1      full-time employee of the Town of Windsor?
 2  A.  Yes.
 3  Q.  She was there five days a week?
 4  A.  Yes.
 5  Q.  Full days?
 6  A.  Yes.
 7  Q.  Okay.  You don't know about Elka Peck you've
 8      already indicated.  When you were terminated from
 9      the Town of Windsor, who was working in the Town
10      Clerk's Office?
11  A.  Alice Williams, Kathleen Quin, Thelma London.
12  Q.  So June Cameron was no longer working for the Town?
13  A.  Correct.
14  Q.  Was Elka Peck still working for the Town when you
15      were terminated?
16  A.  I'm not sure.
17  Q.  Okay.  Do you know when June Cameron stopped
18      working for the Town of Windsor in the Town Clerk's
19      Office?
20  A.  On or about November, 1998.
21  Q.  Shortly after you began?
22  A.  Yes.
23  Q.  Okay.  Do you know why she left or why she no
24      longer worked for the Town Clerk's Office?
25  A.  No.
                                                    58
```

```
 1  Q.  When you were terminated from the position as
 2      deputy town clerk, was Alice Williams a full-time
 3      employee of the Town Clerk's Office?
 4  A.  Yes.
 5  Q.  She was working five days a week?
 6  A.  Yes.
 7  Q.  And she was working full days at that time?
 8  A.  Yes.
 9  Q.  Okay.  When you were terminated from the Town
10      Clerk's Office from the Town of Windsor, was Thelma
11      London a full-time employee?
12  A.  No.
13  Q.  Okay.  Do you recall when Thelma London stopped
14      acting as full-time employee for the Town of
15      Windsor?
16  A.  I believe December, 1998.
17  Q.  Shortly after you were hired; correct?
18  A.  Yes.
19  Q.  Okay.  So shortly after you were hired, the Town
20      Clerk's Office -- strike that.
21          Shortly after you were hired, June Cameron
22      stopped working for the Town Clerk's Office?
23  A.  Yes.
24  Q.  Completely?
25  A.  Yes.
                                                    59
```

```
 1  Q.  And Thelma London stopped as a full-time employee;
 2      is that correct?
 3  A.  Yes.
 4  Q.  In fact, she retired in December of 1998; is that
 5      correct?
 6  A.  Yes.
 7  Q.  And then she came back as a part-time employee; is
 8      that correct?
 9  A.  In June, I believe, yes.
10  Q.  Is it fair to say that you actually don't know what
11      the employment arrangement was with the Town of
12      Windsor and June Cameron when you first began
13      working for the Town of Windsor?
14  A.  When I first began with the Town of Windsor, I did
15      not know.
16  Q.  Okay.
17  A.  And still don't know.
18  Q.  You don't know?
19  A.  No.
20  Q.  You don't know if she was considered a full-time
21      employee, a part-time employee or even a contract
22      employee, do you?
23  A.  I don't -- I don't know.  She may have been in
24      either of those or any of those or all of those.
25  Q.  Okay.  And the same holds true for Alice Williams?
                                                    60
```

```
 1    You don't know, at the time you were hired by the
 2    Town of Windsor, what her capacity was with the
 3    Town of Windsor in the sense of being a full-time
 4    employee, a part-time employee or a contract
 5    employee; is that correct?
 6 A. She was there a lot -- a lot of the time.  She was
 7    there most of the time I was there.
 8 Q. Okay.  You don't know if she received benefits from
 9    the Town of Windsor, do you?
10 A. No, I don't know.  The Town would have those
11    records.
12 Q. Same with June Cameron?  You don't know if she
13    received benefits from the Town?
14 A. I don't know.
15 Q. And when Thelma London came back --
16       Which you believe was June of 1999?
17 A. I'm not certain, but I know she did come back.
18 Q. -- do you know what capacity she came back in?
19 A. She worked two days a week.
20 Q. Okay.  Do you know why she came back?
21 A. No.
22 Q. Okay.  Do you know when the arrangement for Thelma
23    London to come back and work for the Town of
24    Windsor was made?
25 A. No.
                                                 61
```

```
 1 Q. So you don't know if that arrangement was made
 2    before or after you were hired for the deputy town
 3    clerk position; is that correct?
 4 A. I wouldn't know that.
 5 Q. Okay.  And you wouldn't know any of the employment
 6    expectations for the employees of the Town Clerk's
 7    Office that were in place prior to you being hired
 8    as the deputy town clerk; is that correct?
 9 A. Not unless I was told.
10 Q. Were you told anything?
11 A. No.
12 Q. Okay.  Other than Kathleen Quin, June Cameron,
13    Alice Williams, Thelma London and Elka Peck, during
14    your entire time that you were employed as the
15    deputy town clerk for the Town of Windsor, were
16    there any other employees that worked in the Town
17    Clerk's Office?
18 A. No.
19 Q. Okay.  Prior to your -- strike that.
20       Do you know what training was provided to June
21    Cameron prior to you working in the Town Clerk's
22    Office?
23 A. No.
24 Q. Okay.  Do you know what training was provided to
25    Alice Williams prior to you working in the Town
                                                 62
```

```
 1    Clerk's Office?
 2 A. I know that Alice was a town clerk in Bloomfield,
 3    so I know that she had the background.
 4 Q. Okay.  My question to you is:  Do you know what
 5    training Alice Williams had from the Town of
 6    Windsor prior to your employment as the deputy town
 7    clerk?
 8 A. No.
 9 Q. Okay.  Do you know what training was provided to
10    Thelma London by the Town of Windsor prior you
11    being hired as the deputy town clerk for the Town
12    of Windsor?
13 A. Only what Thelma said to me.
14 Q. What did Thelma say to you?
15 A. She received training on the conveyance tax because
16    that's what she did, and her responsibility was to
17    do the marginals.
18 Q. Did she tell you what training she received to do
19    the conveyance taxes?
20 A. No.
21 Q. She just said she received training?
22 A. From the previous town clerk.
23 Q. The marginals, did she say what actual training she
24    received to do those?
25 A. No actual training.
                                                 63
```

```
 1 Q. No actual training?
 2 A. She didn't speak to me about any actual training
 3    she received to do the marginals.
 4 Q. Okay.  So the only training that Thelma London
 5    told you that she received was from the previous
 6    town clerk to do the conveyance taxes?
 7 A. Conveyance taxes and I'm sure this would also
 8    include the marginals because Thelma had been doing
 9    marginals for a long time.
10 Q. Okay.  Are you assuming that, or is that something
11    that she told you?
12 A. She told me.
13 Q. She told you she received training to do the
14    marginals?
15 A. Right.
16 Q. What training did she receive to do the marginals?
17 A. I'm not certain.  She didn't go into any detail,
18    but she tell me also that she was the telephone
19    operator prior to that and that she had a very
20    tough time transitioning to the responsibilities of
21    doing the marginals and taking care of the taxes.
22 Q. But did she tell you what training she received to
23    do the marginals?
24 A. She did not.
25 Q. Okay.  Did she say -- strike that.
                                                 64
```

| | |
|---|---|
| 1  Q. Do you know when Thelma London received the | 1  A. In some instances by Alice Williams. |
| 2     training to do the conveyance taxes? | 2  Q. What training was she receiving when she was |
| 3  A. No, I do not. | 3     unavailable to you? |
| 4  Q. And she told you that she had a tough time | 4  A. Frontpage training, which is publishing training, |
| 5     transitioning from the telephone to doing the | 5     at the computer school in Windsor most of the time |
| 6     taxes? | 6     for publication of the books that she was working |
| 7  A. Being the telephone operator for the Town to doing | 7     on; training to -- in records management functions. |
| 8     the work that she was -- the responsibilities she | 8     That's basically all I know about what Kathy did |
| 9     had to take on in the Town Clerk's Office. | 9     when she was there -- when I was there. I'm |
| 10 Q. Do you know when she had that transition period? | 10    sorry. |
| 11 A. No, I do not. | 11 Q. Frontpage training, do you know if that was |
| 12 Q. Do you know what training Elka Peck received prior | 12    anything to assist in the functions of the town |
| 13    to you being hired as the deputy town clerk for the | 13    clerk? |
| 14    Town of Windsor? | 14 A. No. |
| 15 A. Not specifically but I know that her | 15 Q. You don't know or they weren't? |
| 16    responsibilities were taking care of the dog | 16 A. They weren't. That's a software that allows you |
| 17    licensing. | 17    to publish -- it's a publishing software. |
| 18 Q. Okay. But you don't know what training she | 18 Q. So that's training that you wouldn't have needed to |
| 19    received to take care of those dog licenses, do | 19    do your job as deputy town clerk; correct? |
| 20    you? | 20 A. Not particularly. |
| 21 A. No, I don't. | 21 Q. Okay. Other than being sent to Town Clerk School, |
| 22 Q. Okay. Do you know what training Kathleen Quin | 22    did you receive any other training from the Town of |
| 23    received when she first -- strike that. | 23    Windsor concerning your duties as a deputy town |
| 24    Do you know what training Kathleen Quin | 24    clerk? |
| 25    received prior to you being hired as the deputy | 25 A. I received an introduction to some of the |
| 65 | 67 |
| 1     town clerk for the Town of Windsor? | 1     functions, but there was no training provided for |
| 2  A. Not specifically. | 2     the functions except what June Cameron assisted me |
| 3  Q. What training do you know about? | 3     with when she was there. |
| 4  A. She did attend Town Clerk School. | 4  Q. Okay. So other than going to Town Clerk School |
| 5  Q. The same school you attended? | 5     and the assistance that June Cameron gave you for |
| 6  A. I don't know if it was the same school, but she did | 6     the approximate two to three months that she was |
| 7     attend Town Clerk School. | 7     still employed with the Town, you received no other |
| 8  Q. And the Town of Windsor put you through Town Clerk | 8     training from the Town of Windsor? |
| 9     School; correct? | 9  A. No other training from the Town of Windsor. |
| 10 A. Correct. | 10 Q. Now, when you -- let's -- strike that. |
| 11 Q. All the modules; correct? | 11    Now, did you receive any other instructions |
| 12 A. All five modules, yes. | 12    from the Town of Windsor on how to do the job as |
| 13 Q. Other the Town Clerk School, do you know of any | 13    the deputy town clerk? |
| 14    training that Kathleen Quin received? | 14 A. I received instructions that were written on the |
| 15 A. Training In terms of the responsibilities of the | 15    steps for certain functions; and the manual, the |
| 16    Town Clerk's Office? | 16    Town Clerk's Procedure Manual, was available to me, |
| 17 Q. Yes. | 17    but it didn't necessarily relate to specific |
| 18 A. I know that Kathy did a lot of training aside from | 18    functions of the office. |
| 19    the Town Clerk School. She was always unavailable | 19 Q. Okay. So am I correct in assuming that you did |
| 20    to me so -- I'm told that she was in training most | 20    not consider written instructions on how to perform |
| 21    of the time when she wasn't available to assist me. | 21    the steps of certain functions as training? |
| 22    So, no, I don't know exactly what training she | 22 A. It's training; however, some of the written |
| 23    received. | 23    instructions were outdated. So if they're |
| 24 Q. You were told that, when she was unavailable to | 24    outdated, they're of no use. They were of no use |
| 25    assist you, she was actually out training? | 25    to me. |
| 66 | 68 |