**Page 73**

1  of the Town Clerk's Office?
2  A. No.
3  Q. Do you know of any training that -- strike that.
4      Do you know of any training that Kathleen Quin
5  provided to Alice Williams concerning the
6  functioning of the Town Clerk's Office?
7  A. No.
8  Q. Do you know of any training that Kathleen Quin
9  provided to Thelma London concerning the
10 functioning of the Town Clerk's Office?
11 A. No.
12 Q. Do you know of any training that Kathleen Quin
13 provided to Elka Peck concerning the functioning of
14 the Town Clerk's Office?
15 A. Only with respect to the dog licensing.
16 Q. Okay. And what training did Kathleen Quin provide
17 to Elka Peck concerning the dog licenses?
18 A. The dog license season was in June, and each year
19 the computer systems must be purged in order to
20 accept the licensing for the next year, and I
21 believe Kathleen Quin assisted Elka in that
22 process.
23 Q. Assisted her or trained her in that process?
24 A. Trained, assisted.
25 Q. Okay. And do you know how she trained her in that

**Page 74**

1  process?
2  A. No, I don't.
3  Q. Okay. So you don't know what training she
4  provided to Elka Peck concerning the dog licenses?
5  A. No, I don't.
6  Q. Okay. Have you ever seen the actual complaint in
7  this case, the lawsuit papers?
8  A. Yes.
9  Q. I'm going to show you what's been marked as
10 Defendants' Exhibit 1. That's just a copy of the
11 complaint. (Handing.)
12
13     (Witness reviews document.)
14
15 Q. Did you see this complaint prior to the lawsuit
16 actually being initiated?
17 A. Yes.
18 Q. Okay. And to the best of your knowledge, all the
19 allegations you make in that complaint are true?
20 A. To the best of my knowledge and recollection, yes.
21 Q. Okay. Now, when you were first hired, you were
22 hired as a probationary employee; correct?
23 A. Correct.
24 Q. And that probationary period was for six months?
25 A. No. It exceeded one year.

**Page 75**

1  Q. I guess my question was unclear. The probationary
2  period is initially the six-month period; correct?
3  A. Correct.
4  Q. And then, after the six months, yours was extended
5  for an additional six months; correct?
6  A. Correct.
7  Q. Okay. And your claim is that, during that first
8  initial six-month period, you performed exemplary?
9  A. Satisfactory rating is what I received as a rating.
10 Q. Okay. So it's not your contention that you
11 performed exemplary in that first six-month period
12 of time?
13 A. The first six-month period of time was spent
14 acclimating myself to the town clerk's functions
15 and the office itself. There was not very much
16 conversation with or discussion with Kathleen Quin
17 or the coworkers who were in the Town Clerk's
18 Office at that time.
19 Q. My question to you is -- strike that.
20     Why is it that you made the contention in
21 Paragraph 12 of the complaint that you had an
22 exemplary performance during the initial six-month
23 probationary period?
24 A. Paragraph 12?
25 Q. Yes.

**Page 76**

1  A. That was the second six months.
2  Q. Why does it say, "Despite the plaintiff's exemplary
3  performance during the initial six-month
4  probationary period"?
5  A. The initial six-month probationary period was
6  satisfactory performance. Based on what I had to
7  do, I can consider it exemplary.
8  Q. So you considered your -- now you're saying you
9  considered yourself an exemplary --
10 A. I could have -- I could have --
11 Q. Excuse me. Let me finish my question.
12 A. I'm sorry.
13 Q. So now you're saying that you considered yourself
14 an exemplary employee or you were performing
15 exemplary during that first, initial six-month
16 probationary period?
17 A. Okay. No.
18 Q. Satisfactory?
19 A. Satisfactory.
20 Q. So you don't know why it actually says in
21 Paragraph 12 that you were performing exemplary
22 during that initial six-month period of time, do
23 you?
24 A. No.
25 Q. Okay. And then your probation was extended for a

**Page 77**

1  second six months; is that correct?
2  A.  Yes.
3  Q.  How is it that you know that the town manager
4      directed that your second, six-month, probationary
5      period of time be terminated?
6  A.  He told me.
7  Q.  He told you that specifically?
8  A.  Yes.
9  Q.  Okay.  And how is it that you know that the town
10     manager informed Kathleen Quin that the
11     probationary period should not have been extended
12     past the one year maximum as you allege in
13     Paragraph 14?
14 A.  He told me.
15 Q.  He specifically told you that?
16 A.  He specifically told me.
17 Q.  Okay.  So it's your contention that, as of
18     September 7, 1999, your probationary period had to
19     end?
20 A.  According to Town policy.
21 Q.  Okay.  And that it actually ended two weeks later
22     than that; correct?
23 A.  Yes.
24 Q.  Okay.  Do you know what determinations the Town of
25     Windsor goes through in determining or making a

**Page 78**

1  decision with an employee at the end of the
2  probationary period?
3  A.  Can you repeat that?
4  Q.  Do you know what determinations are undertaken by
5      the Town of Windsor at the end of an employee's
6      probationary period of time?  Basically, do you
7      know what process they go through in terms of
8      handling employees coming off of the probationary
9      period?
10 A.  No.
11 Q.  Okay.  Do you know the internal decision-making
12     that goes on within the Town of Windsor in
13     determining when an employee should come off of
14     probation?
15 A.  I know what the Town policy indicates.
16 Q.  Okay.  You know what the policy indicates, but I'm
17     saying do you know what internal decision-making
18     goes on at that time.
19 A.  I can't say that I do.
20 Q.  Okay.  Do you know who for the Town of Windsor
21     actually has the power to terminate an employee?
22 A.  The town manager has that right upon recommendation
23     by the immediate supervisors perhaps.
24 Q.  Do you know who Kathleen Quin's immediate
25     supervisor is?

**Page 79**

1  A.  Town Manager Leon Churchill, Jr.
2  Q.  So the -- your contention was that you basically
3      served two extra weeks on probation; is that
4      correct?
5  A.  That's correct.
6  Q.  And that took place in September of 1999; correct?
7  A.  Correct.
8  Q.  Okay.  And that's a discreet, separate incident?
9  A.  No other similarly-situated Town employee served
10     more than two, consecutive, six-month periods.
11 Q.  My question to you is:  That event, you serving the
12     two extra weeks on probation, that was something
13     that ceased on September 21, 1999?  On September
14     21, 1999, your probation ended; correct?
15 A.  Correct.
16 Q.  Okay.  Were you placed on probation at any time
17     after that?
18 A.  I don't recall being placed on probation at any
19     time after that.
20 Q.  Okay.  What do you mean in Paragraph 15 when you
21     state, "Defendant, Kathleen Quin, responded by
22     bombarding the town manager with documentation of
23     every error the plaintiff is alleged to have made"?
24 A.  After my month probationary period -- on or around
25     October of 1999, the month after my probationary

**Page 80**

1  period ended, Kathleen Quin began a campaign to it
2  seems prove that I should not have -- I should not
3  have been taken off my probationary period by the
4  town manager, and so all of the alleged errors I
5  made were Xeroxed every day and kept in a file, and
6  this file -- this particular instance, I had asked
7  the town manager to intervene because the
8  situation, work situation, between Kathleen Quin
9  and I had escalated in October, 1999.
10     Kathleen Quin had provided someone I didn't
11 know with my home telephone number; and when I
12 approached her about it, shortly thereafter, she
13 made sure to Xerox every error that I have been
14 alleged to have made; and when I asked that the
15 town manager intervene, Kathleen Quin came into the
16 meeting along with Dede Moore, the human resources
17 director.  Kathleen Quin came in with a box, a big
18 box, of errors that I had allegedly made, and she
19 would go into the town manager's office it seems on
20 a daily basis with these errors.
21 Q.  The incident with your telephone number, that took
22     place in October of 1999?
23 A.  At or around 1999, October.
24 Q.  And it was shortly after that incident that
25     Kathleen Quin started Xeroxing your errors?

**Page 81**

1  A.  Yes.
2  Q.  Prior to that incident, was she Xeroxing your
3      errors?
4  A.  The work -- the indexing was Xeroxed in order that
5      we would have a clean copy for the next day's
6      recording, the next day's attorneys on our counter,
7      and so they may have been Xeroxed then.  I don't
8      have a copy of anything from that time.
9  Q.  It was part of the procedure that all land records
10     were copied; correct?
11 A.  (No response.)
12 Q.  Well, you just said they were copied so you'd have
13     a clean copy?
14 A.  The land records were all on -- they were all
15     computerized, and so there was always a printout of
16     the land recordings for that day, and they were
17     looked at by not just the person who actually did
18     the actual input but also by a second pair of eyes;
19     and once the second pair of eyes looked at it, the
20     clean copy was placed on the counter.  So any
21     Xeroxing that might have taken place in that first
22     year, I don't remember any.
23 Q.  Okay.  And it was part of the process of the Town
24     Clerk's Office in recording land records that a
25     second pair of eyes would always examine the work

**Page 82**

1      of recording the land records?
2  A.  Yes.
3  Q.  Okay.  And that was to ensure that the recordings
4      were accurate; correct?
5  A.  Yes.
6  Q.  And that's regardless of who performed the work; is
7      that correct?
8  A.  No.  No.
9  Q.  Okay.  So other employees that recorded land
10     records, their work was not examined for accuracy?
11 A.  Recording is one thing.  Recording is a different
12     animal than actually indexing and abstracting.  So
13     what are you asking me?
14 Q.  Let's break it down.  The recording -- actually,
15     was it the indexing and abstracting that was
16     checked by a second pair of eyes?
17 A.  Right.
18 Q.  Was that regardless of whatever employee was
19     performing the indexing and abstracting?
20 A.  No.
21 Q.  Okay.  Whose work indexing and abstracting was not
22     examined by a second pair of eyes?
23 A.  Alice Williams', white female.
24 Q.  Any other employee's?
25 A.  No.

**Page 83**

1  Q.  Okay.  So when Thelma London -- strike that.
2      Did Thelma London ever do any indexing and
3      abstracting of land records?
4  A.  No.
5  Q.  You never saw her do any of that?
6  A.  She's not trained to do land records indexing.
7  Q.  How about June Cameron?  Did she ever do
8      abstracting and indexing of land records when you
9      were there?
10 A.  Yes.
11 Q.  Okay.  And was her work checked by a second pair
12     of eyes?
13 A.  Yes.
14 Q.  And June Cameron is a white female; correct?
15 A.  Yes.
16 Q.  Did Elka Peck do any indexing and abstracting of
17     the land records?
18 A.  No.
19 Q.  Okay.
20 A.  I take that back.  When I wasn't there, Elka
21     would.
22 Q.  So you don't know if her -- because you weren't
23     there, you don't know if her work was checked by a
24     second pair of eyes?
25 A.  Correct.

**Page 84**

1  Q.  Did Kathleen Quin do any indexing and abstracting
2      of land records?
3  A.  Yes.
4  Q.  Was her work checked by a second pair of eyes?
5  A.  I don't know.
6  Q.  Okay.  You were never asked to check Kathleen
7      Quin's indexing and abstracting of land records?
8  A.  On second thought, yes, I was.
9  Q.  Okay.  So you actually were the second pair of eyes
10     for Kathleen at times on the indexing and
11     abstracting of land records; correct?
12 A.  Yes.
13 Q.  Okay.  Correct me if I'm wrong.  It was shortly
14     after the incident with the telephone number that
15     you contend Kathleen Quin started Xeroxing all of
16     your errors?
17 A.  All of my errors.
18 Q.  Okay.
19 A.  Alleged errors.
20 Q.  So, in your mind, is it that incident that
21     precipitated Kathleen Quin's actions of Xeroxing
22     all of your errors?
23 A.  I think it was a start because we did have a
24     discussion, she and I, and it was then that she --
25     after that discussion, she went into Leon

```
            Churchill's office and told him that I wasn't happy
            there.
  Q.   Okay.  When did this discussion take place?
  A.   On or about October, 1999.
  Q.   And what was the discussion about?
  A.   A few things.
  Q.   Okay.  What things?
  A.   The fact that I felt that Kathleen Quin was very
       disrespectful towards me, the fact that she didn't
       think enough to ask me if it were okay to give my
       phone number out to a complete stranger, to a
       client, someone that perhaps is a Town employee.
       I don't really know who they were.  It was a
       doctor, but it wasn't anybody that I knew.  I was
       asking for a return call.  I wasn't asking for
       anything other than that from the doctor.
  Q.   Did you discuss anything else during that
       conversation with Kathleen Quin?
  A.   Besides the fact that Kathleen Quin's mistreatment
       and hostility shown toward me as a result of
       perhaps this incident in that particular room, we
       didn't discuss too much else that I can recall.
            MR. MONASTERSKY:  Read the answer back,
       please.
                                                       85
```

```
            (Record was read back by Court
            Reporter.)

  BY MR. MONASTERSKY:
  Q.   So you pretty much discussed the incident with the
       telephone call; is that correct?
  A.   That was the big discussion, yeah.
  Q.   Okay.  And you mentioned hostility and
       mistreatment.  Are you referring to the
       mistreatment with that incident, or are you
       referring to other incidents of mistreatment?  I'm
       not asking about the complaint.  I'm just asking
       about that answer you gave me.
  A.   In that regard and at this particular time, yes.
  Q.   What other incidents were you referring to?
  A.   The fact that, each time I would try to approach
       Kathleen Quin to ask her a question, she would give
       me this look and say, "Well, Pat, what do you think
       about it?"  She would also interject herself in
       conversations, for example, between perhaps a
       customer without saying — without showing the
       respect sometimes that may be accorded.  She would
       violate my work space.  She would lean her body
       over my desk to grab — over my workstation
       rather — to retrieve something from the other side
                                                       86
```

```
            of my desk.
                 Although she didn't speak to me very often,
            she left notes.  She still made it clear that,
            after this incident of giving out my phone number
            and our discussion that things were not — were not
            the same, they weren't going to go well for me.
  Q.   Prior to the incident with the telephone, giving
       out your telephone number, did Kathleen Quin do any
       of the things you just told me about that you
       considered disrespectful or mistreatment?
  A.   I don't recall because we didn't — she was very
       unavailable to me most of the time prior to this
       incident.
  Q.   So these things that you described as hostility or
       mistreatment or disrespectful, you don't recall any
       such incidents prior to the issue with the
       telephone call in October of 1999; is that correct?
  A.   They were subtle, very subtle.  They're becoming a
       bit more aggressive after this incident.
  Q.   And during the conversation that you had with
       Kathleen Quin in October of 1999 concerning the
       telephone call, did you discuss with her at all
       your contention that you believe it was
       disrespectful for her to interject herself into
       conversations you were having with others?
                                                       87
```

```
  A.   I may have mentioned that.
  Q.   Well, I don't want to know if you may have
       mentioned it.  Did you mention it?
  A.   Maybe not in this conversation, in this discussion.
  Q.   I'm just referring to that one conversation.
  A.   I don't recall.
  Q.   Okay.  Did you discuss with Pat (sic) at all the
       issues surrounding leaving notes during that
       conversation?
  A.   Excuse me?
  Q.   Did you discuss the issue about — you claim it was
       disrespectful for Kathleen Quin to leave notes for
       you?
  A.   I didn't mean it was disrespectful for her to leave
       the notes.  It was disrespectful for her to lean
       over in my work space, in my space, my body space.
       She left notes for me throughout the years that I
       worked in the Town Clerk's Office.  So it wasn't
       just disrespect.  It was the way she approached,
       the arrogance when she spoke with me when she did
       speak, which was few and far between, but when
       she . . .
  Q.   When you had that conversation with Kathleen Quin
       in October of 1999 concerning the telephone call,
       did you discuss with her what you considered the
                                                       88
```

**Page 89**

1  violation of your space?
2  A.  I discussed with her that, and I also said to her
3      that I thought that she had very little regard for
4      my safety by violating, I'm sure, Town policy. No
5      other employee — no other similarly-situated
6      employee received that kind of treatment where she
7      would just give out an individual's home phone
8      number. She said to me, "It's in the book." My
9      phone number and my name is not in the phone book.
10     It was a privacy issue.
11 Q.  Okay.
12         MR. MONASTERSKY: Can I have my question
13     read back, please.
14
15         (Record was read back by Court
16         Reporter.)
17
18 A.  Yes.
19 BY MR. MONASTERSKY:
20 Q.  Violation of your space is separate from giving out
21     your telephone number; correct?
22 A.  Yes. We discussed a laundry list of things, yes.
23 Q.  But particularly you discussed with her the fact
24     that you felt she was violating your personal space
25     at that conversation?

**Page 90**

1  A.  At that conversation, the big issue was the giving
2      out of my telephone number.
3  Q.  I know that, but I also want to know if you discuss
4      the issue of violating your personal space during
5      that conversation.
6  A.  During the conversation, yes, we did.
7  Q.  Okay. And how often, prior to the incident
8      concerning the telephone number, did Kathleen Quin
9      violate your personal space?
10 A.  One time is too many.
11 Q.  That's not the question. The question is: How
12     many times did she do it? I'm not asking how many
13     times is too many. I'm asking you how many times
14     she did it.
15 A.  She did it often enough to make me uncomfortable.
16 Q.  What was often enough? Was it more than once a
17     day?
18 A.  About once a day.
19 Q.  About once a day. And after the telephone call in
20     October of 1999 or the incident with the telephone
21     call in October of 1999, how often did she violate
22     your personal space?
23 A.  Anywhere from three to five times a day.
24 Q.  Particularly what was she doing when she was
25     violating your personal space?

**Page 91**

1  A.  My workstation is the first counter in the office,
2      and so that's where I sat, and many times — the
3      cash register was right behind me. If she was in
4      the cash register, she makes sure she gets close,
5      closer than the other employees who come to use the
6      cash register. When recordings are handed across
7      the counter, she makes sure she's as close —
8      rubbing, bumping — as she can get as she took the
9      recordings. So it was — when she did it, it was
10     constant.
11 Q.  Your workstation was at the front counter?
12 A.  Yes.
13 Q.  Okay. And did you have access to work at any
14     other areas in the Town Clerk's Office?
15 A.  I did.
16 Q.  Okay. And that front counter, is that a busy area
17     for the Town Clerk's Office?
18 A.  It's a busy area.
19 Q.  That's where — strike that.
20         You referred to people coming up to the Town
21     Clerk's Office and asking for information or doing
22     something as customers; correct? Is that the term
23     you use?
24 A.  I'm not sure.
25 Q.  I've heard you use the term "customer" today. Is

**Page 92**

1      that what you're referring to, people that have
2      business with the Town Clerk's Office?
3  A.  Business and people that work in the Town Clerk's
4      Office as well. They were our customers.
5  Q.  Okay. But they had something to do with the Town
6      Clerk's Office when they came up?
7  A.  Yes.
8  Q.  So customers were just people that were at the Town
9      Clerk's Office to take care of business they had
10     with the Town Clerk's Office, whether it be a Town
11     employee or not a Town employee; correct?
12 A.  Correct.
13 Q.  So customers would normally approach the front desk
14     area; correct?
15 A.  There were two front desk areas. So, yes, but they
16     can come through the office.
17 Q.  And your workstation was one of those front desk
18     areas?
19 A.  Yes, where recordings for the most part were taken.
20 Q.  Did you ever ask to have your workstation changed
21     from the front desk area?
22 A.  No.
23 Q.  Is there any reason why you didn't ask?
24 A.  Because Thelma London had the — the desks were
25     assigned when I came. June sat there, and when