**Page 93**

```
 1      June left -- I was sitting next to June when she
 2      left, so the only other place I could ask to be
 3      seated was in the vault itself. So, no, there
 4      was --
 5  Q.  You never asked to switch locations, work areas;
 6      correct?
 7  A.  No.
 8  Q.  In fact -- strike that.
 9          Where did Thelma London work when she worked?
10  A.  At her desk in the front area of the Town Hall.
11  Q.  Okay. Was her desk at the front counter?
12  A.  Facing the door.
13  Q.  Where was Elka Peck's workstation when she worked?
14  A.  Next to Kathleen Quin, I believe, in front of
15      Kathleen Quin's desk; and if Thelma is not there,
16      she will sit at Thelma's desk.
17  Q.  Okay. Did you ever complain to the human
18      resources director about what you believed was an
19      invasion of your personal space by Kathleen Quin?
20  A.  No.
21  Q.  Did you ever talk to the town manager specifically
22      about your allegations that Kathleen Quin violated
23      your personal space?
24  A.  No.
25  Q.  Did you complain to anybody about your concerns
```

**Page 94**

```
 1      that Kathleen Quin was violating your personal
 2      space?
 3  A.  No.
 4  Q.  Did you complain to Kathleen Quin that you believed
 5      she was violating your personal space?
 6  A.  I did tell her.
 7  Q.  Okay. How often did you tell her that?
 8  A.  Not as often as perhaps I should have but in the
 9      meeting we had.
10  Q.  Are we talking about the meeting in October of
11      1999?
12  A.  October of 1999.
13  Q.  Okay. And meeting in October of 1999, was that
14      just between you and Kathleen Quin or were there
15      other people involved in that meeting?
16  A.  Just myself and Kathleen Quin.
17  Q.  Okay. Now, at some point, you had periodic
18      meetings set up between you, Kathleen Quin and Dede
19      Moore; is that correct?
20  A.  That's correct.
21  Q.  Okay. When did those meetings begin?
22  A.  On or about the end of October, 1999, I believe, to
23      November, 1999.
24  Q.  Okay. Was it after the incident with the
25      telephone call?
```

**Page 95**

```
 1  A.  Yes.
 2  Q.  Prior to the incident with the telephone call, were
 3      you not required to have periodic meetings with
 4      Kathleen Quin and the human resources director?
 5  A.  Correct.
 6  Q.  So in Paragraph 16 of your complaint, when it says,
 7      "In or about June of 1999, the plaintiff was
 8      required to have monthly meetings with the
 9      defendant, Kathleen Quin, and the human resources
10      director, Dede Moore, to discuss the plaintiff's
11      work performance," that date is wrong?
12  A.  No, that date is perhaps not wrong.
13  Q.  Does that refresh your memory about periodic
14      meetings?
15  A.  When meetings started? Yes.
16  Q.  The meetings started during your second
17      probationary period?
18  A.  No. There were no meetings held during my initial
19      six-month probationary period or my second
20      six-month probationary period. These meetings all
21      occurred after September 21, 1999.
22  Q.  Okay. So when it says in Paragraph 16 that, "In
23      or about of June of 1999," that date is wrong in
24      Paragraph 16 of Count 1; correct?
25  A.  Okay. 1998 there were no meetings for my initial
```

**Page 96**

```
 1      six-month probationary period, which was
 2      September 6, 1998 through six months from that.
 3      If my probationary period ended in '99 of
 4      September, I don't recall if there were any
 5      meetings. My understanding was that all of the
 6      meetings took place after the two-week -- after the
 7      two, six-month probationary periods.
 8  Q.  And after the incident with the telephone call?
 9  A.  Yes.
10  Q.  You don't have any recollection of monthly meetings
11      with Kathleen Quin and Dede Moore at any time
12      during your probationary period; correct?
13  A.  No, I don't.
14  Q.  Okay. I want to go back to the issue with the
15      telephone call. That took place in October of
16      1999; correct?
17  A.  I believe, yes. I'm sure.
18  Q.  And had you been trying to contact a doctor all day
19      long from work that day?
20  A.  Not a podiatrist.
21  Q.  Did I ask what kind of doctor? I asked you had
22      you been trying to contact a doctor all day long
23      the date that you received that telephone call.
24  A.  I don't recall if I was trying to call a doctor
25      that day.
```

1  your husband's name?
2  A. Not my husband's first name. It's under a name
3     that my husband uses that very few people even
4     know.
5  Q. Do you know how many Masseys were in the telephone
6     book for Windsor back in October of 1999?
7  A. No, I don't.
8  Q. Okay. The weekly meetings -- strike that.
9     The meetings that you had on a periodic basis
10    with the human resources director and Kathleen
11    Quin, were those on a weekly or monthly basis?
12 A. Weekly basis.
13 Q. Weekly. Okay. So when you're referring in
14    Paragraph 16 to monthly meetings, that should be
15    weekly meetings?
16 A. No. No. No. With Dede Moore, Kathleen Quin and
17    myself, they were weekly meetings.
18 Q. Okay.
19 A. When Leon Churchill came, this just happened to be
20    a . . .
21 Q. One time?
22 A. Well, it was a one-time -- I think it happened no
23    more than twice. There were no more than two
24    meetings with Leon that I can recall.
25 Q. Okay. I want to show you your discovery responses

101

1  that are dated February 10, 2004. I've marked
2  those as Exhibit 2.
3     MR. MONASTERSKY: Actually, I would
4  like -- what I would like to do is staple the
5  two responses I got today as part of that
6  exhibit, if you don't have any problem with
7  that, Cynthia.
8     MS. JENNINGS: No.
9     MR. MONASTERSKY: The two pages, just for
10    the sake of the record, are actually
11    Numbers 19A and 20A. I'm just going to attach
12    those and make those part of Exhibit 2.
13 BY MR. MONASTERSKY:
14 Q. I'm going to give you Exhibit 2. I'm going to ask
15    you to take a look at the response to Interrogatory
16    Number 3 and particularly your answer, Number 4.
17    It's on Page 5. Do you see what I'm looking at
18    there? (Handing.)
19
20          (Witness reviews document.)
21
22 A. Answer Number 4?
23 Q. Yes. Just for the sake of the record, the
24    interrogatory asks, "With respect to your claim of
25    denial of equal protection of the law set forth in

102

1  Paragraphs 1 and 40 of Count 2 of your complaint,
2  state each and every alleged act taken against you
3  which you perceive to be in violation of your right
4  to equal protection." In Answer Number 4 to that,
5  you indicate that weekly meetings with the human
6  resources director were instituted. Are those the
7  weekly meetings that you were referring to in
8  Paragraph 16 of the complaint?
9  A. There were so many meetings. This particular one
10    should have -- this should have read there were
11    weekly meetings with Dede Moore, human resources
12    director, to discuss a work issue. So the
13    interrogatory answer was a work issue. I didn't
14    intend to insinuate that there was a discussion of
15    performance problems in this instance.
16 Q. So the answer to Number 4 should say a work issue
17    and not performance problems?
18 A. This is on -- right; the work issue. That had to
19    do with the phone call and the other instances of
20    disrespect, etc., that involved Kathleen Quin and
21    myself.
22 Q. Okay. So the answer to Number 4, when it says you
23    had weekly meetings with Dede Moore from October of
24    1999 through November of 1999, those weekly
25    meetings did not deal with your performance issues.

103

1  They dealt with what you had concerns about, the
2  telephone call and the manner in which you believe
3  you were disrespected?
4  A. Yes.
5  Q. Was Kathleen Quin at those weekly meetings?
6  A. Yes.
7  Q. Okay. So those weekly meetings were held to
8     address a concern of yours?
9  A. Kathy called the meetings with Dede, and perhaps
10    that was her agenda, to discuss performance issues,
11    but it was not my agenda to discuss performance
12    issues because there weren't any performance issues
13    to discuss at this time.
14 Q. So in October of 1999 and November of 1999, you
15    believe there were no problems with your
16    performance?
17 A. Not that would require meetings with the human
18    resources director.
19 Q. Okay. And do you know who requested the meetings
20    in October of 1999 and November of 1999 that you
21    referred to in Answer 4 to Interrogatory Number 3?
22 A. As far as I can recollect, Kathleen Quin requested
23    the meetings with the human resources director.
24 Q. Okay. Do you know that, or are you assuming that?
25 A. Well, she -- Kathy told me that -- whenever there

104

**Page 105**

1  was a meeting, she would come about 10, 15 minutes
2  before the meeting and say, "Pat, we have a meeting
3  with Dede" in 15 minutes, 12:00, whatever the time
4  was.
5  Q.  Okay.  So that's what you believe is the reason
6  that Kathleen asked for the meetings?
7  A.  Yes.
8  Q.  Okay.  Do you know if any other Town officials or
9  Town employees asked for those meetings?
10 A.  They did not.
11 Q.  So the answer to my question would be no?
12 A.  No.
13 Q.  You don't know if the town manager requested that
14 those meetings take place in October of 1999 and
15 November of 1999; that being the weekly meetings?
16 A.  I don't know.
17 Q.  Okay.  And did those meetings stop in November of
18 1999?
19 A.  If I recall, yes, the weekly meetings did.
20 Q.  Okay.  The weekly meetings stopped in November of
21 1999; is that correct?
22 A.  I believe so.
23 Q.  Okay.  Thereafter, did you have any other meetings
24 on a periodic basis?  On a regular, periodic basis
25 I should say.

**Page 106**

1  A.  Perhaps one to two meetings that included the town
2  manager, Leon Churchill, Jr.
3  Q.  Okay.  But those would not be regular, periodic
4  meetings?
5  A.  No.
6  Q.  Okay.  Now, I want to turn to the next page,
7  Answer Number 5 to Interrogatory Number 3.  You
8  contend that you received no monetary recognition
9  of receiving your designation as a certified town
10 clerk in June, 2001?
11 A.  That's true.
12 Q.  Do you know if Kathleen Quin received any monetary
13 recognition from the Town of Windsor when she was
14 certified as a town clerk?
15 A.  No, I do not.
16 Q.  Do you know if any other employee of the Town of
17 Windsor received a monetary recognition for ever
18 becoming certified — becoming a certified town
19 clerk?
20 A.  I was told by Glenn Cusano that he received
21 additional compensation, monetary compensation.
22 Q.  Did Glenn Cusano become a certified town clerk?
23 A.  No, he didn't.  He became a certified sanitarian.
24 Q.  So the answer to my question is no.  Okay.  Do
25 you know what the process is to become a certified

**Page 107**

1  town sanitarian?
2  A.  No, I do not.
3  Q.  Okay.  What did Glenn Cusano tell you?
4  A.  He told me that he had passed all the State
5  sanitarian exams and that, when he first passed
6  them, he did not get his compensation but that he
7  would go see the town manager, Leon Churchill; and
8  he did, and he told me that he received additional
9  compensation.
10 Q.  Did he tell you that he asked for the additional
11 compensation?
12 A.  He didn't tell me that he asked for it.  He said
13 that it was — he said that he received it as a
14 result of becoming a sanitarian.
15 Q.  Do you know if, as a result of becoming a
16 sanitarian, his pay grade with the Town of Windsor
17 changed?
18 A.  No, I don't know that.
19 Q.  You don't know the pay rates for the Health
20 Department I take it?
21 A.  I do not.
22 Q.  Okay.  Did you ever ask for additional monetary
23 recognition of the fact that you became a certified
24 town clerk?
25 A.  I did not.

**Page 108**

1  Q.  Okay.  So you never asked it from anyone from the
2  Town of Windsor; is that correct?
3  A.  I did not.
4  Q.  Okay.  And Glenn Cusano said that, when he became
5  a certified town sanitarian, at first he didn't
6  receive any monetary recognition; is that correct?
7  A.  That's correct.
8  Q.  Sometime thereafter he received — strike that.
9     What monetary recognition did he receive?
10 A.  I don't know, but the Town of Windsor probably has
11 copies of that.
12 Q.  Do you know if he received a one-time bonus?
13 A.  I don't know.
14 Q.  Do you know if he received a pay raise?
15 A.  I don't have the answer to that.
16 Q.  Do you know if he received a change in grade of
17 employment status?
18 A.  I don't know that.
19 Q.  You also say in response to — your Answer Number 5
20 to Interrogatory Number 3, you mention a Frank
21 Angelillo, A-N-G-E-L-I-L-L-O?
22 A.  Yes.
23 Q.  Now, it's your contention that he received monetary
24 recognition of some accomplishment?
25 A.  He said he did.

| | | |
|---|---|---|
| 1 | Q. | What accomplishment was that? |
| 2 | A. | He didn't go into detail. |
| 3 | Q. | So you don't know what accomplishment he told you |
| 4 | | he received some monetary recognition for; is that |
| 5 | | correct? |
| 6 | A. | That's correct. |
| 7 | Q. | Do you know what monetary recognition he received? |
| 8 | A. | No, but I believe he received it because he told me |
| 9 | | he did. |
| 10 | Q. | But you don't know what amount or what type he |
| 11 | | received? |
| 12 | A. | I do not. |
| 13 | Q. | And what was Frank's position with the Town of |
| 14 | | Windsor? |
| 15 | A. | Systems analyst or data — he was the administrator |
| 16 | | of data processing systems. |
| 17 | Q. | Okay. I just want to make sure — you're not |
| 18 | | aware of any employee in the Town Clerk's Office |
| 19 | | that received monetary recognition upon receiving |
| 20 | | certification as a town clerk; correct? |
| 21 | A. | Myself and Kathleen Quin were the only two that I |
| 22 | | know of that were in the Town Clerk's Office, so I |
| 23 | | don't know if Kathleen Quin received anything |
| 24 | | additional. |
| 25 | Q. | When you say "were in the Town Clerk's Office," do |

109

| | | |
|---|---|---|
| 1 | | you mean were actually employees of the Town when |
| 2 | | they received certification as a town clerk? |
| 3 | A. | That were employed with the Town when they received |
| 4 | | their certification. |
| 5 | Q. | Do you know if any employee of the Town of Windsor |
| 6 | | since you left has received monetary recognition |
| 7 | | for becoming a certified town clerk? |
| 8 | A. | No, I do not know that. |
| 9 | Q. | Okay. Now in answer to — your answer to |
| 10 | | Number 6, you claim that, under the Family Medical |
| 11 | | Leave Act, your child had a life-threatening |
| 12 | | emergency and proof was required to substantiate |
| 13 | | her condition. What life-threatening emergency |
| 14 | | did she have? |
| 15 | A. | A bee sting and she's allergic to bees. |
| 16 | Q. | When did that bee sting occur? |
| 17 | A. | August, 2000 or thereabouts. |
| 18 | Q. | This is your daughter that lives in Maryland? |
| 19 | A. | Yes. |
| 20 | Q. | Was she hospitalized as a result of that bee sting? |
| 21 | A. | She was — went to the emergency room. |
| 22 | Q. | Okay. Was she kept overnight in the emergency |
| 23 | | room? |
| 24 | A. | No, she wasn't kept overnight. |
| 25 | Q. | Were you with her when she was in the emergency |

110

| | | |
|---|---|---|
| 1 | | room? |
| 2 | A. | No, I was not. |
| 3 | Q. | Okay. Is it your contention that the Family |
| 4 | | Medical Leave Act covers any medical condition of a |
| 5 | | family member? |
| 6 | A. | No, but certainly an emergency one that is as |
| 7 | | life-threatening as a bee sting. |
| 8 | Q. | Did you go to the emergency room? |
| 9 | A. | I went down to see my daughter. I didn't go into |
| 10 | | the emergency room. By then she was out of the |
| 11 | | emergency room and she was at home. |
| 12 | Q. | So by the time you left, your daughter was already |
| 13 | | home and out of the emergency room? |
| 14 | A. | Yes. |
| 15 | Q. | Okay. Was she stable? |
| 16 | A. | I'm not a doctor. I'm hoping that she was. She |
| 17 | | survived it. |
| 18 | Q. | She survived it. She was discharged from the |
| 19 | | hospital that same day; correct? |
| 20 | A. | She went into the emergency room and was |
| 21 | | discharged, yes. |
| 22 | Q. | What were the follow-up care instructions given to |
| 23 | | her? |
| 24 | A. | Basically not to be alone, to have someone there |
| 25 | | with her at least for the next three to five days. |

111

| | | |
|---|---|---|
| 1 | Q. | Okay. And did you ever provide any substantiation |
| 2 | | of that doctor's orders to anyone from the Town of |
| 3 | | Windsor? |
| 4 | A. | The Town policy doesn't require that I provide |
| 5 | | documentation from my daughter's doctor on her |
| 6 | | condition. |
| 7 | Q. | Do you know what is required for documentation |
| 8 | | under the Family Medical Leave Act? |
| 9 | A. | It doesn't require that I bring — have my daughter |
| 10 | | bring a substantiation from her doctor to my |
| 11 | | employer. |
| 12 | Q. | It's your contention that the family medical — |
| 13 | | strike that. |
| 14 | | It's your contention that an employer, under |
| 15 | | the Family Medical Leave Act, is not entitled to |
| 16 | | substantiation of an employee's family medical — |
| 17 | | family member's medical condition to substantiate |
| 18 | | the claim that family medical leave is necessary? |
| 19 | A. | No, I know that, under certain conditions, that's |
| 20 | | required; but certainly, in my case, it was not |
| 21 | | required that my daughter go to her doctor and get |
| 22 | | one, a substantiation, get a substantiation to |
| 23 | | bring to Kathleen Quin. That's my contention. |
| 24 | Q. | Okay. So it's your contention that you didn't |
| 25 | | have to — you didn't have to prove to anyone from |

112

**Page 113**

1  the Town of Windsor that your daughter had a
2  life-threatening condition that required you to
3  take unpaid leave from work?
4  A. I didn't have to go to my daughter's doctor and get
5  substantiation of her condition to bring back to
6  show Kathleen Quin for why I needed to be with her.
7  Q. What did you need to give to substantiate your
8  claim for family medical leave?
9  A. Well, as a parent, I took the liberty of going to
10 see about my child; and the Family Medical Leave
11 Act may not necessarily come into play at this
12 point, but that was something that I chose to do,
13 and that's kind of how I did it.
14 Q. Okay. So when you say under the Family Medical
15 Leave Act, you're now saying it's possible that
16 this whole situation doesn't fall under the Family
17 Medical Leave Act?
18 A. No. It falls under the Family Medical Leave Act,
19 but I was using the Town of Windsor's policy
20 itself, and it doesn't require that I bring — even
21 though this is — it doesn't require that I bring a
22 substantiation back to . . .
23 Q. Let me ask you this: Back at the time of the
24 incident where your daughter was stung by a bee,
25 did you have any personal days left?

**Page 114**

1  A. I don't recall offhand if I had any personal days
2  left.
3  Q. Did you have any vacation days left?
4  A. I don't recall if I had any vacation days left.
5  Q. Did you have any sick days left?
6  A. I don't recall if I had sick days left.
7  Q. Now, the Town of Windsor's personnel policy
8  concerning sick days, do you know if sick days can
9  be used for an employee's illness or whether sick
10 days can be used for an employee's family member's
11 illness?
12 A. Perhaps for both. I'd have to check the policy.
13 Q. In fact, weren't you told, prior to October of
14 2000, that you could not use your — strike that —
15 you could not use your sick time to deal with
16 medical issues concerning family members?
17 A. No.
18 Q. Dede Moore never told you that prior to August of
19 2000?
20 A. I don't recall her telling me that.
21 Q. Okay. Isn't it true that, in 1999, you had a major
22 issue concerning the number of sick days that you
23 used?
24 A. No, I don't recall that.
25 Q. You don't recall that there was an issue of you

**Page 115**

1  using too many sick days because of a possible
2  ambiguity concerning the anniversary date of your
3  hiring and the fiscal year as to when you received
4  additional sick days on a yearly basis?
5  A. I don't recall that.
6  Q. You don't recall having any discussions with Dede
7  Moore about that?
8  A. No.
9  Q. You don't recall having any discussions with anyone
10 from Dede Moore's office concerning that issue?
11 A. No, I don't.
12 Q. Okay. Is it possible that there were such
13 discussions?
14 A. I don't remember being there if that's true. It's
15 possible, but I don't remember being there.
16 Q. So if Dede Moore says that she did have discussions
17 with you concerning issues surrounding use of your
18 sick days prior to August of 2000 — August of
19 2000 — would you have any reason to dispute that
20 contention?
21 A. Discussion of sick days? I remember Kathleen Quin
22 saying something like telling me that I didn't have
23 sick time, but I don't actually recall the day or
24 time or the year when she said that, but I don't
25 recall Dede Moore discussing that with me.

**Page 116**

1  Q. Okay. Isn't it true that, just prior to the
2  incident with your daughter getting stung by a bee,
3  you wanted to know how many vacation days you had
4  left?
5  A. I don't recall if that's true.
6  Q. Isn't it true that you inquired as to how many
7  personal days you had left?
8  A. That's a possibility.
9  Q. Isn't it true that you were actually planning on
10 going down and visiting your daughter in Maryland
11 just prior to her being stung by a bee?
12 A. That's not true.
13 Q. Okay.
14 A. That's not true.
15 Q. Okay. And isn't it true that you indicated that,
16 when you were told that you did not have sufficient
17 personal days and vacation days to take the time
18 off to go down and visit your daughter, you said
19 you would take the days unpaid?
20 A. No, I did not say that.
21 Q. Weren't you told that you could not take unpaid
22 days without permission from the Town?
23 A. No, I was not told that.
24 Q. Okay. So if anyone were to say that they had such
25 a conversation with you concerning the issues about