1    the number of personal days and vacation days you
2    had left around the time that your daughter was
3    stung by a bee, that would be incorrect?
4  A.  Perhaps they could have said it to me or talked to
5    me.  I don't know if -- I can't say yes or no to
6    that.
7  Q.  And you never indicated that you would take unpaid
8    days so you could visit your daughter prior to her
9    being stung by the bee?
10  A.  No, I didn't.
11  Q.  Okay.  Now, in response to Answer Number 6 to
12    Interrogatory Number 3, you list Leon Churchill and
13    Enita Jubrey as part of your answer.  Is there any
14    reason that they're identified as part of your
15    answer in Answer Number 6 there?
16  A.  As far as they had children as well as they were
17    never, as far as I can tell, asked to furnish proof
18    of their child's illness when they were out with
19    them; and certainly Enita would tell me or talk to
20    me to say, "Well, I'm going to be out" or she took
21    her daughter to the doctor.
22  Q.  Okay.  And --
23  A.  Or "I'm going to be out for whatever reason."
24  Q.  So what illness did Enita's daughter have?
25  A.  I don't recall.

117

1  Q.  You don't recall or did you ever know?
2  A.  I don't know if I knew or not because sometimes we
3    would just talk about our kids in passing.  It
4    wasn't that I talked with Enita every day, but in
5    passing sometimes in the morning, we would exchange
6    pleasantries and sometimes family information.
7  Q.  And it's your contention that Enita had medical
8    issues with her daughter that she didn't have to
9    substantiate her daughter's condition?
10  A.  No.
11  Q.  Do you know if Enita did?
12  A.  No.
13  Q.  Do you know if Enita ever had to provide any
14    records to the Human Resources Department or
15    Payroll Department concerning her daughter's
16    condition?
17  A.  No.
18  Q.  Did Enita ever take family medical leave to care
19    for her daughter?
20  A.  I'm not certain if she actually took family medical
21    leave, but I know, when the kids had colds or
22    whatever, she was out with them.
23  Q.  Do you know if she used personal days for that?
24  A.  I don't know that, but I know that I did have a --
25    there was -- Enita was on our payroll at one point,

118

1    and I would be able to tell; but since I left, the
2    last year I was there, I can't be certain.
3  Q.  Okay.  As you're sitting here now, you don't know
4    what time Enita took off to care for her child; is
5    that correct?
6  A.  No, I don't have that information available.
7  Q.  And you don't know if she used personal days for
8    that, do you?
9  A.  Not within the last year.  I wouldn't know that,
10    the last year of my employment.  I wouldn't know
11    that.
12  Q.  I'm saying anytime when you claim that she was
13    given time and didn't have to substantiate it or
14    whatever.  You're claiming that she was given
15    something or she was allowed to do something that
16    you were not allowed to do; correct?
17  A.  Yes.
18  Q.  My question to you is:  You're claiming that she
19    was allowed to care for her daughter without
20    needing to show substantiation of what her
21    daughter's condition is?  Is that your contention?
22  A.  I don't know.
23  Q.  Okay.  I'm just trying to figure out exactly what
24    your contention is.  You're alleging that your
25    equal protection rights were violated.  One of

119

1    your contentions for -- to support your claim for
2    denial of or violation of your rights for equal
3    protection is this incident surrounding the time
4    you took off to care for your daughter, and you're
5    saying that Enita Jubrey was treated differently
6    than you; is that correct?
7  A.  That's correct.
8  Q.  I want to know exactly how Enita Jubrey was treated
9    differently than you concerning this issue.
10  A.  The fact that Enita Jubrey had children.  That was
11    my point.  She had children.  Leon Churchill had
12    children.  They all had children.  Of course, I
13    don't know if they took off as a result of the
14    Family Medical Leave Act.
15  Q.  You don't know if they took personal days?
16  A.  I don't know.
17  Q.  You don't know if they took vacation days?
18  A.  I don't know.
19  Q.  You don't know if they were asked for
20    substantiation concerning their children's medical
21    condition?
22  A.  No, I don't.
23  Q.  That was just an example that you were providing
24    that Leon Churchill and Enita Jubrey had children
25    and that you knew that, at times, they were out to

120

1  protection had to deal with this leave around your
2  child's bee sting, and now you're telling me that
3  you have papers from — or you have documents
4  talking about the days that were added in or taken
5  off?
6 A. I don't know if it's specific to this because, when
7  I received a copy of the paper, I didn't really pay
8  close attention to the date.
9 Q. To the date of?
10 A. The paperwork from Liz that involved the days in
11  question.
12 Q. When you received it way back when you were working
13  for the Town?
14 A. Yeah.
15 Q. But you went through — I take it you have a lot of
16  documents to respond to this discovery request?
17 A. Yeah. Yeah.
18 Q. Is that document in this discovery request?
19 A. Okay. Let me see if I can find it. How would I
20  find this?
21 Q. I'm asking you.
22 A. I'd have to really go through it.
23 Q. I'm asking if it's in there because I don't
24  remember seeing it in my review of all those
25  documents which I've reviewed a number of times.

125

1 A. Leave Correction Form.
2
3    (Whereby the witness indicates.)
4
5 A. Section C. This is it.
6 Q. Did that have to do with the issues surrounding
7  your daughter's condition, or did that have to do
8  with your claim for short-term disability?
9 A. I'm not certain what this had to do with, Leave
10  Correction Form, but this is kind of what I had in
11  mind.
12 Q. That's what you had in mind. So you did produce
13  it?
14 A. Yes.
15 Q. That's what you're referring to?
16 A. Yes.
17 Q. Okay. And that's under Section C, and it's
18  Document 6 under Section C of your production
19  documents dated March 26, 2004.
20 A. Okay.
21 Q. Drawing your attention to that Leave Correction
22  Form, do you know what this form shows?
23 A. A change as of 8-26-2000.
24 Q. And what is it doing? What is it changing?
25 A. Let's see. Something that happened in September.

126

1  I don't know. I really don't know what it is
2  changing.
3 Q. That's the next page you're looking at, the
4  September issue; correct?
5 A. Yeah.
6 Q. The other date, the one that is identified as
7  Page 6, is dealing with something that took place
8  on August 26; is that correct?
9 A. Yes.
10 Q. Does that have to do with the issues surrounding
11  the time that you took off for yourself, or is that
12  surrounding time that you took to deal with your
13  daughter?
14 A. I believe it was to deal with my daughter.
15 Q. Okay. Now, are you sure about the timing of the
16  bee sting with your daughter taking place in August
17  of 2000?
18 A. I believe it was in August of 2000.
19 Q. Is it possible that it was August of 2001?
20 A. I don't believe it was 2001.
21 Q. You believe it was in 2000?
22 A. I believe it was in 2000.
23 Q. Okay. Is it possible that it was in 2001?
24 A. I don't think so, no. It was 2000.
25 Q. Okay. If you would, could you do me a favor?

127

1  Could you put that back together and throw that
2  rubber band around it? I just want to make sure
3  we keep this stuff organized.
4 A. Sure.
5
6    (Whereby the witness complies.)
7
8 Q. I want to turn your attention to Answer Number 2 in
9  response to Interrogatory Number 3 on this
10  document.
11
12    (Whereby Mr. Monastersky indicates.)
13
14 Q. You contend that you had performance appraisals
15  instituted for you that were not instituted for
16  coworkers?
17 A. True.
18 Q. Okay. What performance appraisals were instituted
19  for you?
20 A. Bi-weekly performance appraisals and general
21  performance appraisals. No other
22  similarly-situated employee — Alice Williams
23  didn't have them for her, nor did Kathy have
24  performance appraisals.
25 Q. The bi-weekly appraisals, that had to do with land

128

1  records, correct, accuracy of land records?
2  A.  Bi-weekly performance appraisals?  I believe so.
3  Q.  Okay.  And that wasn't instituted until 2001,
4  those bi-weekly appraisals; correct?
5  A.  Right toward the end of 2001.
6  Q.  Shortly before you were terminated; correct?
7  A.  Right; I believe.
8  Q.  A few months, September, August of 2001?
9  A.  Something in that range.
10  Q.  What are the general appraisals you were talking
11  about?
12  A.  Performance appraisals.  There were regular
13  performance appraisals, and then there were
14  bi-weekly ones for me exclusively.
15  Q.  When we're talking about the general ones, are we
16  talking about the yearly evaluations?
17  A.  Right.
18  Q.  It's your contention that the other employees of
19  the Town Clerk's Office did not have yearly
20  evaluations?
21  A.  Did not have bi-weekly and some of them did not
22  have yearly.
23  Q.  Who did not have a yearly evaluation?
24  A.  Similarly-situated employee Alice Williams didn't
25  have them.

129

1  Q.  You're sure of that?
2  A.  Yes.
3  Q.  Okay.  And Alice retired in the end of 1998;
4  correct?
5  A.  From where?
6  Q.  From the Town.  Or is that Thelma?  That was
7  Thelma; correct?
8  A.  Right.
9  Q.  Alice, you're not sure of Alice's employment status
10  with the Town; is that correct?
11  A.  She signed Notary cards and some papers that were
12  submitted to the State as deputy town clerk.
13  Q.  But do you know if she was — whether the Town
14  considered her a contract employee, an independent
15  contractor or a full-time town clerk?
16  A.  She did town clerk work full-time.
17  Q.  Okay.  You were hired -- your position, your pay
18  scale, you were a deputy town clerk; correct?
19  A.  Right.
20  Q.  Do you know if Alice Williams had the same
21  designation as an employee for the Town?
22  A.  She signed documents as the deputy town clerk.
23  Q.  She signed documents as deputy town clerk, but do
24  you know if she had the same designation in terms
25  of her designation within the internal structure of

130

1  the Town?
2  A.  I don't know.
3  Q.  Would you have any reason to refute that she may
4  have been a contract employee for the Town?
5  A.  The information I had was that the Town contract —
6  contract employees — the Town's — the Town
7  employees could not contract out town clerk work,
8  so I doubt that she was a contractor.
9  Q.  Now, the land records for the Town had to be
10  audited on a yearly basis; right?
11  A.  Sometimes more frequently than that.
12  Q.  By, I'm saying, the Town.  You, yourself, may have
13  audited it more frequently than that, but the State
14  required that your town records be audited at least
15  once a year?
16  A.  Yes.
17  Q.  That had to be by an outside person; correct?  It
18  couldn't be done by you?
19  A.  Right; we couldn't audit ourselves.
20  Q.  The employees of the office could not audit those
21  records themselves?
22  A.  That's true.
23  Q.  While you were employed as a deputy town clerk, do
24  you know who audited the records for the Town of
25  Windsor as required by State law?

131

1  A.  Don Lukowski.
2  Q.  Anyone else besides Don Lukowski?
3  A.  There was a memo from Kathy, I believe, in January
4  of 2000 or thereabouts that Alice was now the
5  auditor.
6  Q.  Alice was functioning as the outside auditor;
7  correct?
8  A.  Functioning as the outside auditor as of January of
9  2000, but she was deputy town clerk before then
10  because that's how she signed.
11  Q.  But she was hired by the Town to perform that
12  outside auditing function required by law of the
13  land records; correct?
14  A.  I suppose she was hired by the Town.
15  Q.  Do you know if Alice Williams received benefits
16  from the Town?
17  A.  I don't have — I'm not privy to any of that
18  information.
19  Q.  So you don't know how she received remuneration for
20  her work; is that correct?
21  A.  I know that — no, I don't know.
22  Q.  Okay.  Now, do you know if Kathleen Quin received
23  yearly general appraisals?
24  A.  No.
25  Q.  You don't know; is that correct?

132

1 A.  That's correct.
2 Q.  Okay.  Is it your claim that no other employee for
3     the Town Clerk's Office had performance standards
4     in place for them?
5 A.  No similarly-situated, white employee had them that
6     I know of, and that was Alice Williams.  She
7     was -- it was Alice Williams, Kathleen Quin and
8     myself basically.
9 Q.  And Elka?
10 A.  And Elka.
11 Q.  And Kathleen?
12 A.  Yes, I did mention her.
13 Q.  And you're saying they did not have performance
14     standards set for them?
15 A.  No, they did not.
16 Q.  The bi-weekly appraisals that you talked about, at
17     that time, what performance standard was in place
18     for you only?
19 A.  For me only and with respect to land records, are
20     you asking that?
21 Q.  I'm asking -- you say that you had performance
22     standards set for you that other employees didn't
23     have.  I'm asking, concerning those bi-weekly
24     appraisals, what performance standards applied only
25     to you?

133

1 A.  Ninety percent accuracy and then, after two weeks,
2     95 percent accuracy on indexing lands records.
3     Nobody else had any -- none of the other
4     similarly-situated white employees had any
5     standards whatsoever.
6 Q.  Anything else besides the 90 percent and 95 percent
7     accuracy on the land records?
8 A.  That's all I remember discussing.
9 Q.  And you're saying that that 90 percent and 95
10     percent after two weeks did not apply to the other
11     two town clerk employees?
12 A.  It did not apply to Alice Williams who was white
13     and a similarly-situated employee.
14 Q.  Was Alice Williams doing land records?
15 A.  Yes, she was.
16 Q.  And you're claiming that she did not have to meet
17     that same requirement?
18 A.  No, she did not.
19 Q.  Did Kathleen Quin have to meet that requirement?
20 A.  No, she did not.
21 Q.  Do you know if she met that accuracy rate?
22 A.  I do not know.  She didn't have any standards.
23 Q.  That's not what I'm asking.  Do you know if her
24     accuracy rate on land records was 95 percent or
25     better?

134

1 A.  It was not.
2 Q.  Do you know if any current employees of the Town
3     Clerk's Office have a 95-percent-accuracy
4     requirement for the recording and indexing of the
5     land records?
6 A.  I do not know that.
7 Q.  In fact, didn't you suggest the performance
8     standard of 90 percent and then, after two weeks,
9     95 percent accuracy in land records?
10 A.  Absolutely not.
11 Q.  And didn't you, throughout the course of your
12     employment at times, request performance standards
13     to be put in place?
14 A.  On occasion I requested that.  From the year after
15     I became a deputy town clerk, I did have a
16     discussion with Kathleen Quin about the standards
17     for the office because I wanted to know what they
18     were and if they existed so I would have a baseline
19     from which to see if I could -- you know, to meet
20     those objectives and deadlines, but there weren't
21     any in the office; and, yeah, we discussed it.  We
22     discussed it, but somehow, because she was so
23     unavailable, we never really got around to it until
24     finally, January, 2000 or thereabouts, it appeared.
25 Q.  In January of 2000, what appeared?

135

1 A.  These -- this standard.
2 Q.  Which one?
3 A.  The 90 and 95.
4 Q.  That appeared in January of 2000?
5 A.  Somewhere around there.  It may have been 2001.
6     I'm not sure, but they didn't materialize during
7     the time when I thought that they would be
8     beneficial.
9 Q.  So at one point, you believed that having
10     performance criteria, performance standards, would
11     be beneficial?
12 A.  I wanted to know if there were any.  I wanted to
13     know, if there were standards, what were they so I
14     could better monitor my work.
15 Q.  When you started, weren't their requirements
16     concerning when all land records had to be recorded
17     and indexed by?
18 A.  When I first started, there were no written --
19     there was nothing written.  I indexed records up
20     until 5:00 because that was closing time.  Around
21     January of 2000 or so, there's this 4:00.  There's
22     this 4:00 time.  That was something that came from
23     Kathleen Quin.
24 Q.  And that 4:00 time applied to all land records for
25     the office; correct?

136





1   usually two, three, four pages alleging errors.
2   The other employees in the office, the coworkers,
3   may have received a sticky note or she would talk
4   to them and tell them about the error.
5   Q.   So the other employees were either spoken to and
6        told about the error or received a sticky note?
7   A.   Uh-huh.
8   Q.   Is that a yes?
9   A.   Yes.   I'm sorry.
10  Q.   Okay.   And your contention is that the two- to
11       three-page memos were only given to you?
12  A.   Yes.
13  Q.   Okay.   But you also received sticky notes
14       concerning errors; correct?
15  A.   No.
16  Q.   You never received sticky notes about errors that
17       needed to be corrected?
18  A.   No.
19  Q.   You never received any notes from Kathleen Quin
20       concerning errors that needed to be corrected?
21  A.   Not on a sticky note.
22  Q.   What were they on?
23  A.   Memos.
24  Q.   Two to three-page memos?
25  A.   Memos or on 8½-by-11 sheets that she had written

141

1   whatever directions she had for me on it, no sticky
2   notes.
3   Q.   Why don't you turn to Exhibit 4, Subsection G.
4
5             (Whereby the witness complies.)
6
7   Q.   Let's look at Number 4.   Is that a sticky note?
8   A.   Yes.
9   Q.   A copy of a sticky note?
10  A.   Yes, it is.
11  Q.   Is that a copy of a sticky note from Kathleen Quin
12       to you?
13  A.   Yes.
14  Q.   The one on the top of the page, what is that
15       concerning?
16  A.   "I audited these before I left Friday.   You made
17       most of the corrections."   But that's not —
18  Q.   — telling you something needed to be fixed?
19  A.   Right.
20  Q.   So she would communicate with you on sticky notes
21       about other things but not corrections that needed
22       to be made; is that correct?
23  A.   That's correct.
24  Q.   But it's your contention that her communicating
25       with you by these sticky notes was discriminatory;

142

1   is that correct?
2   A.   I'm not saying it's discriminatory, no.   I'm not
3        necessarily saying it's discriminatory.   I think
4        the letters — the memos.
5   Q.   The two- to three-page memos?
6   A.   Absolutely.
7   Q.   But these one-page notes that — there's a lot of
8        them in Subsection G of Exhibit 4.   Your contention
9        is that Kathleen Quin providing you these notes was
10       not treating you differently?
11  A.   Which one are you —
12  Q.   I'm just saying the notes in general in
13       Subsection G.
14  A.   The purpose of these — well —
15  Q.   Well, not all of them are memos from Kathleen Quin
16       to you.   Some of them are things you have written,
17       I believe.
18  A.   Could you restate your question?
19            MR. MONASTERSKY:   Read it back, please.
20
21            (Record was read back by Court
22                 Reporter.)
23
24  A.   The fact that Kathleen Quin was not providing me
25       with sticky notes?

143

1   BY MR. MONASTERSKY:
2   Q.   No, the fact that Kathleen would leave sticky notes
3        for you.   Is it your contention that that was
4        discriminating against you in any manner by leaving
5        sticky notes?
6   A.   I don't remember her leaving very many sticky notes
7        for the other employees in the office.   So in that
8        regard, no.
9   Q.   No?
10  A.   It wasn't discriminatory that she communicated —
11  Q.   With sticky notes?
12  A.   — with a sticky note, but when she communicated
13       errors, they were not on sticky notes.   They were
14       on —
15  Q.   — the two- to three-page memos?
16  A.   That was discriminatory because she didn't do that
17       for the similarly-situated employees or for anyone
18       else in the Town Clerk's Office.
19  Q.   I just want to make sure we got this clear.   There
20       is a distinction between her communicating with you
21       by sticky notes or notes in general or her
22       communicating the performance problems that she saw
23       with you in two- to three-page memos?
24  A.   There is a distinction because the sticky notes
25       usually would — as you could see — say I've

144

1  corrected — I've audited these or whatever.  The
2  two- to three-page memos were put into my personnel
3  file.  The sticky notes were not.  So in that
4  regard, yeah.
5  Q.  Okay.  So you didn't have a problem with her
6  communicating with you by sticky note?
7  A.  Not especially.
8        MR. MONASTERSKY:  Do you want to take a
9     break for lunch now?
10        MS. JENNINGS:  That's fine.
11        MR. MONASTERSKY:  Forty-five minutes, is
12     that good — it's quarter past 1 now — if we
13     get back to start by 2?
14        MS. JENNINGS:  2:00 should be — maybe.
15        MR. MONASTERSKY:  Off the record.
16
17        (Off-the-record discussion.)
18
19        (Recess taken from 1:15 p.m. to
20              2:00 p.m.)
21
22  BY MR. MONASTERSKY:
23  Q.  I want to turn to issues surrounding your
24  termination; specifically, what was going on.  How
25  was it that you learned that you were being

145

1  considered for termination?
2  A.  I believe Kathleen Quin had said in a memo to me —
3  I don't have the date handy — if my performance
4  didn't approve that termination would be a
5  consideration.
6  Q.  Okay.  How was it that — sometime after that, you
7  were terminated obviously.  When was it that you
8  first learned that the Town itself was seeking to
9  terminate you?
10  A.  I didn't know the Town was seeking to terminate me.
11  I guess December 10.
12  Q.  That's when you received a notification; correct?
13  A.  Right.
14  Q.  I'm going to show you a document that's been
15  premarked as Exhibit 58.  Is that the notification
16  that you received from the Town indicating that you
17  were being dismissed?  (Handing.)
18
19        (Witness reviews document.)
20
21  A.  I can't say for sure that that's the one I
22  received.
23  Q.  Prior you to officially being terminated, did you
24  have a meeting with Peter Sousa?
25  A.  Yes, I did.

146

1  Q.  And what was the purpose of that meeting?
2  A.  Peter had asked me to come to his office, I
3  believe, to — because he was trying to get in
4  touch with my attorney because I had asked that I
5  receive severance pay, I believe, for something.
6  I don't quite remember the — all the details, but
7  I believe that's what that was about.
8  Q.  Okay.  You wanted severance pay before you were
9  terminated?
10  A.  No.  I think we were talking about — I don't know
11  what we were talking about with Peter when we had
12  that meeting because he told me that he was trying
13  to reach my attorney and he just couldn't.  I
14  remember that.
15  Q.  Did this meeting with Peter take place on
16  December 7, 2001?
17  A.  I believe it did.  It was a pre — I'm not sure.
18  Yes, that's probably right.
19  Q.  Okay.  He gave you notice before that date that he
20  wanted met with you to discuss your
21  performance?
22  A.  Peter wouldn't have given me a notice that he
23  wanted to discuss my performance.
24  Q.  Okay.  At this meeting on December 7, was Elvira
25  Napoleone there?

147

1  A.  Yes.
2  Q.  And Pat Massey was — you were there?
3  A.  Yes.
4  Q.  And was anyone else there?
5  A.  Peter Sousa.
6  Q.  Okay.  Just the three of you?
7  A.  Yes.
8  Q.  Okay.  And at that time, did he indicate that he
9  wanted to discuss your performance with you?
10  A.  He said he wanted to hear my side of the story,
11  something to that effect.
12  Q.  At that time, did you tell him to contact your
13  attorney at that meeting?
14  A.  At that point, there wasn't very much else I could
15  say to Peter because Peter just said, "Let me hear
16  your side of the story."  I didn't know what side
17  of the story Peter was referring to.
18  Q.  Okay.  Did Peter tell you that he was leaving
19  messages for your attorney but your attorney didn't
20  return his calls?
21  A.  He did say that.
22  Q.  Was your attorney — was it Attorney McKleny at
23  that time?
24  A.  Yes.
25  Q.  And did you tell him — did you tell Peter to write

148

1    your attorney a letter?
2  A.   Yeah.   Yeah, if he wasn't responding.
3  Q.   Okay.   At that meeting, did Peter ask you if you
4       would like to resign?
5  A.   He did.
6  Q.   What did you tell him?
7  A.   I said that was not an option for me.
8  Q.   Okay.   Then the following Monday, I believe, which
9       is December 10, 2001, is when you were provided
10      with this notice?
11 A.   I know I was terminated December 10.
12 Q.   Okay.
13 A.   And that may be the letter I received.
14 Q.   Okay.   Did you receive that letter at a meeting
15      with Peter?
16 A.   And Napoleone, Elvira.
17 Q.   She was present as well?
18 A.   She was present.
19 Q.   And they told you you had a right to appeal your
20      termination to the town manager; is that correct?
21 A.   No, they didn't tell me that.   I knew that I had
22      the right to.
23 Q.   Okay.   You knew that even before that meeting?
24 A.   I did.
25 Q.   But you're saying they did not tell you that at the
                                                149

1       meeting?
2  A.   I don't remember hearing them telling me that.   I
3       remember reading the personnel policies manual.
4  Q.   In fact, the termination notice you received on
5       December 10, 2001 marked as Exhibit 58 specifically
6       informed you of the appeal period?
7  A.   Yes.
8  Q.   In fact, you did appeal your termination; is that
9       correct?
10 A.   I did.
11 Q.   Showing you what's been marked as Defendants'
12      Exhibit 59, it actually comes from your discovery
13      responses.   Is that the notice that you submitted
14      to Mr. Churchill to appeal your termination?
15      (Handing.)
16
17           (Witness reviews document.)
18
19 A.   That's one of them, yes.
20 Q.   What do you mean one of them?   Did you submit more
21      than one appeal of your termination?
22 A.   Uh-huh.
23 Q.   You did?
24 A.   Not more than one appeal, but I did submit another
25      letter before I did this one.   There should be
                                                150

1       another one dated prior to December 28.
2  Q.   Excuse me.   Is that the letter?   (Handing.)
3
4            (Witness reviews document.)
5
6  A.   That's the letter.
7  Q.   Exhibit 62, the memo dated December 13, 2001, that
8       was your appeal?
9  A.   That's my appeal.
10 Q.   Your specific appeal.   Okay.   And then did
11      Mr. Churchill hold a hearing on your appeal or a
12      meeting?
13 A.   He held a meeting.
14 Q.   Okay.   And did that meeting take place on
15      December 20?
16 A.   I believe it was around that — on or about
17      December 20.
18 Q.   Okay.   And during that meeting, who was in
19      attendance?
20 A.   Kathleen Quin, Leon Churchill and myself.
21 Q.   Just the three of you?
22 A.   Just the three of us.
23 Q.   Okay.   And what transpired during that appeal
24      hearing?
25 A.   Not very much because I had presented the letter,
                                                151

1       and when I got to the appeal hearing, it was
2       obvious that the issues that I had addressed in the
3       letter wouldn't be addressed and so I didn't pursue
4       it because I had written them in the letter, and I
5       believe the decision had already been made — I
6       felt that the decision had already been made; and I
7       did submit the appeal hoping that I would get a
8       response from them in writing, and I didn't.
9  Q.   Now, you said not much was discussed at that
10      meeting?
11 A.   No.   These points were not discussed.   The points
12      that I mentioned in the letter were not discussed.
13 Q.   Did you try to raise the points that are raised in
14      the letter?
15 A.   Before Kathy came into the meeting, I had talked to
16      Leon about whether or not he had — I was standing
17      in the doorway, and I asked him if he had taken a
18      look at them, and I believe that's when he asked me
19      what would I consider fair or something to that
20      effect.
21 Q.   But did you ask to discuss the issues that you
22      raised in your December 13 appeal?
23 A.   Yes, I did.
24 Q.   Okay.   And he didn't want to discuss them?
25 A.   It wasn't that he didn't want to discuss them.   He
                                                152