**Page 153**

1  discussed -- he discussed them but said that -- let
2  me see if I can recall. We briefly discussed
3  them. We didn't go down . . .
4
5     (Witness reviews document.)
6
7  A. I don't remember us discussing and I don't remember
8     if he said that he didn't want to discuss them. I
9     don't remember what happened as a result of this.
10 Q. You don't remember what happened at that hearing?
11 A. No, I don't.
12 Q. Okay. Now, did you receive what's been marked as
13    Exhibit 60 from Mr. Churchill considering your
14    appeal? (Handing.)
15
16    (Witness reviews document.)
17
18 A. I didn't receive that.
19 Q. You did not receive the letter?
20 A. No.
21 Q. Okay. How was it that you got a copy of that
22    letter?
23 A. Oh, I'm sorry. Yes, I did receive that from him.
24 Q. Okay.
25 A. Yeah, I remember.

**Page 154**

1  Q. And he was telling you that he was upholding your
2     termination and that he could not provide you with
3     any severance?
4  A. Yes.
5  Q. Okay. You provided a memo to Mr. Churchill, which
6     is the one that was marked as 59, in which you
7     asked for severance of your salary until June 30,
8     2002; is that correct?
9  A. Yes.
10 Q. Okay. And then Mr. Churchill sent you another
11    letter after that indicating that there are not
12    copies in the minutes of the informal hearing; is
13    that correct?
14 A. That's correct.
15 Q. That's the letter that's marked as Exhibit 63?
16 A. That's true.
17 Q. And you received that one?
18 A. Yes.
19 Q. Now, have you had a chance to review your personnel
20    file since your termination?
21 A. No, I have not.
22 Q. Okay. Did you review all the filings in the CHRO
23    matter that you brought against the Town of Windsor
24    concerning your termination and your employment?
25 A. I did look at the CHRO file.

**Page 155**

1  Q. And did you see that as part of what the Town of
2     Windsor submitted was a copy of your personnel
3     file?
4  A. No, I didn't see that.
5  Q. You did not see that in there?
6  A. No.
7  Q. Okay. Let me ask you, have you ever seen
8     Exhibit 61 before? (Handing.)
9
10    (Witness reviews document.)
11
12 A. Yes.
13 Q. When have you seen that before?
14 A. Probably . . .
15
16    (Witness reviews document.)
17
18 A. I have seen it. I'm not sure where I saw this.
19    It had to be in my personnel file, but I haven't
20    seen my personnel file. Department of Labor
21    perhaps.
22 Q. Do you disagree with any of the contents of that
23    memo?
24 A. I didn't receive an opportunity to discuss -- I did
25    not meet with Peter to discuss my declining

**Page 156**

1  performance, but I did -- Peter did tell me that he
2  had not gotten in touch with my attorney. I did
3  write him a letter. I didn't say anything about
4  an idiot. I didn't say -- "Patricia went on to say
5  if an idiot can't do that." I would not have said
6  that. I don't remember saying, "No, I will stay
7  right down there" in response to whether or not I
8  would resign; but the rest -- the termination
9  hearing, I agree with that. I don't have any
10 disagreement with that piece, but those comments
11 are not comments from my mouth.
12 Q. Okay. And you filed a claim for unemployment
13    compensation following your termination; is that
14    correct?
15 A. Yes.
16 Q. Is this a copy of the paperwork you submitted to
17    the State Department of Labor concerning your claim
18    for Workers' Compensation (sic) benefits? It's an
19    exhibit marked as 64, I believe. (Handing.)
20
21    (Witness reviews document.)
22
23 A. Are these out of order?
24 Q. I don't believe so. I believe, if you look at the
25    top of the page, there are page numbers on them.



```
 1  A.  I'm just trying to find the asterisk.
 2  Q.  I believe the asterisk is down there.
 3
 4              (Whereby Mr. Monastersky indicates.)
 5
 6  A.  Okay.  All right.  Here it is.
 7  Q.  I think you went up on the asterisk there.
 8  A.  Okay.  Yes.
 9  Q.  Okay.  So Exhibit 64, I believe, is the number
10      there.  That's what you submitted to the State for
11      your claim for Workers' Compensation --
12      unemployment compensation benefits.
13          Now, in response to Interrogatory Number 4,
14      which has been marked as Exhibit 2, I believe, you
15      were asked to set forth your claim for denial of
16      due process as set forth in Count 2 of your
17      complaint and asked what liberty or property right
18      entitled you to due process, the manner in which
19      the due process was allegedly denied and who denied
20      your due process when you were allegedly denied
21      such process and what process you claim you're
22      entitled to.
23          Your response to that interrogatory indicates
24      that the information provided to the Department of
25      Labor states the reason for termination was willful
                                                    157
```

```
 1      misconduct.  How was that provided to the
 2      Department of Labor?
 3  A.  I'm assuming that the Town of Windsor provided them
 4      with information.  The intake form showed willful
 5      misconduct.
 6  Q.  That's the intake form from the --
 7  A.  -- Department of Labor or unemployment.
 8  Q.  That's a State intake form; is that correct?
 9  A.  Yes.
10  Q.  And is that an intake form that was created by the
11      State in terms of they filled out the information?
12  A.  I don't know if they filled out the information.
13      I assume it came from the Town of Windsor.
14  Q.  Okay.  But what I'm saying is -- do you have a
15      copy of that intake form?
16  A.  I didn't bring that with me.
17  Q.  I take it you're relying upon that form as a basis
18      for your claim of denial of due process; is that
19      correct?
20  A.  Yes.
21              MR. MONASTERSKY:  Can we get a copy of
22          that?
23              MS. JENNINGS:  Sure.
24  BY MR. MONASTERSKY:
25  Q.  Do you know who filled that form out?
                                                    158
```

```
 1  A.  The information came from the Town of Windsor, but
 2      I don't know who specifically provided the
 3      information.
 4  Q.  Okay.  And the intake form -- strike that.
 5          Did you have a telephone conference with the
 6      State Department of Labor concerning your claim for
 7      unemployment benefits?
 8  A.  A telephone conversation?  I went in personally.
 9  Q.  You had a meeting with the State Department of
10      Labor?
11  A.  With the intake person.  I didn't have a hearing
12      or officer.
13  Q.  Okay.  So you never had a meeting with a
14      representative from the Town of Windsor, a
15      representative from the State Department of Labor
16      and yourself?
17  A.  No.
18  Q.  Okay.  And do you know if the Town of Windsor
19      contested your claim for unemployment benefits?
20  A.  They did not.  They did not contest my claim.
21  Q.  Okay.  So they didn't contest your claim.  You
22      received the unemployment benefits.  It's your
23      claim that, because there's a State Department of
24      Labor intake form that says willful misconduct,
25      you've been denied your due process rights?
                                                    159
```

```
 1  A.  Well, the information came from the Town of
 2      Windsor.  I don't think the Department of Labor
 3      would have looked at my file and said willful
 4      misconduct.
 5  Q.  Do you know what information the Town of Windsor
 6      provided to the State of Connecticut Department of
 7      Labor?
 8  A.  I didn't receive a termination slip or anything
 9      from the Town of Windsor.  I just received a
10      letter.
11  Q.  The letters that we've previously discussed?
12  A.  The letter, yes.
13  Q.  But I'm saying do you know what documentation the
14      Town of Windsor sent to the Connecticut Department
15      of Labor.
16  A.  Not specifically, no.
17  Q.  Okay.  Do you know what information the Town of
18      Windsor provided to the Connecticut Department of
19      Labor?
20  A.  I only know what the Department of Labor showed me
21      that came from the Town of Windsor.
22  Q.  Okay.  What did they show you that came from the
23      Town of Windsor?
24  A.  That was the information contained on the intake
25      form.
                                                    160
```

```
 1  Q.  Okay.  Was that intake form something that was
 2      prepared by someone from the Connecticut Department
 3      of Labor based upon things that you believe were
 4      provided by the Town of Windsor, or was that
 5      actually something that was created by the Town of
 6      Windsor and sent to the Connecticut Department of
 7      Labor?
 8  A.  I assume that was something that was created by the
 9      Town of Windsor and submitted to the Department of
10      Labor.
11  Q.  How is it that -- the fact that the Department of
12      Labor intake form indicates reason for termination
13      as willful misconduct, how did that deprive you of
14      your due process rights?
15  A.  Well, I remember an occasion when there was $10
16      missing from the Town Clerk's Office; and as I
17      remember it, my routine was to come into the
18      office, open the vault, open the safe, fill up the
19      machine -- I had a regular routine each day -- and
20      Kathy came in and told me $10 was missing.  I
21      assumed that I followed my usual routine, went and
22      filled up the copy machine, filled up the copy
23      card; and when she said, "Well, let's go look and
24      see if it's in there" because it was missing, I
25      said, "Okay.  Let's go look." I looked. It wasn't
                           161

 1      there.  I said, "Oh, another one of Kathy's games
 2      that she's playing with me." That's what I
 3      assumed.
 4  Q.  How were you denied procedural due process?
 5  A.  The willful misconduct claim, I was really
 6      referring to that.  I didn't know why the Town of
 7      Windsor would submit a willful misconduct claim
 8      regarding my termination.
 9  Q.  Let me ask you this: Do you -- strike that.
10          Let me ask you this: Do you think that the
11      Town of Windsor would have fought your claim for
12      unemployment benefits if they terminated you for
13      willful misconduct?
14  A.  I really don't know if they would.
15  Q.  Okay.  And you believe that the willful misconduct
16      was the issue surrounding the $10 from the copying
17      funds, I believe?
18  A.  I didn't know anything else.
19  Q.  Okay.  Well, you're not sure how that willful
20      misconduct information came to be on the
21      Connecticut Department of Labor intake form; is
22      that correct?
23  A.  It came from the Town of Windsor.  That's my
24      belief.
25  Q.  That's your belief, but you don't know if that was
                           162

 1      something that was a document created by the State
 2      or if it was a document created by the Town of
 3      Windsor?
 4  A.  It was created by the Town of Windsor.
 5  Q.  Okay.  But, unfortunately, I can't cross-examine
 6      you about it today because you haven't provided it
 7      to me today.  So that's something we're going to
 8      have to take up later.  How does that -- how did
 9      that deny you of procedural due process? Strike
10      that.
11          What right -- what property right or liberty
12      interest were you denied as a result of the fact
13      that the Town of Windsor may have provided the
14      reason for your termination as willful misconduct
15      to the State of Connecticut?
16  A.  Well, I wasn't given a chance to -- I wasn't given
17      a chance to present my side of the story or to
18      rebut the claim of willful misconduct.
19  Q.  Okay.  Everything else that you had been provided
20      by the Town indicated that you were being
21      terminated for poor work performance; is that
22      correct?
23  A.  Yes.
24  Q.  Okay.  And you were provided with an opportunity
25      to -- an informal appeal to Mr. Churchill on that?
                           163

 1  A.  Yes.
 2  Q.  And, in fact, you had the right to arbitrate the
 3      issue pursuant to the Town rules; correct?
 4  A.  Right.
 5  Q.  And Mr. Churchill even reminded you in his letter
 6      to you that you had the right to arbitrate your
 7      termination; is that correct?
 8  A.  Correct.
 9  Q.  And you chose not to arbitrate your termination; is
10      that correct?
11  A.  Right.
12  Q.  So you were provided with the opportunity to go on
13      and appeal that termination; correct?
14  A.  Correct.
15  Q.  Subsequent to that, when you applied for the
16      unemployment benefits, you're saying the Town was
17      telling the State of Connecticut that you were
18      terminated for willful misconduct?
19  A.  I thought that's what was happening.
20  Q.  Okay.  But you still received the unemployment
21      compensation benefits; right?
22  A.  I still received them, but I still thought that the
23      Town of Windsor had provided that information to
24      the State Department of Labor.  Who else would
25      have?
                           164
```

```
 1  Q.  I don't know.  I have never seen the form from the
 2      State.  It hasn't been provided to me despite what
 3      I asked for in my Request for Production to produce
 4      all documents you're relying upon.  We'll have to
 5      deal with that at another date.  So you did
 6      receive the unemployment benefits?
 7  A.  Yes.  It was a fact-finding form.  That's what
 8      that was, the fact-finding form.  Probably
 9      Department of Labor.
10  Q.  The Department of Labor created the fact-finding
11      form?
12  A.  That's what it was, a fact-finding form.
13  Q.  Okay.
14  A.  They had to get the information from someone at the
15      Town of Windsor.
16  Q.  But, as far as you know, the Town of Windsor was
17      not fighting your termination; is that correct?
18  A.  I don't know if they were, but I did get -- receive
19      the unemployment.
20  Q.  Did you have a fact-finding meeting with the
21      Department of Labor?
22  A.  I had basically the same day that I completed this
23      information.
24
25              (Whereby the witness indicates.)
                                                  165
```

```
 1  Q.  You're pointing to Exhibit 64?
 2  A.  Exhibit 64.  There was a form that was completed
 3      that was a pre -- the top of the form had already
 4      been completed, and I made a short statement, and
 5      that's on the fact-finding form.
 6  Q.  And on the first page of 64 it says, "Dismissal for
 7      failure to improve my performance as deputy town
 8      clerk"?
 9  A.  That's what the letter says, yes.
10  Q.  Who wrote that?
11  A.  I wrote that because I took it directly from the
12      letter.
13  Q.  Directly from the letter.  And do you know --
14      strike that.
15          Did you give a copy of that letter to the
16      State Department of Labor?
17  A.  Yes.
18  Q.  In fact, Mr. Churchill's letter to you indicating
19      that you had the right to arbitrate your dismissal
20      was even copied to the State Department of Labor;
21      is that correct?
22  A.  That's correct.
23  Q.  Is that because you had already filed your claim
24      for unemployment compensation with the State
                                                  166
```

```
 1      Department of Labor?
 2  A.  No.  I believe I had already sent a copy of this
 3      appeal.
 4
 5              (Whereby the witness indicates.)
 6
 7  Q.  To the Department of Labor?
 8  A.  Yes.
 9  Q.  Okay.  Which division of the Department of Labor
10      did you send that to, do you know?
11  A.  No, I don't.
12  Q.  Okay.  Now, I know that you dealt with the
13      unemployment compensation sort of branch of the
14      Department of Labor.  Did you complain to any
15      other person in the Department of Labor concerning
16      your termination?
17  A.  No.
18  Q.  Okay.  By the time you filed your appeal as of
19      December 13, 2001, had you already made a claim for
20      unemployment compensation benefits?
21  A.  That unemployment claim was made on December 10,
22      the exact date of my termination.
23  Q.  So you went from receiving your termination to the
24      State Department of Labor and filed a claim for
25      unemployment?
                                                  167
```

```
 1  A.  Right.
 2  Q.  Okay.  Is that why you carbon-copied Exhibit 62 to
 3      the State Department of Labor?
 4  A.  Yes.
 5  Q.  Okay.  You had provided a copy of the termination
 6      letter to the Department of Labor --
 7  A.  I don't recall if I submitted a copy of the
 8      termination letter.
 9  Q.  -- which would have been Exhibit 58, the
10      December 10, 2001 letter?
11  A.  I'm sure it was perhaps part of the packet.  I'm
12      not sure if I did submit a copy to the Department
13      of Labor.  I believe I did.
14  Q.  Okay.  In fact, doesn't Mr. Churchill's letter to
15      you, which is Exhibit 60 dated December 28, 2001,
16      indicate that your termination was for performance
17      reasons?
18  A.  That's what he said in the letter, but when I got
19      down to the Department of Unemployment, I saw
20      willful misconduct, and that's what concerned me.
21  Q.  As we sit here, we still haven't determined how
22      that willful misconduct came to be --
23  A.  Okay.
24  Q.  -- is that correct?
25  A.  I assume it came from the Town of Windsor.
                                                  168
```

**Page 169**

1 Q. Okay. I know you assume it came from the Town of
2     Windsor. What I'm saying is: Did you see it on
3     any document that was created by the Town of
4     Windsor?
5 A. No, but if they were doing a phone — if they were
6     doing a phone fact-finder, it could have certainly
7     been said. I don't think they would have pulled
8     that out of a hat.
9 Q. You don't know what correspondence or conversations
10    took place between the Town of Windsor and the
11    Connecticut Department of Labor; is that correct?
12 A. I can't say that I do.
13 Q. Okay. And I just want to make sure. As we sit
14    here, we don't know how that willful misconduct
15    came to be on that form that was in the
16    unemployment office?
17 A. After all the harassment and hostility that I've
18    experienced with the Town of Windsor, I believe
19    that it came from the Town of Windsor.
20 Q. Okay. I know that you claim that Ms. Quin
21    harassed you at the Town of Windsor; correct?
22 A. Yes.
23 Q. Other than Miss Quin, do you claim that anybody
24    else from the Town of Windsor harassed you?
25 A. No. It was Kathleen Quin.

**Page 170**

1 Q. Okay. So do you believe Kathleen Quin told the
2     State Department of Labor that your termination was
3     for willful misconduct?
4 A. I believe she did.
5 Q. You believe it was specifically Kathleen Quin?
6 A. Yes.
7 Q. But you have no evidence —
8 A. No, I do not.
9 Q. Excuse me. You have no evidence to support your
10    contention that Kathleen Quin told the Connecticut
11    Department of Labor that your termination was for
12    willful misconduct?
13 A. No, I don't.
14 Q. Okay. And you have no evidence that Kathleen Quin
15    had any contact with the Connecticut Department of
16    Labor concerning your termination; is that correct?
17 A. That's correct; but Peter Sousa was working in
18    tandem with Kathleen Quin.
19 Q. You don't know who from the Town of Windsor spoke
20    to the Connecticut Department of Labor; is that
21    correct?
22 A. No, but I know that Kathleen Quin had to provide
23    the information to Peter because Peter barely spoke
24    to me. Peter Sousa did not speak to me very much
25    as I worked in the Town Clerk's Office. So Kathy

**Page 171**

1     had to provide any information that was received.
2     In order for Peter to do what he did in terms of
3     writing that letter, the information had to come
4     from Kathleen Quin or Leon Churchill.
5 Q. The information to Peter you mean?
6 A. The information to Peter. Peter had to receive
7     his information from Kathleen Quin or Leon
8     Churchill.
9 Q. So Peter could have been relying upon information
10    that he received from Mr. Churchill during the
11    termination process?
12 A. I don't know what Peter received from Leon during
13    the termination process because Peter was never in
14    on any of the meetings that we held. So I'm not
15    sure what the conversation could have been between
16    Peter and Leon Churchill or Peter, Kathleen Quin
17    and Leon.
18 Q. At the time, Peter was acting as the acting human
19    resources director; is that correct?
20 A. That's correct.
21 Q. Or human resources manager. Do you know who made
22    the final determination to terminate you?
23 A. Kathleen Quin made the final decision to terminate
24    me.
25 Q. That's your belief?

**Page 172**

1 A. I know that Leon Churchill said in his letter that
2     he'd uphold the termination. So if he upheld it,
3     if he were to uphold the termination, then somebody
4     had to make the decision.
5 Q. Doesn't it appear that the decision was made by
6     Peter Sousa? He's the one that actually
7     terminated you?
8 A. Peter would have — if Peter terminated me, it
9     would have to be on the basis of something that
10    Kathy would have told him. It had to come from
11    Kathy. Peter didn't have any dealings with me
12    except the last two weeks in December of 2001.
13 Q. Do you know if anyone had to prove your termination
14    before Peter Sousa sent you the termination notice?
15 A. I'm sure Leon Churchill and Kathleen Quin.
16 Q. Do you think that Mr. Churchill was discriminating
17    against you because of your race?
18 A. Mr. Churchill — can you rephrase that?
19 Q. Do you believe that Mr. Churchill was
20    discriminating against you based upon your race?
21 A. It's possible. I don't know.
22 Q. I'm asking you what you believe.
23 A. Yes.
24 Q. So you think Mr. Churchill was discriminating
25    against you on the basis of your race?

**Page 177**

1  A.  I believe everything is — that I have is contained
2      in the Response for Production, Inspection,
3      Examination and Records of the Plaintiff.
4      Everything that I have is here.
5  Q.  What I'm saying is nothing is actually disclosed in
6      response to Number 1 under Section A.  Section A is
7      just your interrogatory responses, and I want to
8      know what statements you're referring to in
9      response to Request for Production Number 1, which
10     would require production of any of the statements
11     that you consider as responsive to Interrogatory
12     Number 9.  Are you referring just to the notes
13     that you received from people?
14 A.  Uh-huh.
15 Q.  Is that a yes?
16 A.  Yes.
17 Q.  Just notes saying, "Thanks for the help"?
18 A.  Definitely, yes.
19 Q.  Okay.  Do you believe any of the actions taken
20     against you are due to your age; that any of the
21     alleged incidents in the complaint were due to your
22     age?
23 A.  Yes.
24 Q.  Why is that?
25 A.  Because, after my termination, a — I did return to

**Page 178**

1      the Town Clerk's Office on occasion, and there was
2      a younger person performing the duties or sitting
3      at the desk and doing indexing.
4  Q.  Who was that person?
5  A.  I didn't get the name of the person that was there.
6  Q.  How do you know she's younger than you?
7  A.  She looks like she's younger than me.
8  Q.  Well, before I asked you if you knew how old Alice
9      Williams was, Thelma London, and you had no idea.
10     You couldn't tell me if they were older or younger;
11     and now, all of a sudden, you can tell me if this
12     one person — you can definitely say — was
13     definitely younger than you?
14 A.  She looks younger than me.
15 Q.  How old does she look?
16 A.  About 22.
17 Q.  Do you know the name of the person you're referring
18     to?
19 A.  No.  There was a lady that sat at Alice's desk, and
20     then there was the young woman who sat at the desk
21     that I used to occupy.  I was referring to the lady
22     that sat at the desk that I used to occupy, not the
23     older woman in the back.
24 Q.  Okay.  Do you know who was hired as a deputy town
25     clerk after you left?

**Page 179**

1  A.  No, I don't.
2  Q.  So you don't know if anyone that was hired as a
3      deputy town clerk — what their age was?
4  A.  That's true.
5  Q.  This woman that you're referring to could have been
6      hired as a replacement for Elka Peck?
7  A.  Yes.
8  Q.  Okay.  So you have no evidence that age had any
9      basis in any of the actions taken against you; is
10     that correct?
11 A.  Correct.
12 Q.  Now, other than — in response to Interrogatory
13     Number 12, other than the bi-weekly performance
14     evaluations from September 17, 2001 through
15     October 15, 2001 and your claim of unreasonable and
16     arbitrary deadlines for completing the daily
17     abstract duties, are there any other acts which you
18     allege violated your rights secured by Title 7 of
19     the Civil Rights Act of 1964, which would primarily
20     be your race claim, the Age Discrimination and
21     Employment Act of 1967 and the Americans with
22     Disabilities Act of 1990, other than what you've
23     already put in response to Interrogatory Number 12?
24     I want to make sure we cover them all.
25 A.  Yes, I believe I was subject to a hostile work

**Page 180**

1      environment because a rat was placed in my drawer.
2      It was a dead rat.  It was placed in a supply
3      cabinet underneath my desk, my workstation.
4  Q.  Okay.  Any other acts?
5  A.  The different treatment that I was being made to
6      endure as a result of working in the Town Clerk's
7      Office with Kathleen Quin.
8  Q.  Okay.  Other than — you're talking about stuff
9      other than the bi-weekly performance evaluations
10     and arbitrary and unreasonable deadlines for
11     completion of your daily abstracting duties?
12 A.  And the performance appraisal information.  The
13     performance appraisals that I had to endure more
14     than the maximum year as stipulated by the
15     personnel policies and procedures and photocopying
16     of the errors.
17 Q.  That would be the bi-weekly performance
18     evaluations?
19 A.  I had annual and I had bi-weekly and monthly
20     meetings.  No other similarly-situated employee had
21     to meet with Kathleen Quin at any time to do any of
22     this.  Their work was not photocopied.  I was the
23     one that she chose to single out and treat
24     differently.  No other employee in there had to
25     endure this kind of humiliation from Kathy on a

```
 1     daily basis.
 2  Q. Is there any reason why you didn't put that in
 3     response to Interrogatory Number 12 when you
 4     answered these?
 5  A. Which one?
 6  Q. The things you just told me.
 7  A. They're in here.
 8  Q. Not in response to Number 12.  I believe there are
 9     two issues under Number 12.
10  A. Number 12?
11
12                  -(Witness reviews document.)
13
14  A. I hoped to include all of this in here.
15  Q. You hoped to but you didn't, did you?
16  A. But it's very, very compelling.  It's evidence
17     that there has been different treatment on the part
18     of Kathleen Quin by me -- on the part of myself by
19     Kathleen Quin.  That's for sure.
20  Q. Yeah, but it's not in there, is it, in response to
21     Interrogatory 12, is it?
22  A. It's not in there in response to Interrogatory 12.
23  Q. Okay.  Thank you.  This dead rat, wasn't it, in
24     fact, a dead mouse that was found in your supply
25     cabinet under your desk?
                                                    181
```

```
 1  A. A dead mouse?  It was a dead rat.
 2  Q. Do you know the difference between a rat and a
 3     mouse?
 4  A. I believe the rat is bigger.
 5  Q. Okay.  And you believe there was a dead rat found
 6     in the supply cabinet underneath your desk?
 7  A. It was placed in the supply cabinet.
 8  Q. Okay.  Do you know who placed it there?
 9  A. The only person who could have placed it there was
10     someone who worked in the Town Clerk's Office;
11     Kathleen Quin perhaps.
12  Q. And this supply cabinet, was a — strike that.
13     Was the supply cabinet separate from the desk
14     itself?
15  A. It was a two-drawer supply cabinet where I kept my
16     sneakers and socks because I would walk on my lunch
17     hour, and only I used that file cabinet.  No one
18     else did.
19  Q. Were there any holes in the supply cabinet?
20  A. There was a rat in the supply cabinet.  I don't
21     know if there were any holes in the supply cabinet.
22     There was a rat in there.  He had to be put in
23     there.
24  Q. My question is: Were there any holes in the supply
25     cabinet?
                                                    182
```

```
 1  A. I don't know if there were any holes in the supply
 2     cabinet.
 3  Q. So you don't know if the rat was able to access
 4     that supply cabinet without someone placing it in
 5     there; is that correct?
 6  A. No.  A file cabinet usually doesn't contain any
 7     holes that I'm aware of.
 8  Q. Do you remember when the incident with this dead
 9     rat took place?
10  A. In or around -- I know my interrogatory said 2000.
11     November of 1999.  I'd like to change that.  It
12     was in or around November of 1999 and not November
13     of 2000.
14  Q. So it was shortly after the issue with the
15     telephone call?
16  A. Yes, exactly.
17  Q. Okay.
18  A. That's when the harassment started and the
19     hostility started.
20  Q. It all started after that telephone call?
21  A. Yes.
22  Q. In Paragraph 18 of your complaint, you indicate or
23     you allege additional job responsibilities were
24     added to your workload without proper training,
25     compensation or accommodation; and then you go on
                                                    183
```

```
 1     to say the plaintiff was given the additional
 2     responsibility of processing fish and game
 3     licensing, processing state conveyance tax forms,
 4     vital statistics.
 5        Then, in response to Interrogatory 13, I
 6     specifically asked you, "With respect to your claim
 7     of additional job responsibilities you allege were
 8     added to your workload as alleged in Paragraph 18,
 9     Count 1 of your complaint, state for each
10     additional responsibility the following:"  I
11     specifically asked for a description of the
12     responsibility.  The answer that you put in
13     response to Interrogatory 13 was:  "Townwide mail
14     processing duties which had to be physically taken
15     over the United States Post Office by 5 p.m.  In
16     the absence of the town manager secretary or at
17     employees' vacation, these duties were added to my
18     work load."
19        Is that the only duty that was added to your
20     workload that you refer to in Paragraph 18 of your
21     complaint?
22  A. No.  The processing of the conveyance tax forms
23     was an additional responsibility that I had to take
24     on when Thelma was not there.  Whenever an
25     employee was out, all of the additional
                                                    184
```



Page 185:

1  responsibilities, whether it's mail processing or
2  whether it's processing conveyance tax forms, I had
3  to take on that added responsibility because there
4  was two full -- three full -- Kathleen Quin, Alice
5  Williams and myself in the office, but Kathy was
6  unavailable. So most of the time, Alice and I
7  would take on the responsibility for processing
8  some of the things.
9      But, yeah, these two, the processing and the
10 conveyance tax forms and K-Mart licensing -- fish
11 and game is okay, but the K-Mart piece -- K-Mart
12 was a client, a vendor. Those licenses were
13 bought and processed at the Town Hall, so that was
14 an extra piece that I -- that really added to my
15 workload.
16 Q. These were all duties that were performed by the
17    Town Clerk's Office; correct?
18 A. Mail processing was not. That was a corporate
19    function.
20 Q. That was normally done by other employees; correct?
21 A. That was done by the town manager's secretary.
22 Q. Okay. And it was occasionally that you had to
23    perform that function?
24 A. I performed this function more than occasionally
25    and then had to make the 4 p.m. deadline for

Page 186:

1  processing land records. So on more than one
2  occasion -- Alice Williams never had to go down to
3  process mail, so why would I need to go down and
4  process mail? I was treated differently than Alice
5  in terms of having to do this. Alice didn't have
6  to process conveyance tax forms. Alice processed
7  K-Mart, but that's all she had to do.
8  Q. Again, we're getting back to the issue of you don't
9     know actually Alice's scope of employment with the
10    Town of Windsor as far as what arrangement she had
11    worked out?
12 A. No, but she signed as deputy town clerk.
13 Q. Yes, we're clear that she signed things as the
14    deputy town clerk. But you don't know the actual
15    employment arrangement that she had worked out with
16    the Town of Windsor?
17 A. The Town of Windsor -- the Town Council found that
18    having a subcontractor was in violation of Town
19    policy; and, therefore, Alice was considered a Town
20    employee as far as I knew.
21 Q. As far as you knew, but you don't know if your
22    beliefs are correct, do you?
23 A. She was a deputy town clerk. That's what she
24    signed as.
25 Q. Okay. But you don't know the scope of her

Page 187:

1  employment with the Town?
2  A. I know that she was a deputy town clerk. I know
3     the scope of the deputy town clerk's
4     responsibilities, so that's what I'm basing my
5     answer on: The job description that I received.
6  Q. Did Kathleen Quin ever take the mail over to the
7     post office?
8  A. I never saw her take it over to the post office.
9  Q. With the exception of the mail, all the other
10    duties that you described for me are all part of
11    the duties of the Town Clerk's Office; correct?
12 A. Yes.
13 Q. And you were hired as the -- strike that.
14    You were hired as a full-time deputy town
15    clerk; correct?
16 A. I was hired as a full-time deputy town clerk;
17    that's correct.
18 Q. And as a full-time deputy town clerk, you were
19    expected to be able to perform all the duties of
20    Town Clerk's Office; is that correct?
21 A. The townwide mail processing was not --
22 Q. That's not what I'm asking you.
23    MR. MONASTERSKY: Please read back my
24    question.
25

Page 188:

1      (Record was read back by Court
2       Reporter.)
3
4  A. I was not expected to process the townwide mail.
5     That was not in my job description. That's not
6     what I signed on for.
7  BY MR. MONASTERSKY:
8  Q. With the exception of the mail, you were expected
9     to perform all of the functions of the Town Clerk's
10    Office; right?
11 A. And I did.
12 Q. Except you complained about having to do all of the
13    functions of the Town Clerk's Office; correct?
14 A. It was the added job responsibilities with the
15    deadlines, coupled with the deadlines, for
16    performing the abstracting responsibilities and the
17    indexing responsibilities. With the 4:00 deadline,
18    there was no way that all of these responsibilities
19    could be completed by one full-time person and
20    still make the deadline. There were conflicting
21    deadlines. I was treated differently with regard
22    to that. No other employee in the Town Clerk's
23    Office had deadlines for any jobs that they did,
24    but I had a deadline for processing the index --
25    indexing the records and still was expected to do