**Page 189**

1  the rest of the responsibilities of the Town
2  Clerk's Office.
3  Q.  How did the Town Clerk's Office function during
4      your absences?
5  A.  Good question. You'd have to ask someone who
6      knows. If I'm not there, I'm not sure how they
7      function, but they do.
8  Q.  On your absences -- strike that.
9      When you returned from your absences, was
10     there a backload of work?
11 A.  When I wasn't there, I don't know if there was a
12     backload or not. All I know is what I needed to
13     do when I got back, and that was the
14     responsibilities that were assigned to me.
15 Q.  Interrogatory 13, Subpart C, asks what training,
16     compensation and/or accommodations you allege you
17     did not receive. In response, you indicated, "An
18     introduction to the mail processing machine was
19     provided. This responsibility had a specific job
20     classification. These conflicting priorities
21     caused me great stress which manifested in a total
22     mental breakdown. The same treatment continued
23     upon my return from my medical leave."
24     That doesn't say what training, compensation
25     or accommodation you didn't receive.

**Page 190**

1  A.  I received none.
2  Q.  Okay. You received no training on how to do the
3      mail?
4  A.  An introduction to the mail processing machine was
5      provided.
6  Q.  Okay. You were told how to use it; correct?
7  A.  I was told to press this button, press this button
8      and let the mail flow through; but there were times
9      when there was bulk mail and lots of it from all of
10     the departments in the Town, from recreation, from
11     the police department. Sometimes I even had to go
12     and process morning mail, morning mail and the
13     afternoon mail, incoming and outgoing mail, and
14     still meet my deadlines. I had to go down the
15     stairs and go away from the clerk's office and
16     still expected to meet my deadlines. That was
17     different treatment. No other employee had to
18     endure this type of treatment.
19 Q.  I know you're claiming that. My question is --
20     MR. MONASTERSKY: Can I have my question
21     read back, please.
22
23     (Record was read back by Court
24     Reporter.)
25

**Page 191**

1  BY MR. MONASTERSKY:
2  Q.  That was the question. I'm not asking whether you
3      were treated differently.
4  A.  No, I didn't receive any training. I received an
5      introduction to the machine.
6  Q.  Did you receive -- is it your contention you didn't
7      receive any training on how to perform the fish and
8      game licensing?
9  A.  I may have received a -- maybe a one-page handout
10     or something to that effect; but in terms of
11     processing, actually processing licenses, Alice
12     Williams may have afforded an introduction to how
13     it's done, but I didn't receive training.
14 Q.  Do you know if any other employees received
15     training on the responsibility of processing fish
16     and game licensing?
17 A.  I'm sure they -- I'm certain that they must have
18     because the K-Mart licensing took a different turn
19     because they had more licenses, number one, to --
20     more licenses to have to process, and I guess the
21     regular State guidelines were different for the
22     K-Mart licenses. I don't know. I didn't receive
23     training on those things, so a lot of stuff I just
24     can't respond appropriately to.
25     MR. MONASTERSKY: Read back the question,

**Page 192**

1      please.
2
3      (Record was read back by Court
4      Reporter.)
5
6  A.  There was no other employee there except Alice
7      Williams. I don't know if she did or not.
8  BY MR. MONASTERSKY:
9  Q.  All right. So you don't know what training she got
10     on processing fish and game licenses; correct?
11 A.  Correct.
12 Q.  The responsibility of processing conveyance tax
13     forms, you were not provided with any training or
14     instruction concerning those?
15 A.  I did get instructions from Thelma.
16 Q.  Okay. Do you know of any other town clerk
17     employees that received any training or
18     instruction, other than what Thelma gave you,
19     concerning the conveyance tax forms?
20 A.  There was only one other person in the office, and
21     that was Alice Williams. I don't know if Alice
22     received training on conveyance taxes.
23 Q.  Do you know what training Thelma received?
24 A.  No, I don't.
25 Q.  Okay. So you don't know if she received any more

**Page 193**

1  or less training than you did concerning the
2  conveyance tax forms?
3  A. I'm sure that she received perhaps more training
4  because that's basically what she did. Conveyance
5  tax forms and marginals, those were the two
6  functions basically that Thelma handled in the
7  office.
8  Q. Do you know what training she received?
9  A. No, I don't.
10 Q. You don't know if she received any more or any less
11    training than you; is that correct?
12 A. I'm sure — no, I don't know if she did.
13 Q. Okay. Then you claim you were given the added
14    responsibility of processing vital statistics
15    records, and you were given no training or
16    instruction on those?
17 A. I was given instructions by Alice Williams.
18 Q. Okay. Do you know if any other employee of the
19    Town Clerk's Office received any more instruction
20    than you on processing the vital statistics
21    records?
22 A. I don't know if they did, but Elka Peck was there
23    longer than I was. She was a town clerk employee
24    longer than I. She may have received more. I
25    can't say for sure.

**Page 194**

1  Q. You don't know?
2  A. I don't if Elka did or not, but I know I didn't
3     receive any.
4  Q. You received absolutely no instruction on how to
5     perform the vital statistic records?
6  A. I received a handout instruction sheet.
7  Q. Earlier you told me that the Post-It notes you
8     received you did not believe were discriminatory;
9     is that correct?
10 A. I believe that's what I said, but I'd like to
11    change that.
12 Q. You want to change that. Why?
13 A. (No response.)
14 Q. Why?
15 A. I'll leave it alone. I'll leave it alone.
16 Q. If you believe that receiving the Post-It notes was
17    discriminatory, I would like to know.
18 A. No.
19 Q. You do not believe it was discriminatory?
20 A. The Post-It notes that I received were notes that
21    didn't necessarily offend me in any way, but — no,
22    I'll go there. They didn't offend me that — she
23    always gave me notes. Hold on just a moment.
24    Kathy did a lot of notewriting to me, leaving stuff
25    on my desk as I left the office. Most of what she

**Page 195**

1  said to me — most of what she did, she wrote to
2  me. She didn't speak to me, so I want to change
3  that. Yes, they are discriminatory.
4  Q. In what manner?
5  A. They're discriminatory in the sense that she did
6  not communicate with me the way it seems to me she
7  communicated with the other employees in the
8  office. She treated me differently by speaking to
9  me by way of Post-It notes while everybody else she
10 actually verbally had conversations with. That's
11 different. That's different treatment.
12 Q. You allege that communicating with you by Post-It
13    notes or e-mails creates a hostile work
14    environment?
15 A. It's part and parcel of one because you're telling
16    me that you — I'm not to be communicated with as
17    everybody else. I'm not supposed to be treated as
18    everybody else. You have to treat me differently
19    by communicating with me this way.
20 Q. And it's your contention that she did not
21    communicate with others in the office via Post-It
22    notes and e-mails to the same extent that she did
23    with you?
24 A. That's what I'm contending, yes.
25 Q. So it wasn't so much the content of the Post-It

**Page 196**

1  notes or e-mails. It was the manner in which the
2  communication was made?
3  A. Communication was always made for the most part by
4  way of the Post-It notes. Every time I left my
5  desk, I would come back and there's something in
6  the inbox. There's a Post-It note there, but yet,
7  with the other employees in the office, it was a
8  conversation. She talked to them. She would
9  speak to me, but when she did, it was in a very
10 different manner than she communicated with the
11 white employees in the office. That's for sure.
12 Q. And that all changed after October of 1999 when you
13    complained about her giving your telephone number
14    out?
15 A. Prior to September, 1999, Kathleen Quin was totally
16    unavailable to me, so there wasn't that much to
17    deal with in that regard. After October, 1999,
18    when she was done with her schooling, she was in
19    the middle of writing the book. After that —
20    after the first book was completed, then there was
21    some communication with the Post-It notes and with
22    the e-mails.
23 Q. My question concerning the Post-It notes is: Was
24    it the manner of the communication being by the
25    Post-It notes and e-mails or was it the content of

**Page 197**

1    the communication that you claim created a hostile
2    work environment?
3  A. The fact that she communicated with me by way of
4    Post-It notes and the fact that the alleged errors
5    of — whatever she had to say to me, she had to
6    either put it in a letter or a Post-It note as
7    opposed to coming out and discussing it with me,
8    and it led to this continuing manner of
9    communication.
10       Eventually you ask is there something wrong
11    that you're not speaking to me the way you're
12    speaking to the other students — not students but
13    speaking with the other coworkers in the office.
14    Why are you not speaking — you're treating me
15    differently by giving me Post-It notes and memos,
16    and yet you're actually having conversations with
17    the office staff, the rest of the coworkers in the
18    office. If that's not hostile, tell me what is.
19         MR. MONASTERSKY: Please read back my
20       question.
21
22       (Record was read back by Court
23       Reporter.)
24
25  A. With respect to the Post-It notes, it was the fact

**Page 198**

1    that she would communicate with me that way.
2  BY MR. MONASTERSKY:
3  Q. It was the manner, not the content?
4  A. The manner and the content. The content had
5    something to do with it, but it was just the manner
6    that I was not spoken to. Okay. We'll go with
7    manner. That's part . . .
8  Q. Let me ask you this: At any time during your
9    schooling, do you believe that you were
10    discriminated against based upon your race?
11    Anytime in your life during any schooling.
12  A. No. Why would you ask?
13  Q. You don't get to ask the questions today. You
14    claim you have a disability under the Americans
15    with Disabilities Act; is that correct?
16  A. Yes.
17  Q. What disability do you suffer from?
18  A. Depression and generalized anxiety.
19  Q. When were you diagnosed with depression?
20  A. On or around October, 2000.
21  Q. Do you know when you were diagnosed with
22    generalized anxiety?
23  A. I believe they were one and the same — not one and
24    the same time but the same time, simultaneously.
25  Q. Okay. What substantial life activity does your

**Page 199**

1    depression and general anxiety interfere with?
2  A. My enjoyment of life. At that time, my husband and
3    I were still together, and we could no longer enjoy
4    sex with each other. My children, it was very
5    difficult to spend time with my children helping
6    them with their homework and doing the work of a
7    wife and mother.
8  Q. Is your depression and general anxiety something
9    that can be controlled with medication?
10  A. Yes, I'm sure.
11  Q. Well, have you been put on medication in the past
12    to treat your depression and generalized anxiety?
13  A. Yes.
14  Q. Okay. Are you currently taking that medication?
15  A. No.
16  Q. When is the last time you took medication for your
17    depression and generalized anxiety —
18  A. On or about 2003.
19  Q. — approximately?
20  A. Early.
21  Q. Early in 2003. Okay. That's good enough. What
22    medication were you on in early 2003?
23  A. I stand corrected. 2002.
24  Q. Since 2002, you haven't taken any medication for
25    your depression and generalized anxiety?

**Page 200**

1  A. No, I haven't.
2  Q. Do you still suffer from depression and generalized
3    anxiety?
4  A. I believe it's a recurring thing. I would say
5    that I do.
6  Q. How does it interfere with your life now?
7  A. It's — I've been able to kind of handle it a bit,
8    and I see my doctor only on an as-needed basis.
9  Q. Prior to October of 2000, had you ever been
10    diagnosed as suffering from depression?
11  A. No.
12  Q. Prior to October of 2000, had you ever sought any
13    treatment with a mental health professional?
14  A. When I worked third shift, I did briefly. It
15    wasn't — just one visit perhaps.
16  Q. What was the purpose of that visit?
17  A. Just a consultation, and I never acted upon it.
18  Q. What led you to seek a consultation with a mental
19    health professional when you were working third
20    shift?
21  A. My — my doctor — my primary care physician
22    suggested, because my cycle may have been mixed up
23    working nights staying up all night and perhaps
24    sleeping during the day, the sleep cycle needs
25    adjusting. Because once I became an employee

```
 1    during the day, it was difficult to sleep.  So he
 2    suggested that maybe I should talk to a mental
 3    health professional to see if there were any
 4    suggestions they had for handling that holistically
 5    or whatever.
 6 Q. And it's your contention that Kathleen Quin
 7    discriminated against you because of your
 8    depression and general anxiety?
 9 A. I contend that the fact that there was such a --
10    there was such hostility, such different treatment
11    and working in the area and the workload, all of
12    this I think contributed to this particular medical
13    problem.
14 Q. I'm not asking you what caused the problem.  I'm
15    asking you did Kathy -- strike that.
16          It's your contention.  It's in the complaint.
17    You're saying that she discriminated against you
18    because you have a disability?
19 A. Yes.
20 Q. And you're contending that she took discriminatory
21    actions against you solely on the basis that you
22    had depression and generalized anxiety?
23 A. Yes.
24 Q. What is your basis for that contention?
25 A. My basis for that contention is the fact that, even
                                                       201
```

```
 1    after receiving the notification from the doctors,
 2    Kathy made sure that she didn't -- not that -- made
 3    sure that she continued to harass and do the kind
 4    of things that she's always done as related to me.
 5    So that's basically what I contend happened.
 6 Q. So you're saying she treated you the same --
 7 A. Differently.
 8 Q. Let me finish my question.  She treated you the
 9    same before you were diagnosed with the depression
10    and general anxiety as she treated you after you
11    were diagnosed with the depression and general
12    anxiety?
13 A. No.  She treated me differently before, and she was
14    treating me even more differently now.
15 Q. I'm not comparing it to anybody else.  I'm
16    comparing you to yourself, her treatment of you.
17    You claim that you were diagnosed in October of
18    2000.  I believe your interrogatory responses say
19    you were diagnosed in August of 2000, but you're
20    saying that her treatment of you changed after --
21 A. It got worse.
22 Q. -- you were diagnosed with the depression and
23    general anxiety?
24 A. It got worse because she would call me off to the
25    side and say, "You know, you've been out 120 days."
                                                       202
```

```
 1    There was always something that she felt or found
 2    that she could harass me with.  So it was already
 3    different because of my disability, and then it got
 4    progressively worse because I was out of work.
 5 Q. And you're contending that she treated you
 6    differently because you suffer from depression and
 7    general anxiety?
 8 A. Yes.
 9 Q. Okay.  Now, you didn't request any accommodations
10    from the Town of Windsor concerning your employment
11    on the basis of your depression and general
12    anxiety, did you?
13 A. No.
14 Q. In fact, you took substantial time off from work,
15    and they afforded you that time off; is that
16    correct?
17 A. They afforded me the time off?
18 Q. From work.
19 A. My doctors submitted medical leave statements.
20 Q. And they approved the medical leave, the Town of
21    Windsor?
22 A. Yes.
23 Q. And when you were able to work, they let you come
24    back; correct?
25 A. Yes.
                                                       203
```

```
 1 Q. And did you request any changes to your job as a
 2    result of your depression and generalized anxiety?
 3 A. I didn't specifically request any changes, no.
 4 Q. Okay.  It's your contention that, before you
 5    suffered the depression and generalized anxiety,
 6    there were no problems in your marriage?
 7 A. Yes.
 8 Q. That's your contention; and your contention is
 9    that, because of the depression and generalized
10    anxiety, your marriage dissolved?
11 A. Not completely, but the fact that I had to work
12    long hours -- I was always at work very, very early
13    and always leaving later.  Even though my husband
14    and I had a very solid relationship, the fact that
15    there were times when I had -- was called to stay
16    later and there were times when I truly had to --
17    sorry.  There were times when I just had to -- I
18    don't think necessarily that Kathleen Quin caused
19    it, but the fact that I did have the hostile work
20    environment to deal with at work, it had to do with
21    me, not so much with the relationship between my
22    husband and I.  It was more the effect on me and
23    how it affected and impacted them.
24 Q. Some of that was having to stay late and come in
25    early?
                                                       204
```

**Page 205**

1  A.  It was just part of the stress and the hostility
2      that I experienced during the day on the job for
3      such an extended period of time.
4  Q.  If your job was so bad and it was so stressful, why
5      did you continue to work there?
6  A.  It wasn't a matter of my continuing to work there.
7      I enjoyed the contact with the public and the
8      people. The only person that made the job a
9      hellhole was Kathleen Quin. I was a town of
10     Windsor citizen. My kids grew up in Windsor. I
11     love being in Windsor, and I have no problem with
12     the customers and the clients that come in and
13     doing the job.
14 Q.  So you were able to -- strike that.
15     The hostile work environment you're claiming
16     you were subject to wasn't enough that you felt
17     that you could no longer work there?
18 A.  It was hostile. It was hostile certainly. The
19     hostility was coming directly from Kathleen Quin's
20     different treatment of me and the fact that she's
21     putting rats and mice in the drawer, whatever you
22     want to call them, that kind of thing, the
23     sabotaging that took place with her. I had no
24     problem otherwise with my coworkers.
25     Alice, herself, had begun to take on some of

**Page 206**

1      the characteristics of Kathy. She had gotten to
2      the point I couldn't ask Alice a question because
3      I'm sure Kathy was a pawn of Alice. (sic) I had
4      two managers sometimes, so it's all the stress.
5  Q.  So now you're saying that Alice was creating a
6      hostile work environment as well?
7  A.  Because I believe that Alice could no longer feel
8      free to answer a question that I might ask her
9      because she was the oddball for most of the
10     work that I did. Alice was the comparable -- the
11     similarly-situated employee for the work that I
12     did. Kathy, I believe, had given Alice a mandate
13     that -- don't answer questions that I ask. Make
14     sure that I bring questions to Kathy, and then
15     Kathy will ask Alice the question. So there were
16     things that were happening in the work environment
17     that just made it difficult to get the job done
18     within the deadline.
19 Q.  And it's your belief that Kathleen Quin told Alice
20     Williams that Alice could not answer questions for
21     you?
22 A.  Yes.
23 Q.  And what proof do you have of that?
24 A.  Because when Kathy -- that was -- it was never a
25     problem before with Alice and my -- there was no

**Page 207**

1      problem with Alice and my looking -- with Alice
2      looking at my work. There was no problem with
3      that, and then it got to the point where there was
4      such a silent treatment given, even from Alice,
5      after a point of working in the Town Clerk's Office
6      for those three years.
7  Q.  Did Alice ever tell you that Kathy told her not to
8      answer your questions?
9  A.  She would tell me that I would have to go ask
10     Kathy. When I would come to her to ask a question,
11     she would tell me I'd have to go to Kathy.
12 Q.  Did Alice ever tell you --
13 A.  No, she didn't tell me.
14 Q.  Okay. That's just what you believe was said?
15 A.  Because Alice and Kathy worked very, very closely
16     together, and I -- you know, I'm sorry. I
17     wasn't . . .
18 Q.  You don't know if there were any communications or
19     any directives from Kathleen Quin to Alice Williams
20     telling Alice Williams not to answer your
21     questions?
22 A.  There's no written directive from Kathleen Quin
23     telling Alice Williams that, but it's subtle; and
24     I'm sure that was part and parcel of what the two
25     of them had discussed because, prior to the

**Page 208**

1      incident of 1999, October, Alice would freely
2      answer any question that I asked her.
3  Q.  Did Alice tell you that Kathleen Quin told Alice
4      not to answer your questions?
5  A.  No, she didn't.
6  Q.  Is it possible that Alice was growing frustrated
7      with you and no longer wished to answer your
8      questions?
9  A.  No, that was not true.
10 Q.  That's not possible?
11 A.  That's not possible.
12 Q.  But it's a possibility that there was some
13     conspiracy between Kathleen Quin and Alice Williams
14     that Alice would not answer your questions?
15 A.  That's true.
16 Q.  That's a possibility, but the other possibility is
17     an impossibility?
18 A.  I didn't ask Alice so many questions that -- I
19     wasn't inundating her with questions or with
20     conversation.
21 Q.  Did you ever ask Alice why she refused to answer
22     your questions?
23 A.  She wouldn't refuse. She would say, "Let's take it
24     to Kathy." It wasn't that she would refuse.
25     Either she would ask Kathy, or she would say,

```
 1        MR. MONASTERSKY:  We'll start — do you
 2   want to start at 9:30 that day?
 3        MS. JENNINGS:  How is 9:30 for you?
 4        THE WITNESS:  That's fine.
 5        MS. JENNINGS:  Okay.
 6        MR. MONASTERSKY:  We'll start at 9:30 on
 7   the 15th of April.
 8
 9        (Deposition was suspended at 3:59 p.m.)
10
```

                                                                      213

## CERTIFICATE OF REPORTER

I, Frances R. Teti, a Licensed Shorthand Reporter and Notary Public duly commissioned and qualified in and for the State of Connecticut, do hereby certify that there came before me the following named person, to wit: PATRICIA ANN MASSEY, who was by me duly sworn to testify to the truth and nothing but the truth; that she was thereupon carefully examined upon her oath and her examination reduced to writing under my supervision; that this deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney nor counsel for, nor related to, nor employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested in the action.

IN WITNESS THEREOF, I have hereunto set my hand and affixed my seal this 12th day of April, 2004.

_____
Frances R. Teti, LSR, Notary Public
My commission expires: 3-31-05
License No: 00076

                                                                      214

INDEX OF EXAMINATION

                                                         PAGE
DIRECT EXAMINATION BY MR. MONASTERSKY ..........   18

INDEX OF EXHIBITS

 1   Complaint ................................    4
 2   Response to Interrogatories ..............    4
 3   One-page undated letter ..................    4
 4   Response for Production ..................    4
 5   Affidavit of Illegal Discriminatory
     Practice .................................    4
 6   Evaluation of Probationary Employees,
     9-6-98 ...................................    4
 7   Evaluation of Probationary Employees,
     9-14-99 ..................................    5
 8   9-21-99 memo, one page ...................    5
 9   Performance Appraisal, 10-20-00 ..........    5
10   Bi-Weekly Performance Appraisal, 9-17-01 ..   5
11   Bi-Weekly Performance Appraisal, 10-1-01 ..   5
12   Bi-Weekly Performance Appraisal, 10-15-01 .   6
13   Bi-Weekly Performance Appraisal, 10-29-01 .   6
14   5-5-00 memo, two pages ...................    6
15   5-15-00 memo, three pages ................    6
16   5-27-00 memo, two pages ..................    6
                                                                      215

CONTINUED INDEX OF EXHIBITS

                                                         PAGE
17   10-15-01 letter, two pages ...............    6
18   Two-page handwritten document, 10-16-01 ..    7
19   One-page handwritten document ............    7
20   2-25-00 letter, one page .................    7
21   7-25-00 memo, one page, with one-page
     handwritten document attached ............    7
22   One-page handwritten document ............    7
23   One-page handwritten document ............    8
24   One-page handwritten document ............    8
25   One-page handwritten document ............    8
26   One-page document ........................    8
27   8-15-01 memo, one page ...................    8
28   One-page handwritten document ............    8
29   2-12-98 letter, one page .................    9
30   One-page document, 7-1-85 ................    9
31   One-page document ........................    9
32   Photocopy of newspaper article ...........    9
33   1-3-00 memo, one page ....................    9
34   One-page handwritten document ............    9
35   6-7-00 memo, one page ....................   10
36   6-8-00 memo, one page ....................   10
37   6-9-00 memo, one page ....................   10
38   One-page document, December, 2000 ........   10
                                                                      216