UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| PATRICIA ANN MASSEY | :    NO.: 3:03CV55 (PCD) |
| v. | : |
| TOWN OF WINDSOR AND KATHLEEN QUIN IN HER INDIVIDUAL CAPACITY | : |

### AFFIDAVIT OF KATHLEEN QUIN

I, Kathleen Quin, being duly sworn, depose and say that:

1. I am over the age of eighteen (18) years old;

2. I believe in the obligations of an oath;

3. I am the Town Clerk for the Town of Windsor, and have held that position since September 1995.

4. At all times relevant to the Complaint, I was Patricia Massey's immediate supervisor.

5. Ms. Massey was hired for the Deputy Town Clerk position on September 6, 1998.

6. There were six applicants for the position, including Ms. Massey and June Cameron. I, along with Dede Moore and Nicole LaFortune, interviewed each of the applicants.

7. I recommended Ms. Massey for the position, in part because I had found her friendly and courteous on the phone when I had spoken to her as an employee of the Building and Land Department.

8. At the time of Ms. Massey's hire, there were four other women, in addition to myself, working in the Town Clerk's Office. Those women were June Cameron, Alice Williams, Elka Peck and Thelma London.

9. Thelma London was the only full-time employee in the Town Clerk's Office aside from myself. Ms. London retired in December 1998, but returned to work in January 1999 as a part-time employee.

10. June Cameron and Alice Williams had both retired from other jobs and were Certified Town Clerks by the State of Connecticut. They worked in the Windsor Town Clerk's Office on a contractual basis. They were hired to work part-time, 20-40 hours a week as needed.

11. When the Town hired Ms. Massey, our intent was to eliminate the need for Ms. Cameron and Ms. Williams.

12. After Ms. Massey's hire, Ms. Cameron remained through the middle of November 1998 to train Ms. Massey on land records.

13. Ms. Williams continued to work in the Town Clerk's Office as she was needed to review and correct Ms. Massey's work

14. In January 2000, Ms. Williams also began functioning as an outside auditor of the Town's land records. This function may only be performed by a non-employee.

15. Elka Peck was a part-time student employee who worked during school vacations and the summer.

16. After Ms. Massey's hire, the Town sent Ms. Massey to Town Clerk School to become certified as a Town Clerk. Ms. Massey attended the classes, passed the exam and received the State of Connecticut designation as Certified Town Clerk in June 2001.

17. I too had become a State Certified Town Clerk after being hired by the Town of Windsor. I received my designation in May 1999.

18. I did not receive monetary compensation for becoming a Certified Town Clerk, nor has any other employee received additional compensation for said accomplishment.

19. No one working in the Town Clerk's Office is eligible to function as a moderator during the election process. As such, I did not send anyone to the moderator training.

20. The high performance management model training took place in June 2002. I signed Ms. Massey up for said training and Ms. Massey did attend the training. Ms. Massey and myself are the only two individuals from the Town Clerk's Office who received this training.

21. Ms. Massey was initially hired as a probationary employee for a period of six months. I extended her probationary period another six months due to performance issues. After the second six-month period, I continued to have concerns regarding Ms. Massey's performance, and documented those concerns. Nonetheless, the Town retained Ms. Massey after the expiration of her second probationary period In September 1999.

21. In October 1999, I did give Ms. Massey's home telephone number to a physician who had telephoned the office. I was working late that night with Thelma London. Ms. London had mentioned to me that Ms. Massey wasn't feeling well that day and that she had been trying to reach her doctor all day. When the physician called, he said that it was important for him to reach Ms. Massey and he asked if I had her number. In an effort to help Ms. Massey, I looked in the phone book and provided the physician with her home number.

22. Later that month, I met with Ms. Massey to discuss her continued performance issues. During that meeting, Ms. Massey raised the subject of the telephone call, to which I apologized. She seemed very angry.

23. The next day, I met with the town manager, Leon Churchill. I advised him both that Ms. Massey continued to commit an excessive amount of errors and that she was angry with me.

24. Thereafter, Mr. Churchill held a meeting with Ms. Massey, Ms. Moore and I.

25. During the meeting, I addressed Ms. Massey's poor performance. Ms. Massey responded by saying that there was nothing in her file to document such poor performance. I had not documented my concerns in Ms. Massey's file because I thought such an act would be counterproductive to my efforts to help her improve.

26. At that meeting, Mr. Churchill instructed Ms. Massey, Ms. Moore and I to meet on a regular basis.

27. For a period of 3-4 months, Ms. Massey, Ms. Moore and I did meet on a weekly basis, as schedules permitted.

28. At the first meeting, Ms. Moore suggested that Ms. Massey and I meet at the end of each day to discuss the day's performance.

29. Accordingly, Ms. Massey and I did meet at the end of each day for three days, at the end of which Ms. Massey inquired as to whether we were going to continue to meet everyday for me to tell her what she did wrong. I then stopped the practice, and I told Ms. Moore that I was not longer meeting with Pat each day. I believed my presence or tone was annoying Ms. Massey and daily meetings were not being received by Pat as opening up lines of communication. I began communicating more by leaving notes for Pat.

30. I continued each day to review, edit and mark corrections on Ms. Massey's work. I then returned the documents the following day for her to learn and to make the necessary corrections.

31. During this time, I was remaining at work until 7:00 p.m. to review and edit Ms. Massey's work. Ms. Massey exhibited only 40% accuracy.

32. As such, in January 2000, I implemented the practice of having all land records recorded and indexed by 4:00 p.m. each day.

33. This practice of having land records completed by 4:00 p.m. applied to both Ms. Massey and I, as we were the only two who were entering land records at this time. My land records were completed by 4:00 p.m. each day for Ms. Massey to review. (At present I receive the land recordings by 3 PM)

34. Accuracy in the Town Clerk's Office is essential. Accordingly, all land records were reviewed by another individual in the office.

35. At the end of January or early February 2000, Mr. Churchill called another meeting with Ms. Massey, Ms. Moore and I to assess our progress. At this meeting, I produced a box containing the documents of Ms. Massey's that I had reviewed and edited. I advised Mr. Churchill that Ms. Massey had made no progress in her performance.

36. Processing conveyance tax forms, fish and game licensing, and vital statistics are all functions of the Town Clerk's Office.

37. In an effort for Ms. Massey to improve with her accuracy of land records, however, she was not initially asked to perform these functions. In May or June 2000, I did ask Ms. Massey to help out with these responsibilities.

38. These functions did not require a significant amount of time. For instance, the processing of conveyance tax forms was a half hour job once a week. Reports for fish and game licensing and vital statistics were completed only once a month.

39. The job of processing town wide mail was primarily the responsibility of the town manager's secretary. The Town Clerk's Office was the fourth in line for said responsibility.

40. I too processed town wide mail on occasion.

41. In my estimation, Ms. Massey processed town wide mail on less than ten occasions throughout her employment.

42. Ms. Massey was shown how to perform all of the responsibilities of the Town Clerk's Office, including those functions referenced above. In addition, there were form instructions regarding each of the jobs.

43. None of the other individuals who worked in the Town Clerk's Office received additional instruction regarding any of the jobs in the office. In fact, Ms. Massey received more instruction than any of the other individuals.

44. Ms. Massey missed 120 days of work during the year 2000. I did not know what health condition kept Ms. Massey out of work and I did not know when she would return full-time.

45. Toward the end of 2000, I determined that I needed assistance in the Town Clerk's Office. As such, I advertised for a second deputy town clerk - in addition to Ms. Massey's position.

46. I interviewed approximately five candidates, but I did not find anyone suitable for the job.

47. In December 2000, Ms. Massey returned to work. I told her that I had interviewed for a second person but that I had not found anyone.

48. At this time, I also told Ms. Massey that we needed to establish performance standards that would apply to us, as well as to any new hire. Ms. Massey agreed.

49. Ms. Massey suggested the 95% accuracy standard for land records.

50. On January 1, 2001, the performance standards took effect. These standards included: 90% accuracy for indexing land records for the first two or three months, and 95% accuracy thereafter.

51. The performance standard for land records applied to both Ms. Massey and I. We were the only individuals in the office who processed land records.

52. The performance standard for indexing maps applied to everyone in the office.

53. For the first 2-3 weeks after the performance standards were implemented, Ms. Massey performed very well. Unfortunately, this streak ended, and Ms. Massey returned to her prior performance level.

54. During this time, I asked Ms. Massey if there was anything I could do to help her improve. She responded by suggesting that data entry be eliminated from her job responsibilities. Such a request was impossible as data entry is an essential component of working in the Town Clerk's Office. Ms. Massey did not offer any other suggestions.

55. In September 2001, I instituted bi-weekly performance appraisals of Ms. Massey's accuracy with respect to land records.

56. Ms. Massey's accuracy during this time remained unacceptable.

57. Ms. Massey's employment was terminated effective December 14, 2001.

58. Ms. Massey appealed her termination to the town manager. I was in attendance at the appeal hearing. Ms. Massey stated in the hearing that she wanted to be compensated by the Town. She did not refute her continued

problem with accuracy, but rather stated that she relied on her written correspondence.

59. I have never spoken to anyone at the Department of Labor regarding Ms. Massey's termination. I did not advise the DOL that Ms. Massey was terminated for willful misconduct.

60. Ms. Massey was replaced by Agnes Pier in March 2002. Ms. Pier is 57 years old and Caucasian.

61. All of the other individuals who worked in the Town Clerk's Office, with the exception of the part-time student employee, Elka Peck, were older than Ms. Massey.

62. Ms. Massey never told me that she suffered from depression or anxiety, nor was I ever provided documentation to that effect.

63. Ms. Massey never requested any accommodation for her depression or anxiety.

64. I had no involvement in the placement of a mouse in Ms. Massey's desk drawer. When I learned of the mouse, I told Ms. Massey to leave it there and that I would call building management. It was a very small dead mouse. Ms. Massey immediately grabbed the mouse and discarded it herself.

65. I regularly communicate with everyone who works in the Town Clerk's Office via notes.

66. I never avoided Ms. Massey.

67. I did, on only a couple of occasions interject myself into Ms. Massey's conversations with the public, if I heard her giving out misinformation. For instance, on one occasion, I heard Ms. Massey tell someone who wanted to register to vote that she had missed the deadline. I interjected and advised them that the deadline was not until the following week.

68. Ms. Massey's workstation was located in a very busy area at the front counter with the cash register to her left. I would often stand next to Ms. Massey in order to access the cash register or assist customers. Ms. Massey never asked to have her workstation relocated.

69. In August 2001, Ms. Massey told me that she was taking a couple days off at the end of the week to go to Washington with a group. Afterward, I was told that Ms. Massey had asked payroll how many vacation days she had remaining. At the time, she had only two vacation days left and six sick days. The following Monday, I received a message from Ms. Massey that her daughter, who lived in Maryland, had been stung by a bee. She remained out of work for the remainder of the week.

70. Upon Ms. Massey's return to work, I asked for documentation of her daughter's condition. I never received the requested documentation.

71. Despite the fact that no documentation was provided, Ms. Massey's time was counted as sick time.

72. I have never made any racially derogatory comments to Ms. Massey or to anyone in the Town Clerk's Office. I never said, "anyone of color is a problem."

73. I did not discriminate against Ms. Massey on the basis of her race, color, age or disability.

Dated at Windsor, Connecticut, this 28th day of June 2004.

*Kathleen K. Quin*
**Kathleen Quin**

STATE OF CONNECTICUT )
                     ) ss: Windsor
COUNTY OF HARTFORD   )

Subscribed and sworn to before me this 28th day of June, 2004.

~~Commissioner of the Superior Court~~
Notary Public
My Commission Expires:

**AGNES M. PIER**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES APR. 30, 2007