1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

* * * * * * * * * * * * * * * *
PATRICIA ANN MASSEY,           *
         PLAINTIFF,            *
VS.                            *
TOWN OF WINDSOR AND KATHLEEN QUIN *
IN HER INDIVIDUAL CAPACITY,    *
         DEFENDANTS.           *    CIVIL ACTION NO.
* * * * * * * * * * * * * * * *    3:03CV55(PCD)

---

CONTINUED DEPOSITION OF PATRICIA ANN MASSEY

---

Taken before Frances R. Teti, Licensed Shorthand Reporter and Notary Public within and for the State of Connecticut, pursuant to Federal Rules of Civil Procedure, at the law offices of Howd & Ludorf, 65 Wethersfield Avenue, Hartford, Connecticut, on April 15, 2004, commencing at 10:16 a.m.

A+REPORTING
P.O. BOX 831
WALLINGFORD, CT 06492
866.369.9976

2

1 APPEARANCES:
2
3
4 FOR THE PLAINTIFF:
5    THE BARRISTER LAW GROUP, LLC
6    Cynthia R. Jennings, Attorney at Law
7    211 State Street
8    Bridgeport, Connecticut 06604
9
10 FOR THE DEFENDANTS:
11   HOWD & LUDORF
12   David S. Monastersky, Esq.
13   65 Wethersfield Avenue
14   Hartford, Connecticut 06114-1190
15
16 ALSO PRESENT:
17   Kathleen Quin
18
19
20
21
22
23
24
25

3

1                    STIPULATIONS
2
3         IT IS STIPULATED by counsel for the parties
4 that each party reserves the right to make specific
5 objections in open Court to each and every question
6 asked and the answers given thereto by the witness,
7 reserving the right to move to strike out where
8 applicable, except as to such objections as are directed
9 to the form of the question.
10        IT IS STIPULATED by counsel for the parties
11 that the proof of the authority of the Notary Public
12 before whom this deposition is taken is waived.
13        IT IS STIPULATED AND AGREED by counsel for the
14 parties that any defects in the Notice are waived.
15        IT IS FURTHER STIPULATED by counsel for the
16 parties that the reading and signing of the deposition
17 are not waived.

4

1              (Defendants' Exhibit No. 68,
2              one-page document entitled,
3              "Chapter 12 - Grievances and
4              Appeals,"
5              marked for identification.)
6
7              PATRICIA ANN MASSEY,
8         having first been duly sworn, was examined
9              and testified as follows:
10
11      CONTINUED DIRECT EXAMINATION BY MR. MONASTERSKY
12
13 Q.   Good morning, Miss Massey.  This is a continuation
14      of your deposition which was started a few weeks
15      ago.  I just wish to remind you that you're still
16      under oath.  So, therefore, just please tell the
17      truth to the best of your ability.  I just want to
18      refresh you on the ground rules again to make sure
19      things go a little bit smoother.  Please wait
20      until I'm done asking you the question before you
21      answer the question.  Please answer verbally.  If
22      you need to take a break at any time, just let us
23      know and we'll take a break.  All I ask is, if
24      there is a question pending, that you answer the
25      question before we take the break.  Okay?

**Page 5**

1  A.  Okay.
2  Q.  Again, if you don't understand a question I ask
3      you, please let me know; otherwise, if you answer a
4      question, I'm going to assume you understood it.
5      Okay?
6  A.  Okay.
7  Q.  I want to turn to the actual termination process.
8      Now, how was it that you were first informed that
9      you were going to be terminated?
10 A.  I received a call from Elvira Napoleone to meet
11     with Peter Sousa, the then acting director of human
12     resources, and he asked me to come upstairs to the
13     personnel office and gave me a letter.
14 Q.  He gave you a letter at that time?
15 A.  He did.
16 Q.  Okay. Did you have any discussion with him at
17     that time?
18 A.  He did talk about my returning Town property, and I
19     did give him that. I don't recall too much else
20     on that day.
21 Q.  Okay. And subsequent to that conversation you had
22     with Mr. Sousa, did you have any other
23     conversations with Mr. Sousa concerning your
24     termination?
25 A.  No. I don't recall another conversation with

**Page 6**

1      Mr. Sousa.
2  Q.  Okay. I believe you went through this document at
3      the earlier deposition, but this is Exhibit 58.
4      That's a letter that was given to you by Mr. Sousa;
5      is that correct? (Handing.)
6
7          (Witness reviews document.)
8
9  A.  It was provided at the time that I spoke with
10     Mr. Sousa.
11 Q.  Okay. And that was the first indication that you
12     were going to be terminated was at that meeting
13     with Mr. Sousa?
14 A.  Absolutely.
15 Q.  And that meeting took place on December 10, 2001?
16 A.  That's right.
17 Q.  And you were informed of that meeting by whom?
18 A.  Elvira Napoleone in a phone call.
19 Q.  Is she an administrative assistant for the
20     Personnel Department?
21 A.  I believe so.
22 Q.  And prior to that phone call you received from the
23     assistant, Elvira Napoleone, did you have any
24     conversations with Mr. Sousa prior to that time
25     concerning the fact that you were being considered

**Page 7**

1      for termination?
2  A.  Mr. Sousa did call me in one afternoon after work,
3      and he said that he had not heard from my attorney,
4      but there was no discussion about terminating me.
5  Q.  Okay. And that was on December 7; correct?
6  A.  Perhaps.
7  Q.  And at that time, Mr. Sousa gave you an opportunity
8      to discuss your performance, and you informed him
9      that he should contact your attorney?
10 A.  I don't remember anything about discussing
11     performance. He just called me in and said he was
12     trying to reach my attorney. He called him several
13     times, and the attorney had not gotten back with
14     him.
15 Q.  After -- strike that.
16         And Exhibit 58 indicates that you're being
17     terminated for performance issues; correct?
18 A.  Yes, for failure to improve my performance as
19     deputy town clerk over the past three years.
20 Q.  Okay. And then, following that, you exercised
21     your right to appeal to the town manager; correct?
22 A.  I did.
23 Q.  And Exhibit 58 lays out that you did have that
24     right to appeal within I believe it was what, five
25     days, and that you did submit an appeal within that

**Page 8**

1      five-day period; correct?
2  A.  I believe I did, yes.
3  Q.  In fact, Exhibit 62 was the appeal you submitted to
4      Mr. Churchill; is that correct?
5  A.  That's correct.
6  Q.  Okay. And then you actually had a meeting with
7      Mr. Churchill; is that correct?
8  A.  Mr. Churchill and Kathleen Quin.
9  Q.  And Kathleen Quin. Okay. And that meeting took
10     place on December 20; is that correct?
11 A.  I believe that's correct.
12 Q.  Okay. Now, did you raise any issues at that
13     appeal hearing or meeting?
14 A.  The issues were in the letter and so I did not
15     reiterate.
16 Q.  Okay. You didn't ask to discuss the issues raised
17     in Exhibit 62? If you want to look at that . . .
18     (Handing.)
19
20         (Witness reviews document.)
21
22 A.  I basically knew that the town manager had received
23     the letter, and I really wanted him to address the
24     issues that were in this letter, and I did not
25     raise -- I didn't bring up the point of the issues

**Page 9**

1  in my letter.
2  Q.  Okay.  Did you request any severance pay during
3      that meeting with Mr. Churchill?
4  A.  I did.
5  Q.  Did you make a specific monetary amount or just
6      simply requested severance?
7  A.  I just requested severance.  I didn't request a
8      monetary amount.
9  Q.  And Mr. Churchill asked you what your suggestion
10     would be; is that correct?
11 A.  He may have.
12 Q.  In fact, in response to that, you sent him
13     Exhibit 59; is that correct?  (Handing.)
14
15            (Witness reviews document.)
16
17 A.  Yes.
18 Q.  Okay.  And in that exhibit, you set forth that you
19     wished to have your salary continued through
20     June 30, 2002?
21 A.  That's right.
22 Q.  And you also requested copies of the minutes from
23     the hearing of December 20, 2001; correct?
24 A.  That's right.
25 Q.  Okay.  In response, Mr. Churchill sent you

**Page 10**

1   Exhibit 60; is that correct?  (Handing.)
2
3             (Witness reviews document.)
4
5  A.  That's right.
6  Q.  And he also sent you Exhibit 63 which set forth
7      that there were no minutes as it was an informal
8      meeting; is that correct?
9  A.  That's right.
10 Q.  Okay.  Now, in Exhibit 59, you indicated that --
11     well, the exhibit at one point says, "I wish to
12     have my salary continued until June 30, 2003.
13     This is what the first Town can do not so much for
14     me but for itself."  What did you mean by that
15     sentence in terms of what it can do for itself?
16 A.  Well, the Town basically advertised that it was
17     first for the citizens; and as a citizen of the
18     town, I felt that I had certainly given -- in terms
19     of time, effort, I had served the Town of Windsor
20     quite well in my capacity as deputy town clerk; and
21     if the Town was true to its campaign, I believe
22     that this was something that would not only be good
23     for me but it would put the Town in a different
24     light.  From what I understand from conversations
25     with some of the customers and people that I had,

**Page 11**

1   there were times when there were people in the Town
2   Clerk's Office who were not necessarily helpful.
3   I felt that I was being more than helpful and
4   always worked overtime and went beyond the call of
5   duty to see that the Town's citizens were
6   well-served.
7  Q.  Okay.  Do you know of any other employees from the
8      Town of Windsor that were terminated that received
9      severance pay?
10 A.  I don't know of any employees that were terminated.
11 Q.  So the answer to my question would be no?
12 A.  Yes.
13 Q.  Now, you chose not to appeal further from the
14     meeting you had with Mr. Churchill; is that
15     correct?
16 A.  That's correct.
17 Q.  Although, you did have the option to do so; is that
18     correct?
19 A.  That's correct.
20 Q.  And you were aware of your option to take a further
21     appeal; is that correct?
22 A.  That's correct.
23 Q.  In fact, Exhibit 60 informed you of your right to
24     proceed to arbitration; is that correct?
25 A.  That's correct.

**Page 12**

1  Q.  Okay.  Is there any reason why you chose not go
2      through the arbitration process?
3  A.  I didn't have the money.
4  Q.  Okay.  Do you know how much it would have cost to
5      go through the arbitration process?
6  A.  I remember reading some of the requirements, and I
7      believe the Town had to pay half of the cost of
8      arbitration and I had to pay the remaining
9      arbitration fee, and I just didn't have that money
10     available to me.
11 Q.  Okay.  Do you know how much that cost was?
12 A.  No, I don't.
13 Q.  Did you ask anyone what that cost was?
14 A.  The cost -- whatever the cost was, I was not in a
15     position to fund it.
16 Q.  Let me ask you, during the meeting you had with
17     Mr. Sousa on December 10, 2001, did you raise to
18     him your belief that you were being discriminated
19     against based on your race?
20 A.  I don't recall.  I don't recall that conversation,
21     having that conversation with Peter Sousa.
22 Q.  I'm just asking you if you did.  I don't know if
23     you did or didn't.  I'm just asking if you did.
24 A.  I don't know if I did.
25 Q.  How about your meeting with Mr. Churchill on

**Page 13**

```
 1      December 20, 2001?  Did you ever raise, during that
 2      meeting, your belief that you were being
 3      discriminated against based on your race?
 4  A.  I didn't specifically say that I was terminated
 5      (sic) against.  I said I was being treated
 6      differently.
 7  Q.  Did you inform Mr. Churchill that you believed you
 8      were being treated differently because of your
 9      race?
10  A.  I don't remember if I said because of my race.
11  Q.  You just told him you thought you were being
12      treated differently?--
13  A.  Right.
14  Q.  Did you inform Mr. Churchill in your December 20,
15      2001 meeting that you believed you were being
16      treated differently because of your disability?
17  A.  I don't remember having a meeting with Leon
18      Churchill regarding my disability.
19  Q.  I'm asking you during the meeting you had with him
20      on December 20 --
21  A.  There was no discussion.
22  Q.  Likewise, during your meeting with Mr. Sousa on
23      December 10, 2001, did you indicate to him that you
24      believe you were being treated differently because
25      of your disability?
```

**Page 14**

```
 1  A.  No.
 2  Q.  Okay.  How about indicating whether you believe
 3      you were treated differently because of your age in
 4      your meeting with Mr. Sousa on December 10, 2001?
 5      Did you make any such indication to him?
 6  A.  No, I did not.
 7  Q.  Did you indicate to Mr. Churchill during your
 8      meeting on December 20, 2001 that you believed you
 9      were being treated differently because of your age?
10  A.  Could you say that again?
11  Q.  Sure.  During your meeting with Mr. Churchill on
12      December 20, 2001, did you indicate to Mr.
13      Churchill that you believed you were being treated
14      differently because of your age?
15  A.  I didn't have a meeting with Mr. Churchill on the
16      20th.  The 20th of December?
17  Q.  Yes.
18  A.  No, I didn't.
19  Q.  You had the meeting; correct?
20  A.  I had the meeting, but no.
21  Q.  But you did not indicate you felt you were being
22      treated differently because of your age?
23  A.  I did not mention that to Mr. Churchill.
24  Q.  Okay.  Let me ask you this: How do you believe
25      that the Town failed to follow Chapter 11,
```

**Page 15**

```
 1      Chapter 8 and Chapter 14 of the personnel rules?
 2  A.  Chapter 8 and 11 and 14 pertains to the terms and
 3      conditions of employment; and certainly, when we
 4      talk about the issues here, the probationary
 5      period, having that probationary period extend
 6      beyond the one year, the fact that the -- the
 7      appraisal system.  Every two months, I was to
 8      have -- if there were problems, for example, I was
 9      to have written notices of those issues that were
10      being discussed at that time; and the fact that --
11      the willful misconduct, I don't see where that
12      would have actually applied in my own case; and
13      just based on the terms and conditions of
14      employment, I feel that the Town was in violation
15      because they didn't follow their own rules with
16      respect to those.
17  Q.  I just want to know specifically what rules you
18      claim they were not following.  One was the issue
19      concerning your probation?
20  A.  Right.
21  Q.  The other one was the appraisal system?
22  A.  Yes.
23  Q.  And what -- were there any other Town rules you
24      believe weren't followed?
25  A.  I don't know the procedures without having to refer
```

**Page 16**

```
 1      specifically to those procedures as we have them
 2      here, the personnel policies.  I'd have to look at
 3      them.
 4  Q.  So you can't recall at this point any other Town
 5      rules that you believe were not followed?  I'm
 6      just asking.
 7  A.  With respect to training, that's a Town policy that
 8      wasn't necessarily followed; but I can't recall
 9      specifically Chapter 8, 11 and 14 --
10  Q.  Okay.
11  A.  -- of the personnel rules.
12  Q.  In Exhibit 62, you mention under "E," remove
13      records or caused to be removed records favorable
14      to my performance from my personnel file.  What
15      records were removed from your personnel file?
16  A.  When I looked at my personnel file prior to writing
17      this memo, there were -- the only -- it was the
18      first appraisal and the first six-month appraisal.
19      That was the only thing that was there.  There
20      were no records that I found regarding anything
21      favorable, and there were favorable pieces of
22      information in my file; but when I reviewed it on
23      the date prior to receiving this information, they
24      were not there.
25  Q.  What favorable information was in the file that you
```

### Page 17

1  believe was removed?
2  A. The information pertaining to -- not necessarily
3     town clerk information but previous -- the previous
4     position that I held in the Building Department.
5  Q. What materials were those?
6  A. I can't recall exactly all of the materials that
7     were there, but I do know that there were favorable
8     remarks about my ability to perform the work in the
9     Building Department; and I don't recall exactly,
10    but when I looked at the file that day, that
11    information hadn't gotten in there.
12 Q. And that was -- strike that.
13    Where did you look at the personnel file?
14 A. In the personnel office.
15 Q. Did you ask -- strike that.
16    Who did you speak to in the personnel office?
17 A. Holly Holt.
18 Q. Did you ask her if there were any other materials
19    or any other files that would constitute your
20    employment file?
21 A. I didn't ask her.
22 Q. You did not?
23 A. No, I did not.
24 Q. And that favorable material you indicate concerns
25    your employment with the Building Department; is

### Page 18

1     that correct?
2  A. Yes, from the Building Department basically.
3  Q. And -- strike that.
4     Now, I wanted to go back to the issue
5     concerning your daughter and the bee sting.
6     Correct me if I'm wrong. During the first session
7     of your deposition, you indicated to me that that
8     whole situation with your daughter getting stung by
9     the bee and you having to go down to Washington,
10    D.C. took place in August of 2000; is that correct?
11 A. 2000 or 2001.
12 Q. I'm asking if you recall what you told me
13    approximately two weeks ago because I'm pretty sure
14    you told me it took place in August of 2000 two
15    weeks ago. I just want to see if you recall that.
16 A. I believe it was 2001.
17 Q. Okay. In fact, your complaint, which has been
18    marked as Exhibit 1, in Paragraph 26 indicates that
19    the issue concerning your daughter's bee sting took
20    place in August of 2001; is that correct?
21    Paragraph 26, Page 7. (Handing.)
22
23                (Witness reviews document.)
24
25 A. I believe that was 2001.

### Page 19

1  Q. Okay. So when you indicate in response to
2     Interrogatory Number 3 in your discovery responses,
3     which have been marked as Exhibit 2, Answer
4     Number 6 where it refers to, I believe, the same
5     incident and it says August of 2000 --
6  A. It should be 2001.
7  Q. -- it should be 2001? Okay.
8     So that's a mistake in your discovery
9     responses?
10 A. That's right.
11 Q. Okay. Now, did anyone go down with you to
12    Washington, D.C. at that time?
13 A. I don't -- I don't recall if anyone else went down
14    with me at that time. My daughter may have
15    accompanied me. I'm not sure.
16 Q. Your other daughter?
17 A. The second child that I have.
18 Q. Okay. And you didn't go down with any family
19    members or friends?
20 A. No.
21 Q. How did you get down there?
22 A. Usually when there's something like that, I usually
23    fly down, and I'm sure I flew down if I went down.
24 Q. You didn't rent a van with some other people and
25    drive down?

### Page 20

1  A. No.
2  Q. You never told anyone prior to that incident where
3     your daughter got stung that you were planning to
4     drive down to Washington with some friends and rent
5     a van?
6  A. No, absolutely not.
7  Q. Now, in your complaint, Paragraph 21 on Page 6, you
8     indicate that Kathleen Quin failed to inform you of
9     the moderator training which would have allowed you
10    to participate in the election process. Do you
11    see where I'm referring to?
12 A. Page 6?
13 Q. Yes, Paragraph 21.
14 A. Yes.
15 Q. Do you know of any other employees of the town
16    clerk's office that participated in moderator
17    training in September of 1999?
18 A. No.
19 Q. Okay. In fact, as the deputy town clerk, you
20    could not function as a moderator during the
21    election process; is that correct?
22 A. That's correct.
23 Q. The next paragraph says in October of 1999,
24    Kathleen Quin failed to provide you with high
25    performance management model training; is that

**Page 21**

1  correct?
2  A. That's correct.
3  Q. Were there any other employees of the Town Clerk's
4     Office that participated in the high performance
5     management model training?
6  A. All of the Town employees were required to
7     participate in the high performance management
8     model training.
9  Q. All employees were required to take place in that?
10 A. The town manager required and Dede Moore sent a
11    memo around the office with the names of the
12    employees who were to participate, and my name was
13    one of the names that was on the list.
14 Q. Okay. So it was not all Town employees. It was
15    only those that were identified on that list?
16 A. From my understanding, the town manager had --
17    wanted to include all Town employees in the high
18    performance management model training.
19 Q. Okay. Do you know if other employees from the
20    Town Clerk's Office participated in that training?
21 A. I don't know if they participated in the training.
22    I just know what the town manager required and what
23    Dede Moore had submitted to me, a list of at least
24    15 to 20 names. So, no, I don't know if every
25    Town employee participated.

**Page 22**

1  Q. My question was: Do you know if any other
2     employees of the Town Clerk's Office participated?
3  A. No, I don't know.
4  Q. Okay.
5  A. But, of course, Kathy did participate.
6  Q. In October of 1999, was Alice Williams working in
7     the Town Clerk's Office?
8  A. October of 1999?
9  Q. Yes.
10 A. Yes.
11 Q. Was Thelma working in the Town Clerk's Office?
12 A. Yes.
13 Q. Was Elka working in the Town Clerk's Office?
14 A. Yes.
15 Q. Do you know if Alice, Thelma or Elka participated
16    in the high performance management model training?
17 A. I don't know if they did.
18 Q. Okay. I want to show you Exhibits 35, 36 and 37.
19    (Handing.) I want you to review those documents.
20    I'm going to ask you some questions about them.
21
22              (Witness reviews document.)
23
24 Q. While you're reviewing those, I'm going to take a
25    two-second break.

**Page 23**

1
2              (Recess taken from 10:08 a.m. to
3              10:09 a.m.)
4
5  BY MR. MONASTERSKY:
6  Q. Have you had a chance to review those three
7     documents?
8  A. I did.
9  Q. In fact, you were provided with notice of the high
10    performance management model training before it
11    took place; correct?
12 A. Yes.
13 Q. In fact, Kathy said that you were signed up for it;
14    is that correct?
15 A. The -- the -- the incident that's here refers to
16    the round table discussion meeting that Leon
17    Churchill had prior to this information coming up.
18    In the round table discussion meeting, Leon had
19    asked us to ask our supervisors for copies of the
20    forms that came out before the classes were
21    scheduled to begin. This is after the round table
22    discussion that we -- a few of us had with the town
23    manager, and, yeah, my name is on the list.
24 Q. And, in fact, the high performance management model
25    training didn't take place in October of 1999. It

**Page 24**

1     took place in June of 2000; correct?
2  A. The round table discussions took place in October
3     of 1999 where Leon Churchill talked to us about the
4     high performance model that he was introducing as
5     the town manager. That's what that was referring
6     to.
7  Q. What was referring to?
8  A. The -- my complaint.
9  Q. October of 1999?
10 A. Yes.
11 Q. Okay. But, in fact, the training didn't take
12    place until June of 2000; correct?
13 A. That's -- that's true.
14 Q. Okay. So how could you be failed to -- strike
15    that.
16       How can you have not been provided with the
17    training in October of 1999 when the training
18    didn't take place until June of 2000?
19 A. The introduction to the high performance model,
20    which was not necessarily the training, the high
21    performance model paradigm was introduced by Leon
22    Churchill prior to the actual scheduling of the
23    classes, and that's what I was referring to. I
24    didn't realize the classes were even going to take
25    place, but the town manager did say that he had

**Page 25**

1      provided the supervisors with a paradigm of the
2      high performance model and that we should ask our
3      supervisor for copies so we could review it prior
4      to any classes that might be held later on.
5 Q.  In fact, Exhibit 36 is a memo from Dede Moore to
6      you attaching articles to read prior to the high
7      performance training; is that correct?
8 A.  What was the date on that?
9 Q.  June 8, 2000, Exhibit 36.
10 A.  Okay. Yes.
11 Q.  In fact, you were being provided with materials to
12     read prior to the training which was to take place
13     the next week; correct?
14 A.  Right. Right before the training was to take
15     place, I received the information from Dede.
16 Q.  In fact, Exhibit 35 is copies of e-mails concerning
17     the high performance management model training;
18     correct?
19 A.  Exhibit 35 does talk about the high performance
20     training.
21 Q.  And Kathy passed this e-mail or Exhibit 35 on to
22     you; correct?
23 A.  Yes.
24 Q.  And telling you that you were signed up for the
25     training; correct?

**Page 26**

1 A.  I was signed up for the training, but Kathy
2     apparently signed me up. I didn't know about it
3     prior to this time.
4 Q.  Do you know who was responsible for scheduling the
5     training?
6 A.  No, I do not know who's responsible for scheduling
7     the training; but I know Kathleen Quin is the town
8     clerk, and she had control over my hours and what I
9     did while employed as the deputy.
10 Q.  And -- strike that.
11     And, in fact, you were permitted to go to the
12     training in June of 2000; correct?
13 A.  That's correct.
14 Q.  And the training took place on June 14, June 15,
15     and June 16 of 2000; correct?
16 A.  That's correct.
17 Q.  Who signed you up for that training?
18 A.  Kathy Quin was authorized to sign me up for the
19     training.
20 Q.  Okay. Who signed you up for the training? Not
21     who was authorized but who signed you up for it?
22 A.  I do not know who signed me up for the training.
23 Q.  Okay. Dede Moore was responsible for coordinating
24     the training; is that correct?
25 A.  I don't know who was responsible for coordinating

**Page 27**

1      the training, but I received the memo from Kathy
2      Quin.
3 Q.  In Paragraph 34 of the complaint -- strike that.
4      In Paragraph 24 of the complaint, which is on
5      Page 7, you indicated that Kathleen Quin had
6      implied that you had stolen from the Xerox copy
7      money; is that correct?
8 A.  That's correct.
9 Q.  When did that incident take place?
10 A.  It was in 2001, I believe. I'm not sure of the
11     actual date.
12 Q.  And how was it that she implied that you stole $10
13     from the Xerox copy money?
14 A.  Because she asked me -- she said to me she hadn't
15     found the $10, and she said that directly to me as
16     she passed my desk.
17 Q.  Okay. At that -- prior to that time, what was the
18     procedure for the town clerk to handle the copy
19     money?
20 A.  The copy money was in an envelope, separate
21     envelope, placed in the vault inside the safe at
22     night; and the person that opened up the office the
23     next day would bring the money out, put it on the
24     card. The card sits out in the open in the
25     office, and then the money is placed in the drawer.

**Page 28**

1      If it's not really handled or if the accounting is
2      not done earlier in the morning, if it's left for
3      someone else to do, it's placed inside of a drawer
4      in anticipation of someone actually taking care of
5      sending the money down to the Finance Office.
6 Q.  So, at some point, there's an accounting of the
7     copy money?
8 A.  Yes.
9 Q.  When was that accounting supposed to take place?
10 A.  Usually it happens at the close of the day, of the
11     business day.
12 Q.  Now, when you indicate that Miss Quin had implied
13     that you had stolen the $10, what time of day was
14     that?
15 A.  It was in the morning.
16 Q.  Okay. Who had audited the Xerox copy money the
17     evening before?
18 A.  It may have been myself or Thelma.
19 Q.  Do you know if it was audited the evening before?
20 A.  No, I don't.
21 Q.  You don't recall?
22 A.  I don't know.
23 Q.  Okay. Well, if you had done it the night before,
24     you would know; correct?
25 A.  If I had done it the night before, that's a

## Page 37

1  A. Yes.
2  Q. She had the certification from the State to act as
3     a town clerk; correct?
4  A. Yes.
5  Q. And I believe, during our last session, we actually
6     went through the process. At one point, Alice
7     Williams was hired as the outside auditor to audit
8     the land records; correct?
9  A. In 2000, 2001, yes.
10 Q. Okay. Now, do you know who for the Town of
11    Windsor would make the determination on whether to
12    hire a new deputy town clerk in November of 2000?
13 A. I know who would make the recommendation, but I'm
14    not sure -- the recommendation would certainly come
15    from Kathy to the personnel office perhaps, and the
16    town manager could be involved. No, I don't know.
17 Q. You don't know who actually had to approve the
18    hiring of a new town clerk in November of 2000?
19 A. No, I don't.
20 Q. Is it fair to say that you don't know if there were
21    any conversations that took place between Ms. Quin
22    and Mr. Churchill about hiring an additional town
23    clerk in November of 2000?
24 A. I don't know if there was a conversation between
25    the two of them, no.

## Page 38

1  Q. You don't know if there were any conversations
2     between the two of them that this new deputy town
3     clerk would be in addition to you; is that correct?
4  A. No, I don't. I mean, yes, that's correct.
5  Q. So you just assumed, when you saw the
6     advertisement, that it was for your position;
7     correct?
8  A. Rightfully so, yes.
9  Q. Well, it's your opinion that it's rightfully so.
10    Did you ever ask Mr. Quin about the advertisement?
11 A. No, I did not.
12 Q. Did you ever ask the personnel office about the
13    advertisement?
14 A. No, I did not.
15 Q. Did you ever ask Mr. Churchill about the
16    advertisement?
17 A. No, I did not.
18 Q. Did you ever ask anyone with the Town of Windsor
19    about that advertisement?
20 A. No. I did not ask anyone about the advertisement.
21 Q. Okay. So you saw the advertisement in the paper,
22    and you assumed that that meant they were replacing
23    you; correct?
24 A. Yes, because we had two deputies.
25 Q. Now, in Paragraph 29 on Page 8, you indicated that

## Page 39

1     medical documentation of your illness was provided
2     to Ms. Quin. I want to go -- address that issue
3     now. Do you know when medical documentation of
4     your illness was provided to Ms. Quin?
5  A. Well, in September of 2000 -- I believe it was
6     September of 2000 -- I came and I handed --
7     hand-delivered a copy of the first documentation I
8     provided from Dr. Stephen Goldenberg to Ms. Quin.
9  Q. Is that medical documentation Exhibit 48?
10    (Handing.)
11
12           (Witness reviews document.)
13
14 A. That's right.
15 Q. That's the medical documentation that you're
16    referring to in Paragraph 29 of your complaint?
17 A. That's the first medical documentation that I
18    provided to her. Any additional medical
19    documentation was to be faxed to her by the
20    doctor's office.
21 Q. Okay. And now this note that's marked as
22    Defendants' Exhibit 48 simply indicates that you're
23    to be excused from work for two weeks due to
24    medical reasons; is that correct? (Handing.)
25

## Page 40

1           (Witness reviews document.)
2
3  A. Yes.
4  Q. And that was handed to Pat when -- excuse me. That
5     was handed to Kathy when?
6  A. I gave that to Kathy on or around September or
7     August because I remember coming back to work on
8     the day that I received that from the doctor.
9  Q. Okay. Now, Exhibit 48 doesn't specify what
10    illness you were suffering from; is that correct?
11 A. Not at this point it does not.
12 Q. So that gives no indication to whomever received
13    that note what condition you were suffering from at
14    that time; is that correct?
15 A. It was medical reasons, and that was, I felt,
16    sufficient at that time because there still had to
17    be other tests taken.
18 Q. What I'm saying is that note --
19 A. This note did not.
20 Q. Let me finish my question. Exhibit 48 does not
21    inform anyone who may have seen that note what
22    particular medical condition you were suffering
23    from at that time; is that correct?
24 A. That's right.
25 Q. It just simply uses generic medical reasons; is

**Page 41**

1  that correct?
2  A. That's right.
3  Q. And, in fact, the note indicates that the doctors
4     are specialized in gastroenterology and internal
5     medicine; is that correct?
6  A. That's right.
7  Q. There would be nothing on this note, Exhibit 48,
8     which would indicate to anybody that you may have
9     been suffering from depression or general anxiety;
10    is that correct?
11 A. Not at this point; right. That's right.
12 Q. Now, did you physically provide any other medical
13    documentation to Ms. Quin?
14 A. On that day, I presented her with this memo from
15    that doctor.
16 Q. Other than Exhibit 48, did you physically present
17    Ms. Quin with any other medical documentation
18    concerning your illness?
19 A. No, I did not.
20 Q. Okay. So all the other documentation was to have
21    been provided by your doctors to Ms. Quin?
22 A. That's right.
23 Q. Do you know if any of them did provide any medical
24    documentation to Ms. Quin?
25 A. I don't know specifically whether they did or not,

**Page 42**

1  but I know it went to someone here, either Ms. Quin
2  or Dede Moore or Liz Santos in payroll. So of
3  those three . . .
4  Q. My question is: Do you know if any of your doctors
5     provided any documentation of your illness to
6     Ms. Quin?
7  A. Not specifically. I do not know.
8  Q. Okay. Now, when you came back -- strike that.
9         So you were out of work for some period of
10    time in August and September of 2000; correct?
11 A. September -- I believe it started September of
12    2000. Perhaps. I'm not sure. Yes. It's
13    2000.
14 Q. Well, Exhibit 48 is dated August 22, 2000; is that
15    correct?
16 A. Yes.
17 Q. And this note indicates that you should be excused
18    from work until September 5, 2000; is that correct?
19 A. That's correct.
20 Q. Okay. So did you -- strike that.
21        The first time that you were out, did it
22    actually take place in August of 2000?
23 A. Yes.
24 Q. And it stretched into September of 2000; correct?
25 A. Yes.

**Page 43**

1  Q. Okay. When did you come back to work, in
2     September of 2000?
3  A. I don't recall the exact date I came back to work
4     in the year 2000.
5  Q. Okay. I'm going to show you what's been marked as
6     Exhibit 49, which I believe was provided as part of
7     your discovery responses to me in this case; and,
8     in fact, that little Number 3 at the bottom I
9     believe was provided by your attorney. I'm going
10    to ask you, do you know when -- strike that.
11        Did you fill out the information on
12    Exhibit 49? (Handing.)
13
14        (Witness reviews document.)
15
16 A. Yes, I did.
17 Q. Okay. When did you fill that information out?
18 A. I don't remember the exact date I filled it out
19    because I don't think I got the form, the
20    short-term disability form, on the same day that I
21    left the office, but it was on or about August of
22    2000 I would say.
23 Q. Okay. And did you have to submit this to your
24    doctor to fill out?
25 A. I believe there's a portion that the doctor had to

**Page 44**

1  complete.
2  Q. Okay. Did you submit this to the doctor?
3  A. Yes.
4  Q. Which doctor did you submit this to?
5  A. Dr. Miano.
6  Q. Okay. And this was a form that would be submitted
7     to the Town of Windsor's short-term disability
8     insurer?
9  A. It goes to Liz Santos in payroll.
10 Q. Okay. And -- strike that.
11        Did you provide a copy of this form to
12    Dr. Goldenberg?
13 A. I don't believe I did. I don't remember.
14 Q. Let me ask you -- I'm going to show you Exhibit 50,
15    which was provided with your discovery responses to
16    me. (Handing.) Does that refresh your memory as
17    to whether you provided a copy of the disability
18    form, which was marked as Exhibit 49, to
19    Dr. Goldenberg?
20
21        (Witness reviews document.)
22
23 A. Yes.
24 Q. If I'm correct, in Exhibit 49 you don't list
25    Dr. Goldenberg as one of the physicians that was

1  Q.  And you believe that's actually your handwriting,
2      those numbers?
3  A.  I believe that's my handwriting, yes.
4  Q.  And you believe you sent that to the risk manager;
5      is that correct?
6  A.  I'm not sure who I may have sent it to. It could
7      be the risk manager, or it could be -- I basically
8      dealt with three people. That was Liz Santos in
9      payroll, the risk manager and Dede Moore.
10 Q.  Okay. Did you submit a claim or -- strike that.
11     Did you request short-term disability for the
12     time you were out of work in April and May of 2001?
13 A.  I don't know if I requested it. I'm sure I may
14     have.
15 Q.  That's why the risk manager may have received those
16     memos, because he was in charge of submitting the
17     short-term disability?
18 A.  Perhaps, yes.
19 Q.  Okay. Did you provide a copy of Exhibit 56 to
20     Kathy Quin?
21 A.  No, I did not.
22 Q.  Okay. Do you know if Kathy Quin was provided a
23     copy of Exhibit 56 from anyone in the Town of
24     Windsor?
25 A.  I don't know that she did, but -- receive a copy of

61

1      this memo.
2  Q.  Now, Exhibit 56 indicates that you were being
3      treated for depression; is that correct?
4  A.  Yes.
5  Q.  Okay. Prior to -- strike that.
6      Did you ever inform Kathy Quin that you were
7      suffering from depression and general anxiety?
8  A.  I did not inform her specifically because, at that
9      time, I really didn't know what the diagnosis was
10     early on.
11 Q.  I'm just asking at any point in time.
12 A.  No, I did not.
13 Q.  So at no point in time did you ever inform Ms. Quin
14     that you were suffering from depression and
15     generalized anxiety?
16 A.  I don't recall that I did.
17 Q.  She just knew that you were out of work for periods
18     of time; correct?
19 A.  She knew that I was ill and seriously so.
20 Q.  But she didn't know the nature of your illness?
21 A.  I don't know if she knew the nature of my illness,
22     but I didn't really tell her the nature of my
23     illness.
24 Q.  Okay. And the only doctor's note that you
25     actually gave to Kathy Quin was Exhibit 48; is that

62

1      correct?
2  A.  I gave her this one, and I faxed --
3
4          (Whereby the witness indicates.)
5
6  Q.  Exhibit 55 as well I believe you said you sent to
7      Kathy Quin. This is 55 right there.
8
9          (Whereby Mr. Monastersky indicates.)
10
11 A.  All right. There was a cover sheet if I did fax
12     it. Yes.
13 Q.  Okay.
14 A.  This one and this one.
15
16         (Whereby the witness indicates.)
17
18 Q.  So 48 and 55?
19 A.  Yes.
20 Q.  Nowhere on Exhibit 48 or 55 did it indicate what
21     the medical condition was that you were suffering
22     from?
23 A.  No. I just said I was out to take care of medical
24     issues.
25 Q.  Exhibit 48 is, in fact, a note from a

63

1      gastroenterologist/internal medicine doctor;
2      correct?
3  A.  That's my primary care physician, and he was doing
4      tests.
5  Q.  That's indicated right on Exhibit 48?
6  A.  Right. He's an internal medicine specialist.
7  Q.  Okay. Now, you claim that Ms. Quin was
8      discriminating against you based upon your medical
9      condition; is that correct?
10 A.  Yes.
11 Q.  And how was she discriminating against you based
12     upon your medical condition?
13 A.  I believe that Kathleen Quin was aware that I was
14     under a doctor's care, and just that alone should
15     have given reason to have at least provided help
16     and some assistance with the workload and the
17     arbitrary deadlines.
18 Q.  The mere fact that you were under a doctor's care
19     and that she knew you were under the doctor's care
20     is indicative of the fact that she was
21     discriminating against you based upon your
22     disability?
23 A.  Not discriminating against me based on just the
24     disability but in many other ways in terms of the
25     workload itself. Just treating me differently.

64

```
 1  A.  She was a part-time employee with the Town
 2      Manager's Office at one point while I was employed
 3      with the Town.
 4  Q.  What was her position with the Town Manager's
 5      Office?
 6  A.  She was the secretary.
 7  Q.  Okay.  Why have you identified her as a witness
 8      who you expect to testify at trial?
 9  A.  I have talked to her, and she said that she had no
10      information that she could share because she
11      didn't -- she was not privy to any conversations
12      between Kathy Quin and I.
13  Q.  So she said she has no information?
14  A.  She knew that I was employed with the Town, but she
15      had nothing that was relevant to this particular
16      case.
17  Q.  Do you know what her address is?
18  A.  I know she resides either in Windsor or Bloomfield.
19      I'm not sure what her address is, but she has
20      agreed not to . . .
21  Q.  She agreed not to testify?
22  A.  Right.
23  Q.  She doesn't want to testify?
24  A.  She does not want to testify.
25  Q.  Karen Kiley, why have you identified her as a
                                                        77

 1      witness?
 2  A.  While I was employed in the Building Department,
 3      Karen Kiley was the person who I worked closely
 4      with; and I know that Kathy spoke with Karen, and
 5      Dede spoke with Karen when I was approached to
 6      apply for the deputy town clerk position.
 7  Q.  So she's going to testify concerning events that
 8      occurred before you began working in the Town
 9      Clerk's Office?
10  A.  If she did, yes.  She's ill, so I'm not sure if
11      she'll be around, if she'll be available to
12      testify.  She's been seriously sick.
13  Q.  Do you contend that she witnessed any of the
14      alleged discriminatory conduct towards you?
15  A.  I don't know if she witnessed anything for sure.
16      I know there were conversations with Karen
17      regarding my performance while I was in the
18      Building Department.
19  Q.  That was before you worked in the Town Clerk's
20      Office?
21  A.  Right; because Kathy mentioned that to me.
22  Q.  Enita Jubrey, why have you identified her as a
23      witness?
24  A.  Enita worked with the Town Manager's Office as well
25      and was on the town clerk's payroll for the first
                                                        78

 1      two years before she was on the town -- before she
 2      was moved to the town manager's payroll, and Enita
 3      was the person that Kathy left in charge to sign
 4      our time sheets, the time report.  In some
 5      instances, she would leave Enita notes as to how to
 6      handle the time.
 7  Q.  Is there any other reason why you identified her as
 8      a witness?
 9  A.  That's the basic reason because I was not -- I was
10      a deputy, but yet Enita was -- used to sign off on
11      our time sheets.
12  Q.  Why have you identified Gary Dowgewicz as a
13      witness?
14  A.  I believe that it was Gary Dowgewicz who placed the
15      dead rat in my workstation and that he knew that it
16      was there.  Gary is almost like an adopted child
17      for Kathy.  He does what she wants him to do.  If
18      she didn't place the dead rat there, Gary Dowgewicz
19      was the person who placed it there.  Kathy
20      allegedly called Gary to remove the dead rat, and
21      Gary didn't come.  I saw Gary around November
22      perhaps, and he said he didn't receive a call, but
23      Gary knew about the rat.
24  Q.  What was Gary's position with the Town?
25  A.  He worked in the Town Manager's Office for -- from
                                                        79

 1      the time I was in the Town Clerk's Office from
 2      prior to 1998 to around 2000, early 2001, and he
 3      was transferred to public works or building and
 4      grounds.
 5  Q.  So at the time of the incident with the rat, he was
 6      working for the Building Maintenance Department?
 7  A.  Yes.
 8  Q.  And you have no evidence that he placed the rat in
 9      your drawer.  It's just your belief; correct?
10  A.  It's a very strong belief that Gary placed it
11      there.
12  Q.  It's just your belief.  You don't have any
13      evidence.  You didn't see him do it, did you?
14  A.  I didn't see him do it.
15  Q.  Okay.  He never admitted to you that he did it?
16  A.  He smiled, but he never admitted that he did it.
17  Q.  He smiled when?
18  A.  I saw Gary on or about 2000, November.  The rat was
19      placed in there prior to that, and I asked him then
20      did he get a call about a dead rat in my
21      workstation; and he said he didn't get the call,
22      which means that Kathy perhaps didn't place the
23      call, but that was what I heard her say; that she
24      called Gary Dowgewicz.
25  Q.  Was the rat removed from your drawer?
                                                        80
```