**Page 85**

1   Town employees in the Town Clerk's Office?
2 A. Well, he knew that Alice Williams never processed
3   mail.
4 Q. Did any other employees in the Town Clerk's Office
5   ever process mail?
6 A. Perhaps Elka processed mail on occasion, but she
7   wasn't a town clerk.
8 Q. Did you ever witness Kathleen Quin processing mail?
9 A. She may have processed it when I wasn't around, but
10   I never witnessed Kathy processing mail if I was
11   there.
12 Q. Why have you identified Katie Chiodo as a witness?
13 A. She's the probate administrator next door, and
14   sometimes she would have to come over and access
15   our records, town clerk records; and I'm sure,
16   because there's — it's the adjacent office, I'm
17   sure she overheard some of the loudness and some of
18   the rudeness perhaps that was exhibited toward me
19   by Kathy Quin.
20 Q. She worked for the probate court?
21 A. Right next door, yes.
22 Q. Okay. So she was not a Town employee; correct?
23 A. No. She works for the State, but they have offices
24   in our building.
25 Q. Have you talked to her about this lawsuit at all?

**Page 86**

1 A. No, I haven't talked to her about the lawsuit.
2 Q. Have you asked her if she witnessed any of the
3   conduct you claim that she'll testify about?
4 A. No. When I was there, I talked to Katie about a
5   few things that were unsettling and things that I
6   thought were different treatment.
7 Q. Why have you identified Kathy Jordan as a witness?
8 A. She also works in the Probate Office, and I knew
9   Kathy before I came to work for the Town, and we
10   would have conversations about the treatment that I
11   received, the different treatment I received, as a
12   result of being in the Town Clerk's Office; and
13   sometimes Kathy would come over and speak with me
14   just briefly to see how I was doing, etc.
15 Q. Why have you identified Holly Holt as a witness?
16 A. Well, Holly was present when I went through my
17   personnel file. She made all the copies that she
18   handed to me, and — so she has — she knew what
19   was in my file before.
20 Q. Why have you identified Glenn Cusano as a witness?
21 A. Glenn was in the Health Department which is right
22   upstairs. He was never called about the rat
23   problem. There was never any memos, any alarm
24   sounded, nothing about even having discovered the
25   rat; and then Glenn and I would just — because I

**Page 87**

1   worked in the Building Department which is also
2   located on the second floor across from the Health
3   Department, Glenn and I would meet in passing and
4   we would discuss just things that were going on in
5   the town as well as my situation, my current work
6   situation.
7 Q. Did you ever complain to Glenn Cusano about the
8   rat?
9 A. I didn't complain to Glenn about the rat because I
10   knew if it was legitimate, if the rat had not been
11   placed there, Glenn would have known about it
12   because Kathy would have made sure that the Health
13   Department, which is right upstairs, would have
14   been called; and the State has very, very strict
15   guidelines with respect to the vault and eating and
16   all of that whole area; and if there was a rat
17   infestation problem or a rogue rat problem in the
18   Town Hall, Glenn would have made sure that he
19   initiated any kind of program to get rid of the
20   rats.
21 Q. So the answer is you never complained to Glenn
22   Cusano about the rat; correct?
23 A. I didn't complain. I mentioned the fact that
24   there was a rat, and Glenn hadn't heard anything at
25   all about a rat being found in Town Hall.

**Page 88**

1 Q. Why have you identified Frank Angelillo as a —
2 A. Frank was also an systems administrator for the
3   computer system. On occasion, I had asked Frank
4   about certain access to the system and who had
5   access and how that access was obtained and just
6   general questions about the computer system in the
7   Town Hall.
8 Q. Why have you identified Christine Foss as a
9   witness?
10 A. Chris was in the Tax Collector's Office, and
11   certain times of the month, she would bring down
12   tax liens, etc., that had to be indexed; and,
13   again, because of the deadlines that I had, it
14   was — those — many times there were many, many
15   tax records that had to go on, and Chris would
16   bring those down, and she would always ask is it a
17   good time — when is a good time to bring it down
18   because she knew what the workload was like in the
19   office; and for that reason, I think she can
20   testify that there was an awful lot of work for one
21   person to do.
22 Q. Why have you identified Kelly Barrett as a witness?
23 A. Kelly — after — Kelly became the head of the
24   payroll area, Payroll Department, and she was aware
25   of most funds and moneys that flowed through the

**Page 93**

1  of alleged errors, all of the different treatment
2  with respect to having meetings with personnel in
3  spite of the deadlines that I had to complete as a
4  result of all of the constant harassing that took
5  place with Kathy.  Leon seemed to be -- he and
6  Peter Sousa seemed to be in agreement with it.
7  They didn't really approach me.  Kathy approached
8  them, and the three of them decided my fate in
9  relation to this matter.
10 Q. At any point in time, did you ever indicate to
11    Mr. Churchill that you believed you were being
12    discriminated against based upon your race?
13 A. I did tell Mr. Churchill that I was being treated
14    differently and that the treatment was based on my
15    race.
16 Q. When did you tell him that?
17 A. The conversation that I had with Mr. Churchill
18    prior to -- prior to the instance -- the incident
19    where the alleged errors were brought into the
20    room.  It had to be the end of October, 1999, on
21    or around October of 1999, through on or about that
22    meeting with Leon in the beginning of 2000.  Leon
23    and I had a conversation, and it was then that I
24    said to him I would appreciate it if you would
25    intervene on my behalf because Kathy is doing some

**Page 94**

1  things that I feel violate Town policy, and he said
2  he'd get back to me.
3         The next day, I was in the vault.  He came
4  in, and he said that he was going to let -- allow
5  the town procedures, meaning Dede Moore, handle it,
6  and that's how those meetings got started.
7  Q. When you told Mr. Churchill that you believed Town
8     policies were being violated, did you specifically
9     tell him you believed you were discriminated
10    against based upon your race?
11 A. I don't remember the exact words, but I believe I
12    did say because I'm a woman and because -- he knew
13    that I was a woman, and, sure, there were other
14    women.  There were no men in the Town Clerk's
15    Office, but because I was a black female, I
16    believed that I was being subject to different
17    terms and conditions of employment.  I mentioned
18    that to him.
19 Q. You specifically used the term because you were a
20    black female?
21 A. Because I was a black female, it seemed that I
22    ended up having to be subjected to different forms
23    of treatment.  I was the only person that had to
24    be subjected to these bi-weekly appraisals.
25 Q. Well, the bi-weekly appraisals didn't start until

**Page 95**

1  much later on; correct?
2  A. They started at the end of October when Leon
3     Churchill directed Kathleen Quin to take me off the
4     extended probation, 2001, when the bi-weekly ones
5     started; but all along, there were letters.  I was
6     inundated with memos.  If I left the office for a
7     couple of days to attend Town Clerk School, I'd
8     come back and there were five memos I'd have to
9     respond to and then meet the deadlines.  It was
10    almost impossible.
11 Q. The bi-weekly meetings that started with your --
12    after your meeting with Leon were as a result of
13    Leon saying that he was going to let the Town
14    policies handle the situation; correct?
15 A. The Personnel Department.
16 Q. And that's when those meetings started; correct?
17 A. Yes.
18 Q. And those were instituted by Leon and the Personnel
19    Department?
20 A. Well, he said he would get Dede Moore, who was the
21    then personnel director, to intervene and to handle
22    that aspect of it.
23 Q. And then Dede Moore is the one that instituted
24    those bi-weekly meetings; correct?
25 A. And that's . . .

**Page 96**

1  Q. Is that correct?
2  A. Dede Moore was the person that contacted me and
3     Kathy.  Leon didn't.
4  Q. Dede Moore was the one that instituted the
5     bi-weekly meetings following your discussion with
6     Leon Churchill in October of 1999; correct?
7  A. I believe at Leon's instruction, yes.
8  Q. Okay.  And then, in 2001, you had bi-weekly
9     performance appraisals where there was actually a
10    form filled out; correct?
11 A. That's correct.
12 Q. The form started in 2001; correct?
13 A. There were letters before that.  The form itself
14    appeared early on.  There were -- first there were
15    the letters.  After the letters, there were the
16    meetings, and then the letters continued.  So it
17    was continuous and ongoing, but the actual
18    bi-weekly, yes, started in 2001.
19 Q. When did you take the town clerk's exam for the
20    State of Connecticut?
21 A. I was in the partial hospitalization program, and I
22    had gotten excused for that day.  So that was
23    around June or May of 2001.
24 Q. So you were actually out of work at the time you
25    took that test; correct?

**Page 109**

1  who was -- it was for me -- we were supposed to
2  have a paper ballot primary as well, and this was
3  given in case there were towns calling in for
4  copies of the packet or that I could review as well
5  because that was something I needed to know about.
6  Q.  My question to you is: Why was this put in your
7  discovery responses? What is this supposed to
8  purport to prove or show?
9  A.  Just that most of the -- part of the conversations
10      that I had with Kathy basically concerned -- they
11      were put in memo form, and this is something that
12      was not necessarily for me. It was just
13      information letting me know that, if other towns
14      called in for these packets, there was a master
15      packet available and to make copies for them so
16      they could have them. It was directions from her,
17      instead of telling me, using memos.
18  Q.  I'll show you Exhibit 20, which I believe is a memo
19      written by you to Leon Churchill; is that correct?
20      (Handing.)
21
22           (Witness reviews document.)
23
24  A.  Right.
25  Q.  Okay. What led up to you submitting this

**Page 110**

1  memorandum?
2  A.  After I had approached Kathleen Quin about the list
3      of annoyances and one of the things that she had
4      violated, my right to privacy by giving out my
5      phone number to a caller, we did finally meet,
6      Kathy and I; and in that meeting, I asked her why
7      had she chosen to do this, and she told me that my
8      number was in the phone book and that she didn't
9      think it was such a big deal. Neither my name nor
10     my number could have been recognized by anyone from
11     the phone book. To make a long story short, she
12     said that she didn't think I belonged there and
13     asked me what was I going to do about it; if I was
14     dissatisfied, what was I going to do about it.
15          After our meeting, Kathy went to Leon
16     Churchill and told him that I was not happy there;
17     and Leon asked me if I wanted to stay or remain in
18     the Town Clerk's Office, and that's how this letter
19     came about.
20  Q.  How do you know what Kathy and Mr. Churchill
21      discussed during that meeting?
22  A.  I'm not saying I know exactly what they discussed,
23      but after the meeting Kathy had with me, she
24      immediately went into Leon Churchill's office; and
25      Leon Churchill asked me based on our conversation,

**Page 111**

1  discussion, later on that afternoon.
2  Q.  That's why you wrote that memo?
3  A.  That's what initiated -- caused me to initiate this
4      memo.
5  Q.  That's marked as Exhibit 20. Okay. Thank you.
6      I'm going to show you Exhibit 22. (Handing.) Can
7      you tell me what the purpose of the inclusion of
8      that document in your discovery responses was?
9
10          (Witness reviews document.)
11
12  A.  I must have mixed it up with other things. It's a
13      general memo. It could be have been about
14      something that got mixed up that should not been
15      allowed to continue.
16  Q.  Can you tell me what the purpose of Exhibit 23 is?
17      (Handing.)
18
19          (Witness reviews document.)
20
21  A.  These were basically notes that I had written,
22      especially the one here where I have a comradery
23      task team meeting. In reviewing my performance
24      appraisals, Kathy did mention that I didn't let her
25      know far enough in advance when I had a meeting or,

**Page 112**

1  in this case, a comradery task team meeting. I
2  had given Kathy the -- a copy of my desire to
3  attend this comradery task force meeting on August
4  2. The meeting was not scheduled until August 8,
5  and I also gave her the time. The rest of these
6  were notes that somehow got mixed up with the
7  things that I had.
8       This one here, June 28, I opened up my e-mail;
9  and, low and behold, I had items that were deleted,
10 and I knew that I had not deleted them. I didn't
11 know who would have done such a thing. These are
12 notes that I had written.
13 Q.  To yourself some of them?
14 A.  Basically, except for the one that I have addressed
15     to Kathy.
16 Q.  I'll show you what's been marked as Exhibit 24.
17     Can you tell me what the purpose of including those
18     in your discovery responses was? (Handing.)
19
20          (Witness reviews document.)
21
22 A.  These were problems I was having with my computer
23     system, especially the problem with the shortcut.
24     These are things leading me to believe that the
25     data on my computer was being compromised, and

```
 1    these are the notes that I wrote because, in
 2    explaining to the program people and the people --
 3    the system administrator, mostly I wrote these
 4    notes out to help me remember what it is that I
 5    need to tell them.  These are basically notes that
 6    came from my computer.
 7 Q. So you would write notes to yourself to help you
 8    remember what you wanted to talk to people about?
 9 A. In the case of the shortcut, I don't really know
10    what's involved with the VAX system or the computer
11    system; and many times, when I would call down,
12    they would ask me, "What was the error message?
13    What did the computer say exactly?"  So I would
14    write the message that came up on the computer
15    screen, especially the problem with the shortcut
16    and then the item "clerk 11-14," those things
17    definitely.  That's why I put yes or no because I
18    was trying to write the error message so I could
19    give them the exact details that showed up on my
20    screen.
21 Q. So you were writing memos at the time something
22    occurred so you would remember what you had to talk
23    to them about in the future?
24 A. In the case of these two, in the case of the 11-14
25    and this one, this one was regarding the problem
                                                      113
```

```
 1    with my computer.  This one here, the one dated
 2    10-31, I needed to look up -- I needed to look
 3    again at that ruling.  This customer wanted to
 4    register to vote, and I talked about the deadline
 5    to her, but then Kathy intervened.  So I wanted to
 6    check that information about the -- it was
 7    regarding the presidential ballot.  I wanted to
 8    find what that information said with respect to
 9    registering to vote past the deadline and if that
10    was acceptable.
11 Q. Actually, that wasn't registering to vote.  That
12    was for a ballot; correct?
13 A. For the presidential ballot, yeah.
14 Q. Registering to vote isn't handled by your office,
15    is it?
16 A. Yes, we do.  We do handle registration.  Even
17    though the Registrar's Office is downstairs,
18    Windsor did not -- they were not open full-time.
19    They were only part-time.  When they were not open
20    or available, we had the voter registration cards
21    right there in our office and we would register
22    people to vote, yes.
23 Q. What is the purpose of Exhibit 25?  (Handing.)
24
25                (Witness reviews document.)
                                                      114
```

```
 1
 2 A. This was information that perhaps came from
 3    probably a death certificate.  Kimberly-Hall is an
 4    elderly facility, and we often receive death
 5    certificates from Carmon Funeral Home regarding
 6    information that needs to be amended on death
 7    certificates; and these instructions may have come
 8    from the State of Connecticut or may have come from
 9    Kimberly-Hall themselves asking us to amend a death
10    certificate because that information either comes
11    from a family member or from someone there at the
12    Kimberly-Hall facility.
13 Q. I'll show you Exhibit 26.  (Handing.)
14
15                (Witness reviews document.)
16
17 Q. Did you have a meeting with Leon Churchill and
18    Kathy Quin in January of 2001?
19 A. I don't recall a meeting with Leon and Kathy.
20 Q. Okay.
21 A. In January.
22 Q. Do you recall that you and Kathleen Quin wanted to
23    measure your progress without Alice or any other
24    full-time persons for two months?
25 A. Yes, I remember stating that's what we wanted to
                                                      115
```

```
 1    do.
 2 Q. And wasn't that agreement, that you wanted to do
 3    that, in direct response to the fact that the Town
 4    was planning on hiring an additional full-time town
 5    clerk and that you and Kathy discussed it and said
 6    why don't we try for two months to see if we can
 7    handle it without hiring a new, full-time deputy
 8    town clerk?
 9 A. We had -- by this time, Alice had become auditor.
10    So now we've got -- as of January 11, we've got
11    this meeting that we're going to meet to try to
12    iron out or try to figure out how Kathy and I can
13    do the work.  So after Alice became auditor, yeah,
14    this is what happened.
15 Q. And you and Kathy agreed that you're going to
16    try -- strike that.
17        You and Kathy were going to see how things
18    worked for two months before any determination to
19    hire new employees would be made; is that correct?
20 A. That's correct.  That was what we were supposed to
21    do, yes.
22 Q. And that the two of you agreed to set performance
23    standards for indexing lands records; correct?
24 A. For me, yes.  Just for me.
25 Q. Well, wouldn't the standard also apply to Kathy
                                                      116
```

```
 1      Quin indexing lands records?
 2 A.   They should have but they didn't.
 3 Q.   What was the performance standard that was set up?
 4 A.   There were several. The first time, according to
 5      this -- let me see.
 6
 7              (Witness reviews document.)
 8
 9 A.   I'd have to refer to my notes perhaps. I think it
10      was 90 percent and then, after two weeks --
11      90 percent of the work needs to be error-free.
12      Then 95 percent within two weeks had to be
13      error-free of the indexed land records, something
14      to that effect.
15 Q.   You say that standard was not to apply to other
16      employees in the Town Clerk's Office that were
17      indexing land records?
18 A.   Exactly.
19 Q.   Wasn't it two months to get up to the 95 percent?
20 A.   Two months.
21 Q.   Exhibit 27 is a -- it looks like it's several
22      e-mails concerning problems with your computer?
23      (Handing.)
24
25              (Witness reviews document.)
                                                   117
```

```
 1 A.   Yes.
 2 Q.   Okay. So the first one on the bottom there is
 3      actually a message from Kathy Quin to Kim Ridel,
 4      Frank Angelillo and Ed Pruitt concerning problems
 5      with your computer; correct?
 6 A.   That's the first message.
 7 Q.   And then the one above it is a response from Frank
 8      Angelillo to Kathleen Quin; is that correct?
 9 A.   That's right.
10 Q.   And then Kathy sent the whole thing off to you; is
11      that correct?
12 A.   That's correct.
13 Q.   Doesn't this document show that Kathleen Quin was
14      trying to solve problems you were having with your
15      computer?
16 A.   What this document shows is that those problems
17      were either being created by somebody -- we're
18      talking here about August 15, 2001. Now, all of a
19      sudden, there's a problem with the user incorrectly
20      exiting an application? How could I be
21      incorrectly exiting? I've been exiting the
22      application for the past two and a half years.
23      Now, here it is August and I don't know how to get
24      in and out of it? So, yeah, this is an effort to
25
                                                   118
```

```
 1      show that -- she's documenting paper in the file
 2      that shows she's trying to get some help.
 3 Q.   I'd like you to look at Exhibit 28. (Handing.)
 4
 5              (Witness reviews document.)
 6
 7 Q.   Is that your handwriting there where it says
 8      "passing the buck again"?
 9 A.   Yes.
10 Q.   What is that supposed to mean?
11 A.   Again, Kathy is trying to say that I am the -- I'm
12      the problem, the reason why the computers are not
13      working; but even Kim Ridel, who was a computer
14      person, when she came up, the computer locked up on
15      here. The problem with the computer locking up
16      was another one of those side issues after two and
17      a half years of exiting and entering an
18      application. The computer system had not changed.
19      The VAX system had been around for a very long time
20      for the Town Clerk's Office, and that's the system
21      that we're talking about. We're talking about our
22      VAX system, V-A-X.
23 Q.   Doesn't the Town continually change things on the
24      computer system? They have personnel that are
25      constantly changing, programming and updating
                                                   119
```

```
 1      things?
 2 A.   Not with respect to the VAX. Regular computers,
 3      yeah, because the Town ordered a whole slew of
 4      Gateway computers; but the VAX system is a very,
 5      very dependable system, and that's what we're
 6      talking about here.
 7 Q.   Exhibit 30 is the job description under which you
 8      were first hired as the deputy town clerk; correct?
 9      (Handing.)
10
11              (Witness reviews document.)
12
13 A.   That's correct.
14 Q.   Exhibit 31, what's your contention that that
15      document is showing? (Handing.)
16
17              (Witness reviews document.)
18
19 A.   This document, Exhibit 51, is the --
20 Q.   Thirty-one.
21 A.   I'm sorry. Thirty-one. It was given to me
22      because the requirements for the town clerk duties
23      were being updated, and so this is -- these are
24      just my -- these are the things that I thought
25      needed to be updated; and it did ask for a Master's
                                                   120
```

Frances R. Teti, LSR

**Page 141**

1  A.  They were created -- they were written at the time
2      I did them; however, I was still working -- I was
3      doing -- prior to receiving instructions for some
4      of the responsibilities in the Town Clerk's Office,
5      I was already doing them.  For example, here where
6      it says -- I issued a firearms license.  This was
7      January of '99, but I got no instructions and I got
8      no training on issuing them, so yes.  Don't forgot
9      to sign it, these kinds of things.
10 Q.  Would you have to be instructed to sign a license?
11 A.  No, but many times, when it gets busy, we --
12     sometimes it's an oversight.  It's not something
13     that one would do in the ordinary course of
14     performing their duties.
15 Q.  Turning to April of 1999, on the 6th, there's
16     something about a death threat was called in.
17     What is that referring to?
18 A.  I received a call from the school that someone had
19     called in a death threat on my daughter.
20 Q.  September, 1999, on the 30th, you went -- why do
21     you have the Town Clerks Conference at Water's Edge
22     listed there?
23 A.  Because that was the scheduled date.
24 Q.  Did you go?
25 A.  Yes, I did.

**Page 142**

1  Q.  Did Kathleen Quin go?
2  A.  I don't think she did.
3  Q.  I'd like to turn your attention to October of 1999.
4      On the 21st, there's a note there.  Could you read
5      that note for me, please.
6  A.  October.  Which date?
7  Q.  October 21.
8  A.  "Kathy made general remark that 'anyone of color is
9      a problem.'  I wonder what set her off this time."
10 Q.  You heard her specifically say, "Anyone of color is
11     a problem"?
12 A.  It's in quotes.
13 Q.  I'm asking you.  Did you specifically hear her say
14     that?
15 A.  I placed in quotes what I heard her say.
16 Q.  I'd like to turn your attention to January of 2000.
17     On the 19th, you were having a panic attack?
18 A.  That's what it says here.
19 Q.  And then you have a note there, "Call Attorney
20     Jonathan Gould"?
21 A.  Uh-huh.
22 Q.  What was the purpose of that note there to call
23     Attorney Gould?
24 A.  I just wanted to discuss an issue that I had with
25     him that I felt I needed some legal advice on.

**Page 143**

1  Q.  Did it have anything to do with your employment?
2  A.  Attorney Gould is an employment attorney.
3  Q.  On the 20th, Leon Churchill wanted to meet with you
4      and Dede Moore?
5  A.  On January 20?
6  Q.  Yes, January 20.
7  A.  Yes.
8  Q.  Did you have a meeting with Mr. Churchill and Dede
9      Moore at that time?
10 A.  I know I met with Leon Churchill because I have the
11     note there.  Meeting with Dede Moore, I'm not sure
12     if these two went together or if that was just
13     another note on my calendar.
14 Q.  February, 2000, on the 3rd, is that the day that
15     you indicate Kathleen Quin accused you of stealing
16     $10?
17 A.  February?
18 Q.  February 3.
19 A.  I don't think it was.  I can't be sure.  I think
20     she just asked where the money was on that
21     particular day.
22 Q.  I would like to turn your attention to March 23,
23     2000.  Am I correct in saying that it indicates
24     "TC and I talked about"?  Is that what it says at
25     the top of that date?

**Page 144**

1  A.  Yes.
2  Q.  Is the "TC" Kathleen Quin?
3  A.  Town clerk.
4  Q.  And that was Kathleen Quin?
5  A.  Yes.
6  Q.  You talked about lawsuits; is that correct?
7  A.  We talked about them.
8  Q.  What discussion did you have about lawsuits?
9  A.  That when a lawsuit is presented, we have to make
10     sure we get a receipt, clock it in, that sort of
11     thing, so that we have a time.
12 Q.  Anything else about lawsuits?
13 A.  Distribution of the lawsuit.
14 Q.  Who in the Town it had to go to?
15 A.  The attorneys.  The town clerk maintained a file
16     of all the suits that were being litigated between
17     the Town and others.
18 Q.  What is Number 2 under there?
19 A.  Foreclosures probably or fire losses.  I think
20     it's fire losses.
21 Q.  What did you talk about fire losses?
22 A.  Town's responsible for doing the same thing with
23     respect to fire losses as well.
24 Q.  Number 3, you talked about billing and monthly
25     reports?

**Page 149**

1  Q.  Why did you write it down?
2  A.  Because there are things that seem so out of the
3      ordinary -- I needed help with the records, with
4      indexing, with town clerk business; and this
5      certainly was not part and parcel of town clerk
6      business as I saw it, so I wrote it down.
7  Q.  Well, the timing of that event is September 17,
8      2001; correct?
9  A.  That's correct.
10 Q.  Less than a week after September 11, 2001; correct?
11 A.  That's correct.
12 Q.  Do you know what Kathleen Quin was doing with this
13     information she was looking for on that day?
14 A.  No, I don't.
15 Q.  Did you bother to ask her?
16 A.  No. I was busy trying to do town clerk work.
17 Q.  Do you know who she submitted that information to?
18 A.  No.
19 Q.  Would you be surprised if that information was
20     submitted to the FBI?
21 A.  No.
22 Q.  So you don't know the purpose of what she was doing
23     that research for, do you?
24 A.  No. I just knew that I didn't have any help that
25     day.

**Page 150**

1  Q.  And you didn't know if she was asked to look up
2      those records, do you?
3  A.  No.
4  Q.  And you don't believe it's the job of the Town
5      Clerk's Office, if you're asked to do some research
6      that may affect national security, that that's
7      something the town clerk should be doing?
8  A.  I certainly believe that. Yes, I do. Yes, I do.
9  Q.  Now, the next page, October 16, you wrote, "KQ was
10     so impolite and inconsiderate." Was that
11     different than any other day?
12 A.  Probably wasn't.
13 Q.  So why did you write it down on that day and not
14     any other day?
15 A.  It was written down on other days.
16 Q.  During the year 2001, was it written down on any
17     other days?
18 A.  I don't have the rest of the calendar. I've just
19     got September and October. I don't see it in
20     there.
21 Q.  Well, I believe your discovery responses will speak
22     for themselves. Put those back together, please.
23
24          (Whereby the witness complies.)
25

**Page 151**

1  A.  (Handing.)
2  Q.  Thank you. Were there any other employees in the
3      Town Clerk's Office that went to the high
4      performance training?
5  A.  I'm not sure. I don't recall. I know Kathy
6      went.
7  Q.  Did Elka go?
8  A.  I don't know. I know Kathy went.
9  Q.  Did Alice go?
10 A.  I don't know. I know Kathy went.
11 Q.  Did Thelma go?
12 A.  I don't know. I just know Kathy went.
13 Q.  And you went, too; correct?
14 A.  And I went, yes.
15 Q.  Well, actually, weren't you out with a root canal?
16 A.  I had -- Dede postponed it because there was an
17     issue initially, but everyone had to attend this
18     HPO, high performance organization. So I worked
19     around my schedule, and Dede was able to get me in
20     because I asked her was this the last chance I
21     would have to do that, and she was able to work me
22     in.
23 Q.  Did Kathleen Quin ever call you a stupid,
24     slow-learning, black girl?
25 A.  That was kind of the way she treated me in a sense.

**Page 152**

1  Q.  Did she ever call you that?
2  A.  Not in those terms.
3  Q.  Did Kathleen Quin ever make a racial slur towards
4      you?
5  A.  Specifically calling me -- what do you mean?
6  Q.  Well, anything that you would consider a racial
7      slur.
8  A.  Her actions certainly demonstrated --
9  Q.  I'm not asking about her actions. I'm asking did
10     she ever direct racial slurs towards you.
11 A.  She just said I didn't belong there.
12 Q.  Do you have any evidence of the training that the
13     Town of Windsor provided to its supervisors?
14 A.  Evidence of training that the Town of Windsor
15     provided its supervisors? No.
16 Q.  Okay. I would ask you to look at your complaint,
17     which is Exhibit 1. (Handing.)
18
19          (Witness reviews document.)
20
21 Q.  I believe we're on Count 2, Paragraph 5. You
22     indicate the defendants acted jointly and in
23     concert with each other. Who were you referring
24     to there?
25 A.  Kathleen Quin, Alice Williams, Leon Churchill,

```
 1      you had a heavier workload than everyone else in
 2      the office?
 3  A.  Yes, I do.
 4  Q.  Was your workload heavier than the town clerk's
 5      workload?
 6  A.  Yes.
 7  Q.  Were your hours longer than other
 8      similarly-situated people in the office?
 9              MR. MONASTERSKY: Objection.
10              MS. JENNINGS: I'll withdraw that
11          question.
12  BY MS. JENNINGS:
13  Q.  Let's talk about your illness. Have you ever been
14      diagnosed with depression before you worked for the
15      Town of Windsor?
16  A.  Depression wasn't a medical condition before I
17      began working for the Town of Windsor.
18  Q.  Had you ever received any type of psychological
19      counseling before you worked for the Town of
20      Windsor?
21  A.  I received counseling as a result of having worked
22      third shift for five years, and the -- my doctor
23      insisted that I see a counselor to see if something
24      can be done because, after working for five years
25      third shift, I had a problem sleeping.
                                                    185
```

```
 1  Q.  All right. So you had a sleeping problem before
 2      but not depression?
 3  A.  Not depression.
 4  Q.  Okay. What do you believe triggered your
 5      depression?
 6  A.  I believe it was different treatment, the heavy
 7      workload that I had to endure as a result of
 8      working in the Town Clerk's Office and the fact
 9      that all of the efforts -- all of my efforts, the
10      deadlines, all of that was not enough even after
11      putting in the long hours and the fact that being a
12      black woman, being black, it was one of the
13      things -- it was something for me to do. All the
14      extra work, whatever needed to be done, put it on
15      my plate.
16  Q.  Let's talk about the hostile work environment.
17      You claim hostile work environment in your
18      complaint; correct?
19  A.  That's correct.
20  Q.  Could you give me a list of things you thought you
21      believed made the workplace hostile for you?
22  A.  Certainly the rat situation has to be at the top of
23      the list and the fact that I was never spoken to --
24      I was not spoken to in a civil manner by Kathleen
25      Quin -- it was always a condescending, arrogant
                                                    186
```

```
 1      manner when she addressed me -- and the fact that,
 2      of course, she would not respect my space. She
 3      would constantly lean over me whenever she was at
 4      my desk, lean her body in my space, these kinds of
 5      things, and it just continued during my stay in the
 6      Town Clerk's Office.
 7  Q.  You talked earlier in your deposition about
 8      isolation or the silent treatment I believe you
 9      called it?
10  A.  Yes.
11  Q.  Could you explain that, please.
12  A.  That was another thing that kind of made it such an
13      extremely hostile situation to be placed in, to
14      work in.
15  Q.  What was the silent treatment? What did it
16      consist of?
17  A.  Many times she would --
18  Q.  Who is "she"?
19  A.  Kathleen Quin would speak to the other three
20      employees, but with me, she would leave a note or
21      just speak loud enough so I could hear but not
22      necessarily be included in the conversations that
23      were being done that she was participating in with
24      the other co-workers, and it was just the whole
25      idea of her just not answering questions about the
                                                    187
```

```
 1      instructions. If there's an instruction, even a
 2      written instruction, you couldn't get an answer
 3      from her on those.
 4  Q.  Did Kathleen Quin know that you suffered from an
 5      illness?
 6  A.  She had knowledge of a medical condition.
 7  Q.  When you say "knowledge of a medical condition,"
 8      none of your documents said that she knew what the
 9      illness was, but did she know you were ill?
10  A.  Yes, she knew I was ill.
11  Q.  How did she know?
12  A.  Because I brought her the initial medical excuse
13      from the doctor, and, as a matter of fact, I
14      brought her two medical excuses from the doctors;
15      and Dede Moore told her because, otherwise, Dede
16      wouldn't have called me.
17  Q.  Did you think your illness impacted your major life
18      activities?
19  A.  Yes, it did.
20  Q.  How? How did your illness impact your major life
21      activities?
22  A.  I wasn't able to help my children with their
23      homework, and my husband -- the relationship
24      between my husband and I, I wasn't able to maintain
25      that relationship. I was mentally drained and
                                                    188
```

## CERTIFICATE OF REPORTER

1  I, Frances R. Teti, a Licensed Shorthand
Reporter and Notary Public duly commissioned and
qualified in and for the State of Connecticut, do hereby
certify that there came before me the following named
person, to wit: PATRICIA ANN MASSEY, who was by me duly
sworn to testify to the truth and nothing but the truth;
that she was thereupon carefully examined upon her oath
and her examination reduced to writing under my
supervision; that this deposition is a true record of
the testimony given by the witness.

I further certify that I am neither attorney
nor counsel for, nor related to, nor employed by any of
the parties to the action in which this deposition is
taken, and further that I am not a relative or employee
of any attorney or counsel employed by the parties
hereto, nor financially interested in the action.

IN WITNESS THEREOF, I have hereunto set my
hand and affixed my seal this 30th day of April, 2004.

_____
Frances R. Teti, LSR, Notary Public
My commission expires: 3-31-09
License No: 00076

197

## INDEX OF EXHIBITS

| | | PAGE |
|---|---|---|
| 57A | One-page document | 127 |
| 57B | One-page document | 128 |
| 57C | One-page document | 128 |
| 57D | One-page document | 128 |
| 57E | Two-page document | 128 |
| 57F | One-page document | 128 |
| 57G | One-page document | 128 |
| 57H | Two-page document | 129 |
| 57I | Two-page document | 129 |
| 57J | One-page document | 129 |
| 68 | One-page document entitled, "Chapter 12 - Grievances and Appeals" | 4 |
| 69 | One-page document dated 7-25-00 | 106 |
| 70 | One-page document dated 7-25-00 | 106 |
| 71 | Fact-Finding Report, one-page document | 155 |

(ORIGINAL EXHIBITS ARE BEING RETAINED BY ATTORNEY MONASTERSKY.)

199

## INDEX OF EXAMINATIONS

| | PAGE |
|---|---|
| CONTINUED DIRECT EXAMINATION BY MR. MONASTERSKY | 4 |
| CROSS-EXAMINATION BY MS. JENNINGS | 164 |

198

## ERRATA SHEET

I, PATRICIA ANN MASSEY, do hereby certify that the following corrections and additions are true and accurate to the best of my knowledge and belief:

PAGE   LINE   CORRECTION           REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____

(SEE ATTACHED SHEETS   [ ] YES   [ ] NO )

_____           _____
DATE                       PATRICIA ANN MASSEY

At _____ in said County of _____, this ___ day of _____, 2004, personally appeared, PATRICIA ANN MASSEY, and she made oath to the truth of the foregoing corrections by her subscribed.

Before me, _____, Notary Public.
My commission expires: _____

200

Frances R. Teti, LSR