# CONNECTICUT COMMISSION ON HUMAN RIGHTS & OPPORTUNITIES

## AFFIDAVIT OF ILLEGAL DISCRIMINATORY PRACTICE

Date: **March 7, 2002**

CHRO No.: **0210368**

EEOC No.: **16AA266811**

**My name is** Patricia Ann Massey

**and I reside at** 50 Briarwood Dr., P.O. Box 262, Bloomfield, CT. 06002

**The respondent is/are** Town of Windsor

**whose business address is/are** 275 Broad St., P.O. Box 472, Windsor, CT 06095

**I was**
- ( ) denied reasonable accommodation on the basis of as disability on or about _____
- (X) terminated on or about December 10, 2001
- ( ) laid off on or about _____
- ( ) demoted on or about _____
- ( ) poorly evaluated on or about _____
- ( ) sexually harassed on or about _____
- ( ) earning unequal pay on or about _____
- ( ) retaliated against on the basis of my participation in a civil rights issue on or about _____
- ( ) delegated unequal duties on or about _____
- ( ) placed on probation on or about _____
- ( ) given reduced hours on or about _____
- ( ) denied equal services on or about _____
- ( ) suspended on or about _____
- ( ) not recalled on or about _____
- ( ) harassed on or about _____
- ( ) warned on or about _____
- ( ) denied a raise on or about _____
- ( ) transferred on or about _____
- ( ) not hired on or about _____
- ( ) not promoted on or about _____
- ( ) less trained on or about _____
- ( ) other _____ on or about _____

**and believe that my**
- (X) race (African-American)
- (X) color (Black)
- ( ) national origin (____)
- ( ) ancestry (____)
- ( ) prior criminal record
- ( ) having previously opposed discriminatory conduct
- (X) age (51 dob: May 11, 1950)
- ( ) alienage (____)
- ( ) sexual orientation (____)
- ( ) religion/creed (____)
- ( ) physical disability (____)
- (X) mental disability/disorder (Major Depression/Gen'l Anx)
- ( ) learning disability (____)
- ( ) marital status (____)
- ( ) sex (____)
- ( ) Pregnancy

**was/were in part a factor(s) in this action. I believe that the respondent violated the following Connecticut General Statutes and Acts listed below:**

- (X) 46a-58(a)
- (X) 46a-60(a)(1)
- ( ) 46a-60(a)(4)
- ( ) 46a-60(a)(7)
- ( ) 46a-75
- ( ) 46a-64(a)
- ( ) 46a-81( )( )
- ( ) 46a-80
- ( ) 46a-60(a)(8)( )( )
- ( ) 46a-70( )
- (X) Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 20003 and the Civil Rights Act of 1991 (15 or more employees)
- (X) Age Discrimination in Employment Act of 1967, 29 U.S.C. 621-634 (20 or more employees)
- ( ) Americans with Disabilities Act, 42 U.S.C. 12101 et seq.
- ( ) Equal Pay Act of 1964, U.S.C. 206
- ( ) Other _____



DEFENDANT'S EXHIBIT NO. 5 FOR IDENTIFICATION 4-26-04 DATE RPTR F.T.

# AFFIDAVIT/COMPLAINT

1. My name is Patricia Ann Massey and I reside at 50 Briarwood Drive, Windsor, CT 06095. **IMPORTANT:** Address all correspondence concerning this matter to me at POB 262, Bloomfield, CT 06002.

2. The Respondent is Town of Windsor, located at 275 Broad Street, POB 472, Windsor, CT 06095.

3. The Respondent employs more than 15 persons.

4. I am a fifty-one year old, Black-American female.

5. On February 21, 1996, I was hired by Personnel Director Dede Moore to work for the Respondent on a permanent part-time basis as a Clerical Assistant in the Building and Land Department.

6. On September 6, 1998, I was hired as Deputy Town Clerk to work in the Information Services area (Town Clerk's Office) with five white, female employees Kathleen K. Quin, Full-time Town Clerk, Full-time Employee Thelma P. London, Contractual Employee/Deputy Town Clerk/Auditor Alice J. Williams, Contractual Employee June Cameron and Part-time Student Employee Elka M. Peck.

7. I worked with June P. Cameron who explained the procedures used in the office.

8. In and around December 1998, I attended Town Clerk's School and completed the first of five training modules for Town Clerk certification.

9. From in or around January 1999, I observed the Town Clerk, Kathleen K. Quin writing, editing and typing her college term papers. Thelma P. London, who retired in December 1998, returned to work on a part-time basis two days per week.

10. In or around March 1999, I received a six-month Performance Evaluation rating of "marginal" and was told by the Town Clerk that this was the case because I had not yet experienced the full range of tasks associated with the Deputy Town Clerk position.

11. Immediately following Kathleen K. Quin's obtaining her BA Degree from St. Joseph's College in May 1999, she began the Windsor Storyteller's book writing project. A significant part of the working day and often entire days were spent compiling materials, scanning and cropping pictures, making and receiving telephone calls relating to the stories, editing and typing manuscripts for the book. I spoke with the Town Manager about my need for additional office support. He told me that after the book was finished, Kathleen K. Quin will provide the needed assistance.

12. In or about May 1999, I attended Town Clerk's School and completed the second of five training modules for Town Clerk certification. From this time forward, there was very little communication between Kathleen K. Quin and I. On September 10, 1999, she told me that Moderator Training for the upcoming election was held on September 9, 1999, but she forgot to tell me. She'll be sure to remind me the next time. The extent of her communication with me was to leave notes on my desk whenever I took a lavatory or lunch break. No white employee was communicated with in this manner. There were no discussions of indexing deadlines or time limits

for accomplishing any of the day's tasks. On September 21, 1999, the Town Manager in accordance with Personnel Policies requested that the Town Clerk Kathleen K. Quin, end my employment probation as it had extended beyond the one-year maximum limit. The overall Performance rating given was exceeds performance standards. I was an exemplary employee the previous two years. Often arriving at work early and remaining until the days' work was completed.

13. In and around October 1999, there was a more noticeable deterioration in the behavior of Kathleen K. Quin towards me. On a daily basis, the Town Manager was bombarded or blitzed with xeroxed copies of every "alleged" error made in an effort to justify her reason for keeping me on probation.

14. I attended a before work (7:00A.M.) mandatory roundtable discussion called by the Town Manager in October. He spoke about the Town's Mission Statement and the High Performance Organization training that every employee will receive. The High Performance Management Model is geared towards moving the organization towards a coaching and guidance management model and away from the traditional top-down, dictatorial approach to employee management. This HPO system is suppose to take "performance" to a higher level by putting responsibility and decision-making ability in the hands of those doing the work. This model purports to unite a number of related tasks, (monitoring, coaching, providing feedback, information gathering and assessment of the incumbent's work), and allows for accomplishment of the task(s) in the context of the objectives - the immediate objectives of the department and the overall goals of the organization; and it carries them out systematically throughout the year. The Town

Manager asked if I had been briefed on this information and I replied that I had not. He told me to ask about the workshop and the manual, because the Leadership Team member (Kathleen K. Quin) was suppose to bring the information to the unit and share it.

15. Upon dismissal from the discussion group, I e-mailed Kathleen K. Quin about my interest in hearing about the High Performance Organization workshop and reviewing the manual on the subject. I also shared with her that I had a laundry list of issues which I also wanted to discuss related to understaffing in the Town Clerk's office; and the resulting impact on my personal workload, which left me with four peoples' jobs to do.

16. Meanwhile, the real estate records went on-line giving customers next-day internet access to transactions, which tremendously impacted my personal work strategy. I overheard Kathleen K. Quin tell an attorney that his title search has just been made easier. The real estate records were up and running and she proceeded to give him a demonstration. This was clearly an operations initiative which affected my work priority. I was not in any way briefed or included in any discussions of workload adjustments to meet the new time demands created as a result of this new service.

17. When Kathleen K. Quin and I met in October, I discussed a breach in privacy issue, in which she gave my home telephone number to a member of the public. This was done without my knowledge and consent; and I considered it to be a serious and egregious act. I was particularly annoyed by the lack of regard and total disrespect this action represented. To my knowledge, Kathleen K. Quin had never given to a member of the public, the home phone number of any white person who

worked in the office. Immediately following the meeting Kathleen K. Quin went into the Town Manager's office.

18. The following day, the Town Manager called me into his office and told me that Kathleen K. Quin told him that "I was not happy here." I made no such statement to her in our meeting. I simply raised the issue of her giving out my home telephone number to a member of the public.

19. I still received no assistance with daily office tasks, which became more unreasonable and burdensome. When decisions impacted me or my workload, Kathleen K Quin employed arbitrary standards and expectations to my responsibilities. This same decision-making arbitrariness was not applied too or placed on the white females with whom I worked. The Town Manager asked the Director of Personnel to intervene in an effort to resolve the work issues imposed upon me by Kathleen K. Quin, as a direct result of her typing, editing and publishing a book during work hours.

20. A dead rat was placed in my file drawer. This was "reported" to Building Maintenance by Kathleen K. Quin, however, no investigation was ever conducted.

21. In and around December 1999, I attended Town Clerk's School and completed the third of five training modules for Town Clerk certification. From January 1999 to November 1999, I indexed over 7,000 individual land transactions.

22. In or around January 2000, I met with Kathleen K. Quin and Personnel Director, Dede Moore again. I still have received no additional staff support.

23. In or around February 2000, I was given the additional responsibility, without training, for payment of monthly bills to vendors.

24. Even though the hard drive to my computer crashed, I still indexed all records that same day. The Town Manager asked me if I wanted to remain employed with the Town of Windsor. My response was "yes I want to stay." I had no reason to leave.

25. In or about March 2000, I met with the Town Manager, Ralph Leon Churchill, Jr., Town Clerk, Kathleen K. Quin and Director of Personnel, Dede Moore. Kathleen K. Quin entered the meeting carrying a box loaded with my alleged "errors", the goal being to show the Town Manager why I should be terminated from my position.

26. Kathleen K. Quin met with me in anticipation of her vacation. Since being hired in 1985, she had never left the office for three-consecutive weeks, even with a retired town Clerk functioning in the position of Deputy Town Clerk. Thelma P. London and I were left to handle all of the office business. Kathleen K. Quin knew or should have known that two people would not be able to keep up with the workload.

27. Upon her return from vacation, she began compiling materials, scanning and cropping photos, making, receiving and returning phone calls, editing and typing manuscripts for a second book. In or about April 2000, I attempted to access the Town of Windsor's Computer System and was refused access.

28. In or about May 2000, I attended Town Clerk School completed the fourth training modules for Town Clerk certification. Upon my return, there was correspondence

in my letter tray from Kathleen K. Quin alleging "poor performance." I was given the additional responsibility, without training, for processing of fish and game licensing. In the same month, I was given the additional responsibility, without training, of processing Connecticut State Conveyance Tax Forms; and the additional responsibility, without training, for processing vital statistics (marriage licenses, birth and death) records.

29. In or about June 2000, I was given the additional responsibility, without training, for processing May 2000 fish and game licenses from our agent. In between regular duties, these licenses must be sorted and filed; and the hunting licenses must be entered into the computer database. There are separate reporting and balancing procedures for these licenses. The volume of these licenses can double or triple our over-the-counter intake. Interruptions are constant. When this process was being handled by a white female in the office, that person sat well away from the hub of office activity to get the job done.

30. I was on vacation from July 19th through July 25, 2000. Upon my return there were two letters in my tray with "examples of my alleged "poor performance" on vitals processing and map indexing. Each time I am out of the office, I return with an in-box laden with xeroxed copies of "alleged" errors. Others in the office do not receive communications in this manner.

31. In or about August 2000, in addition to my duties in the Town Clerk's office, Kathleen K. Quin introduced me to the in-bound morning mail distribution; and the afternoon mail processing procedures. The afternoon outbound mail, in addition to having to be processed, must also be carried down the block to the Post Office. In this same

month, I became ill at work. I called my doctor and he agreed to see me immediately. Upon testing the doctor placed me on medication and excused me from work for two weeks (until September 5, 2000). During the two week period, I was referred to a specialist who extended my absence for illness until September 30th. I returned to work on October 2, 2000. In and around April 2001, I was hospitalized due to a recurrence of my illness. I returned to work briefly and was out again from May 21st to the end of June. All due to extreme and unreasonable conditions associated with the burdensome workload. Medical documentation was provided to the Town Clerk, Kathleen K. Quin as allowed by law.

32. In or about October 2000, after my return to work, I received a letter from Kathleen K. Quin entitled "2-Year Performance Appraisal" with a blank Performance Appraisal Form attached to it. The instructions were to complete it so that we could meet on Friday, October 13th to discuss and establish goals for future performance. We failed to meet on October 13th.

33. When Kathleen K. Quin and I met she had completed her form and had it typed. I presented a handwritten copy, with notes as prompts for the discussion we would have. There was no discussion between us as proposed in her correspondence to me. She asked for a signature and I signed her copy to acknowledge that I had seen it; and she signed my copy. The meeting was adjourned.

34. In the November 2000 issue of the Municipal Clerk's News Digest periodical, Kathleen K. Quin caused to publish an advertisement for my position, while I was still working as Deputy Town Clerk. She also posted my position on the Town Hall bulletin board and interviewed candidates for my position. These notices created

emotional and mental anguish, humiliation and daily embarrassment, thereby undermining my effectiveness with town staff, co-workers and the public; and perpetuated an already hostile and intolerable work environment.

35. In December 2000, I attended Town Clerk's School and completed the fifth and final training module for town clerk certification. I am eligible to take the Municipal Clerk's exam in June 2001. During the past two and one-half years, as the only full-time employee, the records in the town Clerk's Office remained up-to-date and in good order throughout the entire two years of books and thesis writing on the part of the Town Clerk.

36. In or about March 2001, the number of land records increased dramatically. I maintained up-to-date records with no additional support. I managed to complete the tasks by working many hours beyond the regular work day.

37. In or around May 2001, Town Clerk, Kathleen K. Quin implied that I had stolen $10.00 from the xerox copy money that was lying around on the office cart. She then mentioned to me that other money had been missing on other occasions but that she hadn't told me about it. From this point on, whenever Kathleen K. Quin was going to be out of the office, she would leave the key to the copy machine down the hall with the Finance Department. This reflected unfavorably upon my credibility as a member of the Town Clerk's staff. The implication was clear and obvious from her behavior that Kathleen K. Quin was accusing me of stealing money from the Town.

38. In or about July 2001, I received notification that out of twenty-eight (28) candidates sitting for the Connecticut Municipal Town Clerk's examination, only fourteen (14) passed. I was one of the fourteen who passed the test and received my Certified Municipal Town Clerk designation. Additionally, I have a BA degree from Connecticut College, Certified Paralegal designation from Hartford College for Women an am pursuing a Master's Degree through the University of Connecticut.

39. In or about August 2001, my daughter has a life-threatening allergic reaction which necessitated me taking time off from work. Upon my return, I recorded the time as "illness in the family". Kathleen K. Quin requested that I present her with a note from my child's allergist stating that I had to be out with her as a result of her illness. White females with children are not required to present such documentation.

40. In or about September 2001, immediately upon my return, Kathleen K. Quin instituted a bi-weekly appraisal system with arbitrary standards. The performance improvement plan was pre-textual and used in a discriminatory manner in order to force me to resign from my position.

41. In or around December 2001, I was asked to resign by acting Personnel Director and Assistant Town Manager Peter Souza. I declined.

42. On December 10, 2001, I was called to the Personnel office by Peter Souza, Assistant Town Manager/Acting Personnel Director and given a letter of dismissal "for failure to improve my performance as Deputy Town Clerk over the past three years." The information given to the

Department of Labor lists my termination as due to "wilful misconduct".

43. I therefore charge the Respondent with discriminatory animus based on race (African-American), color (Black), disability (Major Depression and Generalized Anxiety Disorder) and age (51-DOB 5.11.50). This discriminatory animus escalated dramatically after I passed the Municipal Clerk's Examination; and upon Kathleen K. Quin learning that I was enrolled in a Master's Degree program.

FORM 103

**IMPORTANT: YOU MUST OBTAIN A NOTARIZATION OF YOUR COMPLAINT BEFORE YOU RETURN**

I request the Connecticut Commission on Human Rights and Opportunities investigate my complaint, secure for me my rights as guaranteed to me under the above cited laws and secure for me any remedy to which I may be entitled.

___Patricia Ann Massey___ being duly sworn, on oath, states that she or he is the Complainant herein, that she or he has read the foregoing complaint and knows the content thereof; that the same is true of her or his own knowledge, except as to the matter herein stated on information and belief and that as to these matters she or he believes the same to be true.

Dated at ___Hartford___, Connecticut this ___7th___ day of ___March___, 20 02.

___[signature]___
Complainant's Signature

Subscribed and sworn to before me this ___7th___ day of ___March___, 20 02.

___[signature]___
Notary Public/Commissioner of the Superior Court

My commission expires: ___October 31st, 2005___

RECEIVED
COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES
CAPITOL REGION

Form 103                                                                                       Revised 1/1/96