DEFENDANT'S
EXHIBIT NO. 17
FOR IDENTIFICATION
DATE 4-2-04    RPTR



# TOWN OF WINDSOR

First in Connecticut. First for its citizens.

October 15, 2001

Patricia A. Massey
Town Clerk's Office
Town of Windsor

Dear Patricia,

As you know at the end of your six-month probation, March 1999, I pointed out that your probation would be extended for another six months because of errors in your daily work. We increased the amount of training and reviewed your work to help you improve. At the end of one year there seemed to be a slight improvement in land record entry. However, as you will recall, I asked you to assist me with the September 1999 primary and we had a reportable incident due to inaccurate data entry on an absentee ballot. In spite of this, I was hopeful that your work would come up to standards needed for the performance of this job.

*NOT TRUE!*

I made my concerns known to the Town Manager and I agreed to end your probation on the basis that there would be an employee probation period. Unfortunately there was no improvement; and, in fact, accuracy and productivity decreased. The town manager instructed the Personnel Officer to become involved to help resolve this problem.

As a result, during your second year, we had monthly meetings with Dede Moore, Windsor's Director of Human Resources. In these meetings I emphasized again the importance of accuracy in the Town's land records and we reviewed page after page of data entry errors in an effort to correct the problem and pinpoint training to help you improve. Each time you promised to review your work and try to improve your performance. This did not happen.

In November of 2000, with your participation and agreement, we set a performance standard for land record data entry. The plan included daily feedback and began in January 2001. This proved beneficial until mid February, when your performance returned to its previous level. During the next six months, we continued the program, but there was no improvement. Consequently on September 4, I initiated a bi-weekly reporting system.

As before, I reviewed the work that you submitted daily and I scored the number of documents compared to the number of documents entered containing errors. Although, at that time, I did not add a standard for the amount of time it took to enter each record, I did add the performance standard that you submit the completed days land entries by 4 PM. This deadline would give me time to conduct reviews and make corrections before publishing the

grantor/grantee index nightly on the Internet. During this six week period, the performance reports show that there has not been a single day in which you have met performance standards in data entry accurately and only once in the last 29 work days have I received your completed work by 4 PM. In addition to the bi-weekly collection of performance standards, I have added a performance appraisal that includes other problem areas that are routine responsibilities of the Deputy Town Clerk.

It is absolutely essential to the residents and commerce of Windsor that our land records are accurate. In addition, the public must be able to depend upon the Town Clerk's office to protect and uphold their right to vote by absentee ballot, to receive their ballot in a timely fashion and at the location directed on their absentee application. They must be able to trust that their vital statistics collected in the Town Clerk's Office can be found immediately and handled correctly when they need a certified copy.

After more than three years of actively encouraging your development and providing every opportunity for training and improvement, I regret that it is necessary to write this letter of reprimand. I can no longer spend hours of my time reviewing your routine work to make sure that our records are reliable – time that must be devoted to other responsibilities. The quality and quantity of your work has left me no other choice. Please be advised that if there is no improvement within the next month further disciplinary action, including dismissal, will be necessary.

Very truly yours,

*Kathleen K. Quin*

Kathleen K. Quin
Town Clerk

43

DEFENDANT'S EXHIBIT NO. 16 FOR IDENTIFICATION DATE: 4-2-04 RPTR: FT

## MEMORANDUM

Date: May 27, 2000

To: Pat Massey
 Deputy Town Clerk

From: Kathy Quin
 Town Clerk

Thank you for your timeliness in responding on May 15 to our conversation of May 4, which I summarized in my memo of May 5. This memo is to recap our conversation of May 16.

Your suggestion that we create a "Knowledge Management System – a system of written procedures, especially in the case of quarterly reports," puzzles me. The Town Clerks' Association publishes a very extensive "Handbook for Town Clerks" describing in detail all the functions and procedures in a Town Clerk's Office. I purchased one copy for you when you came into our office and we have a second copy on our bookshelf. In addition, Matt Hart created a detailed binder on the "Annual Budget – Town Meeting and Referendum Procedure," which I updated after the Charter Revision changed this procedure.

When I first came to this office in 1995, I began to write detailed instructions on each procedure that we follow pertaining specifically to our office. As a matter of fact, one of the first tasks that I asked you to complete when you came into this office was to put these pages into a three-ring binder. I felt it would accomplish two things: first, it would familiarize you with the duties of the Windsor Town Clerk's Office; and second, you would know where to find this information when you needed it.

When, after six months this assignment had not been completed, I removed the stack of information from your desk. I then put a copy of each procedure at the point where it is needed. There is a central location for these documents and they are posted where we use them. For instance, the procedure for recording a trade name is in the front of the trade name file; the procedure for recording and entering a Veteran's DD-214 is in the front of the Veterans file; the procedure for issuing and printing an absentee ballot is taped to the table next to the computer where we enter absentee ballots; the procedure to amend birth certificates and to replace birth certificates for legitimated or adopted children is in the "birth reference" file; and the procedure to bring up the computers in the vault is kept on the cart so it is near the computers. I agree that the benefits of having this system of standardized procedures should make it much easier to complete tasks – it is important that we use these resources that have been so carefully prepared.

On March 24, 2000 I explained the basic guidelines for the quarterly billing operations. My verbal explanation was "print out the quarterly report called 'rep unpaid', attach the billing vouchers that are in the billing folder and give this packet to Peg Williams sometime during the first week of April – she mails the bills." I asked if you had any questions and you said you did not. I left you with written instructions that, "The first of April Peg needs the March Financial Report also the billing report for the first quarter...." Because you did not give the report to Peg, but instead sent it out from the Town Clerk's office, I am still dealing with payment problems today.

We had two incidents regarding working outside of our normal 8 AM to 5 PM workday and your need for "at least a day's prior notice" is well taken. In most cases we do have at least 24 hours notice; however, as with any job, there are times when emergencies arise or the Town Manager asks for support when no one else is working. The facts of the incident regarding the need for a Notary at Sage Park School change with each telling. It remains that we were asked to satisfy a need and we did not meet the expectations of our citizens.

You mention that "only this quarter" you have had training in vitals reporting to the State Vital Records and fish and game reporting to Department of Environmental Protection -- and you asked the question, "Has there been other training provided?" Since December of 1998 I have provided in our budget for Town Clerks' School for your training. During this fiscal year alone - July of 1999 to May 2000 - you have attended seven full days of training outside of our office. Furthermore, after the March 7, 2000 Primary, you said that Frank Angilillo recommended that you take an advanced Excel course. I suggested that you contact the Personnel Office to see if New Horizons offers this course and when it might be offered, so that it would fit in with our office coverage. As far as I know, you have not pursued this.

Working for the Town of Windsor, in the Town Clerk's office, requires attention to detail. Every day, citizens make decisions that effect their financial future based upon what they read in our land records. Every day people count on our office to keep confidential that which is to be kept confidential and disclose to the public all that is covered under the Freedom of Information Act. Every election the registered voters of Windsor count on us to direct their absentee ballots to them, to count their vote and to keep their identity anonymous. Every day we are asked to look up information that has been entered into the computer. The public has a right to expect that we enter this information without error.

Over the past two years I have **not** written to your personnel file, but personally met many times with you, the Personnel Director and the Town Manager about your performance. While I was focusing on your improvement, it seemed to me that letters to your personnel file could be counter-productive. However, when we last met with the Town Manager and the Personnel Director you said that your performance was obviously satisfactory since there were no written comments in your personnel file. As a result, I find it necessary now to document these matters in writing.

Attention to detail continues to be a serious problem in your work. I will cite a recent example. Birth certificates are among our most confidential records. The State of Connecticut requires that every Town Clerk's office follow the procedures set forth in C.G.S. §19a-41-2 when qualifying a request. As shown in the attachment, you had a parent fill out the proper paperwork to obtain their child's birth certificate, but then gave the parent the birth certificate of a child from another family. This is not a training issue. The proper procedure was followed, but the outcome was completely wrong – this type of error exposes the Town and our office in particular to legal action.

I intend to have a discussion with our office staff about the standards that the public expects from us. However, reading the training manuals, attention to details and error-free data entry are basic responsibilities of the individual employee.

cc: personnel file

May 9, 2000

Issuing a confidential birth certificate:

On May 9, 2000 Colleen Rafala came in to return the birth certificate of Matthew Loughner Gill born 4/22/98.

She was in on May 5, to purchase two birth certificates —paperwork attached. One for her son Matthew born 3/10/96 and one for her daughter Celina born 4/12/98.

She was given a certified copy of Matthew Louis Rafala's birth certificate and, instead of Celina's, she was issued a certified birth certificate for Matthew Loughner Gill.

Copies and documents attached.


Kathy Quin

DEFENDANT'S
EXHIBIT NO. 14
FOR IDENTIFICATION
DATE: 4-2-04   RPTR

## MEMORANDUM

Date: May 5, 2000

To:    Pat Massey
       Deputy Town Clerk

From: Kathy Quin
       Town Clerk

Yesterday we met and I discussed my concerns about your job performance and your contribution to the office of town clerk. Let me recap the issues that have come to my attention that effect the reputation of the Windsor Town Clerk's office and, therefore, are of concern to me.

First is the issue of billing other government agencies for recording land records. During the time you have been in the Town Clerk's office, we have discussed the preparation of our quarterly report to the finance department and how daily data entry is the source of the information and dollar amounts that are the basis for this quarterly report. You will recall that Peg Williams came to our office in January, and stood at your desk, to discuss her concerns that she was not receiving payments from customers who charged recordings – specifically, the State Department of Social Services. At that time, you and I discussed this problem and we agreed that the State's Department of Social Services could not leave recordings without a check until they had satisfactorily responded to Peg's inquiries. At that time you posted a note on your desk and as a consequence refused a recording. We put in place a system to assure that finance would collect on all Social Services recordings in the future.

When I went on vacation, I explained the process of the quarterly billing that was to be done on April 1. To help you, I wrote instructions, reviewed them with you, and I called numerous times while I was on vacation, to answer any questions you might have on this or other tasks that needed to be done in the Town Clerk's office.

This past Monday I became aware that the April 1 billing report was never sent to the Finance office for collection. In addition, billing balances were incorrect and backup for several bills was missing. In the case of the MDC, the report billed them $245, the invoices from the billing quarter that were attached totaled $225, and three invoices totaling $150 for recordings after the billing period ended were attached. This appears to be an area where you were not sure of the procedure, but you asked no questions when I called you at the beginning of April.

A second issue involved an inquiry from the Health Department. During the time I was on vacation the Health Department called you to see if we were going to participate in their Rabies Clinic on Saturday, May 6, from 2 to 4 PM. They had a deadline to place an advertisement, which included the date, time and location of the clinic, and the Health Department wanted to include information regarding the issuance of dog licenses. During one of our telephone calls you passed that message to me with the suggestion that I let them know if I would be there, instead of saying that one of us would be there – and if I couldn't be there, you would be.

-22

A third incident, involving a request from the Board of Education, occurred on Wednesday, May 3. Someone from Sage Park School called to say that they were going to have a meeting in the evening with the parents of students who would be going on a trip and would need notarized permission slips. They asked if a notary from our office could attend this meeting. Although you are a notary, you asked me if I would attend the meeting. I explained that I was working this Saturday at the Rabies Clinic and on Sunday would be in the office doing absentee ballots and bags for the moderators. I suggested that you attend the meeting. You replied that you could not attend. A few minutes later you asked Thelma if she wouldn't volunteer to attend the meeting. She asked when it was and you replied that a date had not yet been set. I asked how you knew you could not attend if a date had not been set and you replied that you could not work evenings. This is the first time I have heard this and in your job interview it was explained clearly that the position of Deputy Town Clerk is not a 5 day a week 8 to 5 job. We work when necessary to serve our customers and that can include time in the evenings and on weekends.

Your lack of attention to detail in dealing with financial matters and your lack of commitment to serve the residents of Windsor are a serious concern. We have had many discussions about similar issues, which affect the work and reputation of our office and the town of Windsor. Perhaps you have some suggestions as to additional training which we might undertake and when you will start sharing evening and weekend duties in this office. Please let me know by the week of May 15.


*Kathleen Quin*
Kathleen Quin
Town Clerk

cc: Personnel file

23