FILED

2004 OCT 26 P 12: 13

DISTRICT COURT
NEW HAVEN, CT

## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

PATRICIA ANN MASSEY                  :
                                     :
V.                                   :        CIVIL NO. 3:03CV55 (PCD)
                                     :
TOWN OF WINDSOR,                     :
KATHLEEN QUIN                        :        SEPTEMBER 24, 2004
        Defendants.                  :

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

The plaintiff brought this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et seq., the Age Discrimination in Employment Act of 1967, 29 U.S.C. 621, et seq., and the American's with Disabilities Act of 1990, 42 U.S.C. 12101 alleging discrimination during her employment on the grounds of her age, race, color, and disability.  In addition, the plaintiff brought claims against Kathleen Quin in her individual capacity for violations of her constitutional rights protected under 42 U.S.C. §1983.

### II.    FACTS

The plaintiff is a fifty-one (51) year old African American woman who was being treated for depression and anxiety because of the acts of the defendants.

The plaintiff Patricia Massey was hired as a Deputy Town Clerk to work in the Town Clerk's Office of the defendant, Town of Windsor on or about September 6, 1998. In order to receive Town Clerk certification, the plaintiff was to complete five training modules and pass an examination. The plaintiff attended Town Clerk's school and completed training modules for Town Clerk certification in December 1998, May 1999, December 1999, May 2000 and December 2000. The plaintiff passed the Connecticut Municipal Town Clerk's examination for certification in June of 2001.   The plaintiff's exceptional skill and knowledge base are demonstrated by the fact that the plaintiff was one of only fourteen to pass the Examination that session.

The terms and conditions of the plaintiff's employment included a six month probationary period. A condition of which was satisfactory performance. Despite the plaintiff's exemplary performance during the initial six month probationary period, at the end of the six month probationary period, defendant Kathleen Quinn recommended an additional six month probationary period.  In accordance with defendant Town of Windsor's own policies and procedures, the plaintiff's second probationary period should have ended by September 7, 1999. Despite the fact that the plaintiff's overall performance evaluations had exceeded standards, the defendants had not terminated her probationary period as required.  On or about September 21, 1999, the plaintiff's second six month

probationary period was terminated at the direction of the Town Manager. The Town Manager informed defendant Kathleen Quin that the plaintiff's probationary period should not have extended past the one year maximum limit. Similarly situated employees had at most two six month probationary periods which did not exceed one year.  Defendant Kathleen Quin responded by bombarding the Town Manager with documentation of every error the plaintiff is alleged to have made. Such documentation was not kept for similarly situated employees.

In or around  June of 1999, the plaintiff was required to have monthly meetings with the defendant Kathleen Quin and the Human Resources Director, Dede Moore to discuss the plaintiff's work performance. Similarly situated employees were not required to have such meetings nor does the defendant Town of Windsor have a policy requiring such meetings.  In March of 2000 during one of the scheduled monthly meetings, the plaintiff met with the Town Manager, Ralph Churchill, the Director of Personnel, Dede Moore, and the Town Clerk, defendant Kathleen Quin. Defendant Kathleen Quin requested that the Town Manager attend. Defendant Kathleen Quin brought to the meeting a box loaded with errors she alleged the plaintiff had made. Such documentation was not kept on similarly situated employees.  Additional job responsibilities were added to the plaintiff's workload without proper training, compensation or accommodations. The plaintiff was given the additional responsibility of processing fish and game

3

licensing. The plaintiff was given the added responsibility of processing State Conveyance Tax Forms. The plaintiff was given the added responsibility of processing vital statistics records. On the rare occasions that similarly situated employees were given additional responsibilities, they were either compensated, trained or provided accommodations to perform.  In addition, for an extended period of time, the plaintiff was subjected to an extraordinarily hostile work environment. On numerous occasions in the workplace, plaintiff was subjected to different terms and conditions than those of similarly situated  white, non-disabled employees.  Defendant  Quin communicated with the plaintiff by leaving notes on her desk whenever the plaintiff went to the lavatory or took a lunch break.

Similarly situated employees were not communicated with in the same manner.  In September of 1999, the defendant Kathleen Quin failed to inform the plaintiff of Moderator Training which would have allowed the plaintiff to participate in the election process.  In October of 1999, defendant Kathleen Quin failed to provide the plaintiff with the appropriate High Performance Management Model training information necessary to help meet the goals and objectives of the department.  Defendant Kathleen Quin gave the plaintiff's home telephone number to someone who called the office and asked for the plaintiff. Similarly situated employees phone numbers were not given out when callers inquired

about them.  Defendant Kathleen Quin implied that the plaintiff had stolen ten

dollars ($10) from the xerox copy money. As a result, defendant Quin changed

the procedure for accessing money from the copy machine account.

In November 2000, while the plaintiff was still employed by the defendant

Town of Windsor, the defendant Kathleen Quin caused an advertisement for the

plaintiff's position to posted and published. The defendant interviewed candidates

for the position. The plaintiff had not expressed an intent to leave her position.  In

or about August of 2001, the plaintiff's daughter had a life-threatening allergic

reaction which necessitated the plaintiff taking time off from work. Upon the

plaintiff's return to work, Defendant Quin requested that the plaintiff present her

with a note from a physician stating the nature of the illness.

Similarly situated employees were not required to present such

documentation.  In or about August of 2000 until September 30, 2000, the

plaintiff was out ill due to the emotional distress she was suffering from the

workplace.  In or about April of 2001, the plaintiff was hospitalized because of the

reoccurrence of her illness. The plaintiff returned for a brief period of time and

was out again from May 21, 2001 until the end of June. The plaintiff had been

diagnosed with depression and generalized anxiety.  Medical documentation of

the plaintiff's illness was provided to defendant Kathleen Quin.  In or about

September of 2001, defendant Quin instituted a bi-weekly evaluation program

5

that applied only to the plaintiff. The evaluation program was pretextual and created for the purpose of discriminating against the plaintiff. Similarly situated employees were not subject to bi-weekly evaluations.

In or about December of 2001, the plaintiff was asked to resign by acting Personnel Director and Assistant Town Manager, Peter Souza. The plaintiff declined.  On or about December 10, 2001, the plaintiff was terminated. The plaintiff was given a letter of dismissal "for failure to improve performance as Deputy Town Clerk over the past three years".  The information given to the State of Connecticut Department of Labor lists the plaintiff's termination as "willful misconduct".  The defendants failed to follow proper procedures in terminating the plaintiff. In the past, similarly situated employees have been afforded the proper procedure.

To date, the defendant, Town of Windsor has never instituted such an aggressive campaign against an employee.  The defendant Town of Windsor has imposed a greater standard of conduct on the plaintiff than similarly situated employees. The defendant Town of Windsor knew or should have known of the acts of the defendant Kathleen Quin, described herein. Because the Town of Windsor failed to adequately train, supervise, discipline screen or hire officers in its employ, the defendant Town of Windsor has incurred municipal liability. By failing to act to prevent said actions, the defendant Town of Windsor adopted,

ratified and accepted the actions of the defendant Kathleen Quin as their own.

### III. STANDARD

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to a judgment as a matter of law." The Court must draw all reasonable inferences in the light most favorable to the party opposing the motion, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), mindful that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)

To raise a genuine issue of material fact sufficient to defeat a summary judgment motion, the opponent need not match, item for item, each piece of evidence proffered by the moving party. So long as the opponent has offered enough evidence to exceed the "mere scintilla" threshold, summary judgment is to be denied. In re Unisys Savings Plan Litigation, supra, 74 F.3d 420, 433.

Even if the nonmoving party's evidence appears "implausible," the court may not "weigh" the evidence and must proceed with the greatest caution. R. B. Ventures, Ltd. v. Shane, 112 F.3d 54, 58-59 (2d Cir. 1997). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could

7

return a verdict for the non moving party.' <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Thus, '[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.'" <u>Lazard Freres & Co. v. Protective Life Ins. Co.</u>, 108 F.3d 1531, 1535 (2d Cir. 1997). Citing <u>Gummo v. Village of Depew</u>, 75 F.3d 98, 107 (2d Cir. 1996).

## IV.     ARGUMENT

### THE PLAINTIFF'S CLAIMS IN COUNTS ONE AND THREE, ARE NOT TIME-BARRED BY THE STATUTE OF LIMITATIONS.

The Second Circuit has recognized that in certain situations, the time limits for filing complaints should be extended "where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue un-remedied for so long as to amount to a discriminatory policy or practice." <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 766 (2d Cir. 1998).  This exception applies because "all [the] unlawful actions culminated in the plaintiff's unlawful termination," <u>Cornwell v. Robinson</u>, 23 F.3d 694 (2d Cir.1994). In that case, the continuing violation exception applied because the district court found that the plaintiff "had suffered the same kinds of harassment at the hands of some of the same [co-workers], and under the aegis of some of the same supervisory

personnel," despite plaintiff's numerous complaints. Id. at 704.

The continuing violation doctrine is an exception to both Title VII and state law statutes of limitations. Velez v. New London, 903 F.Supp. 286, 290 (D.Conn.1995). Under the continuing violation exception, the running of the statute of limitations may be tolled until the last act of discrimination where a plaintiff has experienced a continuous practice and policy of discrimination. Cornwell v. Robinson, 23 F.3d 694, 703 (2d Cir.1994).

In the case at hand, the plaintiff has satisfied all prongs of the McDonnell-Douglas test, and is able to show that defendants actions towards her were specific and ongoing without remedy, for what can only be described as an unreasonable amount of time, resulting in plaintiff's ultimate hospitalization, and finally, termination.  The defendants have conceded that the plaintiff is an African American female and that she was subjected to an adverse employment action. The facts clearly provide proof of specific ongoing discriminatory practices which were "permitted" by the employer as far back as plaintiff's probationary period. Plaintiff was hired on September 6, 1998 as Deputy Town Clerk for the town of Windsor, Connecticut.  At the time plaintiff was hired, the Town Clerk's office had five white female employees-Kathleen Quin, (white female) Full-time Town Clerk; Full-time Employee Thelma P. London, (white female) Contractual Employee;

Deputy Town Clerk/Auditor Alice J. Williams, (white famale)  Contractual

Employee June Cameron and Part-time Student Employee Elka M. Peck (white

female).  (Exhibit L)  On or about November 1998, June Cameron was released

from contractual employment, and on or about December 31, 1998, Thelma

London retired from full-time service with the Town.  (Exhibit L).

Plaintiff was  qualified for the Deputy Town Clerk's  position for the Town

of Windsor.  Plaintiff is a graduate from an accredited college/university with an

Associates degree, a Bachelors degree and experience  (one year) in records

management. (Exhibit F).  Plaintiff holds an Associate of Arts degree from the

Hartford College for Women in Psychology; she has a Bachelor of Arts degree

from Connecticut College in Urban Studies; plaintiff also has a Paralegal

Certificate from the Hartford College for Women.  Plaintiff also attended Inlingua,

a foreign language program, where she studied Spanish.    Plaintiff was

nonetheless required to attend Town Clerk Training School where she was

expected to complete five training modules.  (Exhibit L).  Plaintiff was also

expected to pass, which she did,  a competitive examination in order to receive

certification as a Town Clerk.  In or about July 2001, plaintiff received notification

that out of twenty-eight (28) candidates sitting for the Connecticut Municipal

Town Clerk's examination, she was one of fourteen (14) who passed.  (Exhibit L).

Plaintiff was also working on her Master's Degree through the University of Connecticut. (Exhibit L).

Between January 1999 and April 7, 1999, the town Clerk, Kathleen Quin spent time writing, editing and typing college term papers to meet her own graduation requirements. In May 1999 she obtained a BA degree from St. Joseph's College. (Exhibit L). Plaintiff was working as a probationary Deputy Town Clerk, with a significant reduction in staff support. In March of 1999, plaintiff's work performance was evaluated by defendant Quin. On or about September 21, 1999, Kathleen Quin, Town Clerk, sent a letter to R. Leon Churchill, Jr., Town Manager, recommending that "Patricia A. Massey be taken off probation and that she accepts responsibility as Windsor's Deputy Town Clerk." (Exhibit A). Quin's letter of recommendation refers to plaintiff as "considerate; responsive to the public; helpful; friendly toward fellow employees; gracious; and responsible." It also refers to plaintiff as having made an effort to gain knowledge of entering maps, updating Notary registrations, and preparing hunting and fishing licenses. (Exhibit A). In this same letter, Quin states, "Pat balances the cash register from the previous day and deposits the money with finance...It is obvious to me that Pat realizes how important accuracy is on vital records and she now does marriage licenses accurately and with confidence. I

11

believe Pat is aware that it is important to strive for zero errors in vitals, land recording, licensing and most importantly elections...by taking Pat off probation and giving her full authority as Windsor's Deputy Town Clerk, Pat is accepting the responsibility to act as the Town Clerk in my absence." (Exhibit A). Plaintiff was clearly and without reservation, recommended by the Town Clerk to be taken off probation, and moved into the position of Windsor's Deputy Town Clerk. (Exhibit A). Quin's September 1999, letter of recommendation was accompanied by an Evaluation of Probationary Employees wherein she rated plaintiff's overall performance as "Exceeds Standards." (Exhibit B).

Between September 1999 and October 2001, plaintiff performs the duties and responsibilities within the Town Clerk's office almost single handedly with occasional support from part-time and contractual employees. Even with this outstanding letter of recommendation, plaintiff was placed on another six-month probationary in October 2001. (Exhibit G). On or around October 15, 2001, defendant Quinn sent plaintiff a letter stating "As you know at the end of your six-month probation, March 1999, I pointed out that your probation would be extended for another six months. (Exhibit G). This rapid change in the plaintiff's status is pretext. By December 2001, plaintiff is terminated from her position of Deputy Town Clerk.

This situation begs the question, why Defendant Quin went from praising plaintiff highly, and recommending her for the Deputy Town Clerk's position in September 1999, to terminating her from employment in December 2001. Defendant Quinn's evaluation of plaintiff went from "Exceeds Standards" (Exhibit B) to "Unacceptable" in every category (Exhibit E). This rapid change of position on the part of the Defendant Quin was a major adverse action taken against plaintiff. Plaintiff's treatment by both Quinn, and Town Manager Churchill, was a continuing violation, culminating in plaintiff's unlawful termination. Defendant's disparate treatment of plaintiff began about one year after she was hired. Plaintiff was hired in September 1998. Following defendant Quinn's positive evaluation in September 1999 (Exhibit B), plaintiff in October 1999, met with Quin and complained about what she believed to be a breach of her confidentiality, in that defendant Quinn gave plaintiff's home telephone number out to a member of the public, a total stranger. Quinn responded by telling plaintiff, "if [she] felt like this, she [plaintiff] really "didn't belong here..." Plaintiff reiterated her view that she thought such a breach serious. (Exhibit L).

Quinn Immediately complained to Town Manager Churchill about plaintiff. (Exhibit L). On or about October 27, 1999, plaintiff was called into the Town Manager's office and told, he had been informed she, "was not happy here."

13

(Exhibit L).  There was now a marked and noticeable deterioration in Quin's treatment of plaintiff.  Direct  communication with plaintiff was cut off, except by notes left on her desk.  Plaintiff's work errors were…Xeroxed and retained. (Exhibit L).  On a daily basis the Town Manager was bombarded or blitzed (by Quin) with Xeroxed copies of every error made by plaintiff.  Quin used this as the basis for establishing bi-weekly Performance evaluation meetings with plaintiff.(Exhibit L) and later to justify placing plaintiff back on probation in October 2001. (Exhibit L).

November 1999, plaintiff found a dead rat in her drawer at her workstation, which appeared to have been placed there.  (Plaintiff's Continued Depo. pp. 179-183).  Neither Quin nor the other three women in the office expressed alarm. They did not run, scream or jump.  Indeed, they walked over to plaintiff's workstation to look at the rat.  (Plaintiff's Continued Depo. pp. 179-183).  The appearance of this dead rat and the reaction of  the women in the Town Clerk's office was extremely intimidating and harassing for plaintiff, who was alarmed at the fact that, the incident was not reported to the health department, located in the same building,  and no extermination of the facility took place. (Plaintiff's Continued Depo. pp.179-183). More, importantly,  there were no rodent feces anywhere in the vicinity, apparently there had never been a rodent problem in

14

Town Hall prior to this incident; and,  no one that plaintiff talked to had ever seen a rodent in Town Hall. (Plaintiff's Continued Depo. pp. 179-183).  Plaintiff had to dispose of the rodent herself. (Plaintiff's Continued Depo. pp. 179-183).

The severity of this incident cannot be too strongly stated, especially when taken together with the intense intimidation Plaintiff was subjected to from Quinn, using bi-weekly meetings and the pressure of the Town's Personnel Office and Town Manager's office.  Despite the  State Records Division having very strict guidelines relative to rodents and vermin,  none of the procedures related to such a find in the building was ever followed.   (Plaintiff's Continued Deposition p. 184).  It is not unreasonable to infer that the intent of this incident  was to intimidate  plaintiff and to significantly alter the conditions of plaintiff's work environment and to terrorizing plaintiff, such that she would leave of her own volition.

Plaintiff's work environment became so intolerable during this period, that plaintiff felt compelled to sought the assistance of Town Manager Churchill.   He declined to meet with plaintiff and stated, that he would, "allow the process to proceed through its normal channels." (Exhibit L).  So, beginning in early November 1999,  Quin, supported by  Moore (Director of Personnel) began a series of weekly meetings with plaintiff, which later developed into bi-weekly

meetings. (Exhibit L).

The pressure of the weekly meetings and the demands placed on plaintiff to meet deadlines and complete projects, resulted in yet another meeting, on March 1, 2000, which this time included, Town Manager R. Leon Churchill, Jr., Quin, Moore and plaintiff. Quin, used the meeting to devalue plaintiff's work. (Exhibit L). Plaintiff took the opportunity to express her need for support from the Town Clerk and to point out that there was too much work for one full-time person to handle. Plaintiff also stated that she wanted to be spoken to, rather than yelled at; that she wanted to be included in meetings and/or discussions related to work parameters, timeframes and deadlines prior to the implementation of projects as opposed to having the workload 'heaped' upon her as is the case. (Exhibit L). Plaintiff also, complained that Quin, devalued her work, but did not do the same to other employees, such as Deputy Town Clerk, Alice Williams, or any of the white females in the Town Clerk's office, and in fact plaintiff asserts that Quin's treatment of her was arbitrary. (Exhibit L). There are inconsistencies in the rules and procedures and the manner in which they are enforced by Quin. (Exhibit L) For example, plaintiff states, "what is marked properly indexed this week is deemed an error the next week" when her work is looked at by Quinn. (Exhibit L). In this meeting plaintiff asked Town Manager

16

Churchill, to explain the dramatic shift in position from the September 1999 evaluation, which assessed her performance as "exceeds standards" and effectively ended her probationary period to the November 1999 assessment of 'incompetent.' His response was "oh I'll have to take responsibility for that one." (Exhibit L).

With this response, plaintiff received no additional support rather, Quin moved to, and did, establish bi-weekly performance evaluation meetings for plaintiff in and around January 2000, again supported by Personnel Director Moore. (Exhibit L). Defendants never addressed the fact that plaintiff was overworked, and clearly over evaluated. Rather, defendants continued to place additional assignments, tasks, projects and deadlines on plaintiff. The *bi-weekly* meetings which were used to micromanage plaintiff further kept her from meeting her deadlines. (Exhibit L).

Plaintiff was put in an untenable position, one from which she could not succeed. Quin's intent was to intimidate plaintiff out of her position as Deputy Town Clerk, as evidenced by Quin's continued assignment of additional job responsibilities and duties to plaintiff, despite Quin's claim that plaintiff's performance was poor. In February 2000, plaintiff was assigned the *additional responsibility, for **payment of monthly bills to vendors**,* with no additional staff

17

support.  (Exhibit L).

On or about March 27 to April 14, 2000, Kathleen Quin went on vacation for three consecutive weeks, leaving plaintiff and one other staff person. (Exhibit 7). This left the Town Clerk's office critically understaffed for three weeks. Plaintiff went on vacation from July 19, 2000  through July 25, 2000.  Each time plaintiff was out of the office, she would return to an in-box full of  Xeroxed errors she had allegedly made.  The white employees in the Town Clerk's Office did not receive their messages in this way, and neither was their errors pointed out to them on a daily basis.  (Exhibit L).   When plaintiff returned from vacation,  there were two letters in her tray with "examples of  poor performance" on vitals processing and map indexing.  (Exhibit L).   In or around May 2000,  plaintiff attended Town Clerk School and completed the forth training modules for Town Clerk Certification. (Exhibit L).  During this timeframe, plaintiff was assigned the additional responsibility, *of processing Connecticut State Conveyance Tax Forms,* as well as *processing vital statistics* (marriage licenses, birth and death records).  (Exhibit L). In or about June 2000, plaintiff was assigned  the additional responsibility for *processing May 2000 fish and game licenses.* White females assigned this project in the past were allowed to sit well away from the hub of office activity to get this job done, plaintiff was not. (Exhibit L).

On or about August 2000, Quin assigned plaintiff to the **Mail-room to process the mail** for the entire Municipality, in addition to her regular duties as Deputy Town Clerk. (Exhibit L). Plaintiff was required to process **in-bound morning mail distribution; and the afternoon mail processing** which had to be carried [by hand] down the block to the Post Office. (Exhibit L)

The assignment of mail duties in addition to the other newly assigned job responsibilities took its toll on plaintiff. In August 2000, plaintiff became ill at work. Plaintiff was placed on medication and excused her from work for two weeks by her physician. After plaintiff went out on sick leave, the Town Manager hired a new individual to handle the mail, claiming that the respondent's part-time person who handled the respondent's daily mail left. (Exhibit M). When asked did any other employees in the Town Clerk's Office ever process mail, plaintiff stated that "perhaps Elka processed mail on occasion, but [I] never witnessed Kathleen Quin processing mail. " (Plaintiff's Deposition Continued p. 85).

In or around November, 2000, Kathleen Quin published an advertisement for the position of Deputy Town Clerk (Exhibit M). This is the same position plaintiff held at the time. (Plaintiff's Exhibit Continued p. 184). Defendants should have known that the treatment of plaintiff it permitted without any genuine or meaningful remedy, was such that plaintiff would ultimately either leave her

position because it became so intolerable that no reasonable person could stay,
or be terminated from her position as Deputy Town Clerk because the
documentation would exist to support such an act.   Again, it is not unreasonable
to infer, indeed to believe that the advertisement taken out in the Municipal
Clerk's News Digest and posted on the Town Hall bulletin board (Exhibit M) of
the same position held by plaintiff, was not another attempt by defendant to force
plaintiff's constructive resignation.  Certainly, if the Town Clerk and the Town
Manager intended to get plaintiff additional resources, simply courtesy would
necessitate sharing the information with plaintiff before.  This was not done.

   This series of events show that plaintiff's claims in counts one and three,
are not time-barred by the statute of limitation.

## THE PLAINTIFF'S TITLE VII CLAIM MUST SURVIVE

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) lays out the burden
of production and order of proof analysis for Title VII causes of action and 42
U.S.C. § 1981 causes of action.  "To make out a prima facie case, the plaintiff
must show that:  (i) she is a member of a protected class; (ii) she was qualified
for the position; (iii) the defendant took adverse action against her; and (iv) the
adverse action occurred under circumstances giving rise to an inference of
discrimination."  Harper v. Metropolitan District Commission, 134 F. Supp. 2d

479, 483 (D. Conn. 2001) (Covello, C.J.).  Stated another way, a plaintiff may make out a prima facie case "by showing that she is within a protected group; that she is qualified for the position; that she was subject to an adverse employment action...; and that a similarly situated employee not in the relevant protected group received better treatment." McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001).  "Alternatively, the fourth prong of the prima facie case may be satisfied if the plaintiff can demonstrate that the...adverse employment action occurred under circumstances giving rise to an inference of discrimination on the basis of plaintiff's membership in that class." Farias v. Instructional Systems, Inc., 259 F.3d 91, 98 (2d Cir. 2001).

    "To establish a prima facie case of disparate treatment, a plaintiff must show, inter alia, that she was subjected to adverse employment action, under circumstances giving rise to an inference of prohibited discrimination." Fitzgerald v. Henderson, 251 F.3d 345, 356 (2d Cir. 2001). "In an employment discrimination case, the plaintiff has the burden of 'proving by the preponderance of the evidence a prima facie case of discrimination.'" Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994), quoting Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  A plaintiff need not necessarily prove a prima facie case to prevail, however.  "For instance, if a plaintiff is able to produce direct evidence of discrimination, he may prevail

without proving all the elements of a prima facie case." Swierkiewicz v. Sorema

N.A., 122 S. Ct. 992, 997 (2002).

"[S]ummary judgment...is particularly inappropriate where the inferences

which the parties seek to have drawn deal with questions of motive, intent, and

subjective feelings and reactions." Suarez v. Dickmont Plastics Corp., 229 Conn.

99, 111, 639 A.2d 507 (1994). "A question of intent raises an issue of material

fact, which cannot be decided on a motion for summary judgment." Picataggio v.

Romeo, 36 Conn. App. 791, 794, 654 A.2d 382 (1995). When passing upon a

motion for summary judgment, the court may not resolve factual disputes or

make credibility determinations, even if the case is one which eventually will be

tried without a jury. In re Unisys Savings Plan Litigation, 74 F.3d 420 (3d Cir.

1996). Rather, the court must resolve any ambiguities and draw all inferences

against the moving party. Appleton v. Board of Education, 254 Conn. 205, 757

A.2d 1059 (2000); Cargill, Inc. v. Charles Kowsky Resources, Inc., 949 F.2d 51

(2d Cir. 1991). The evidence of the party against whom summary judgment is

sought must be believed. Revak v. SEC Realty Corp., 18 F.3d 81 (2d Cir. 1994).

The court must construe the evidence in the light most favorable to the party

opposing summary judgment and deny the motion unless no construction of the

evidence could support judgment in the plaintiff's favor. Appleton, supra; Adickes

v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Olin Corp. v. Consolidated

Aluminum Corp., 5 F.3d 10, 14 (2d Cir. 1993); United States v. Certain Funds on

Deposit in Scudder Tax Free Investment Account #2505103, 998 F.2d 129 (2d

Cir. 1993); Union Pacific Corp. v. United States, 5 F.3d 523, 525 (Fed. Cir. 1993);

Suarez v. Dickmont Plastics Corp., 229 Conn. 99, 105 (1994); D.H.R.

Construction Co. v. Donnelly, 180 Conn. 430, 434 (1980); Connell v. Colwell, 214

Conn. 242, 246-47 (1990).

  The employer may seek to rebut the prima facie case by proof of a

legitimate nondiscriminatory reason for the adverse employment action.  If the

plaintiff is able to persuade the jury that the employer's explanation is false,

however, that fact, combined with the prima facie case, is sufficient to permit a

jury to find intentional discrimination.  "Proof that the defendant's explanation is

unworthy of credence is...one form of circumstantial evidence that is probative of

intentional discrimination, and it may be quite persuasive....In appropriate

circumstances, the trier of fact can reasonably infer from the falsity of the

explanation that the employer is dissembling to cover up a discriminatory

purpose.  Such an inference is consistent with the general principle of evidence

law that the fact finder is entitled to consider a party's dishonesty about a material

fact as 'affirmative evidence of guilt.'"  Reeves v. Sanderson Plumbing Products,

Inc., 530 U.S. 133, 120 S. Ct. 2097, 108 (2000), quoting Wright v. West, 505 U.S.

277, 296 (1992).  "The fact finder's disbelief of the reasons put forward by the

defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.  Thus, rejection of the defendant's proffered reasons will permit...the trier of fact to infer the ultimate fact of intentional discrimination...[and] no additional proof of discrimination is required."  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993).  "[O]nly occasionally will a prima facie case plus pretext fall short of the burden a plaintiff carries to reach a jury on the ultimate question of discrimination...."  Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 94 (2d Cir. 2001).

   "The plaintiff's burden of establishing a prima facie case of employment discrimination is 'not onerous.'  Burdine, 450 U.S. at 253.  Indeed, "[t]he nature of the plaintiff's burden of proof is de minimis."  Harper v. Metropolitan District Commission, 134 F. Supp. 2d 470, 483 (D. Conn. 2001) (Covello, C.J.), citing Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988).  "As we have often emphasized, the burden of establishing this prima facie case in employment discrimination cases is 'minimal.'"  McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001).  Direct evidence is not necessary, and a plaintiff charging discrimination against an employer is usually constrained to rely on the cumulative weight of circumstantial evidence.  See Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991) ('An employer who discriminates is unlikely to leave

24

a 'smoking gun,' such as a notation in an employee's personnel file, attesting to a discriminatory intent.')." Luciano v. Olsten Corp., 110 F.3d 210, 215 (2d Cir. 1997). Often, "[w]hat is most revealing of the true intention behind the [adverse employment action] is the timing." Harper v. Metropolitan District Commission, 134 F. Supp. 2d 470, 489 (D. Conn. 2001) (Covello, C.J.)

At the summary judgment stage, the Court should not make any finding as to whether [a defendants] reason was, in fact, false. Rather, the Court must determine whether, after casting all of the facts of the case in the light most favorable to [the plaintiff] and drawing all inferences from those facts in favor of [the plaintiff], a rational jury could come to the conclusion that [the defendants] justification for [a particular action] is false. Peralta V. Cendant Corp 123 F.Supp.3d 65 (2000) "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

In the case at bar, relative to the first prong in the establishment of a prima facie case of disparate treatment,  defendants concede that (i) plaintiff is a Black-American female (Exhibit L); that,  (ii) Plaintiff was qualified for the position. Moore, defendant's Human Resources Director, approached plaintiff to encourage her to apply for the position of Deputy Town Clerk (Exhibit M p. 51).