The three individuals interviewing plaintiff believed that she was qualified for the position, and offered her the job.  (iii) The third prong is satisfied because there is no dispute that the defendants took adverse action against plaintiff, in that she was intimidated, harassed and terminated from her position on or around December 10, 2001.  (Exhibit I).  (iv) The fourth prong,  adverse action occurred under circumstances giving rise to an inference of discrimination is satisfied in the instance case as evidenced by the following facts.

Plaintiff was qualified for the position of Deputy Town Clerk therefore, she was hired as such on  September 6, 1998, in the Information Services Area.  She worked with five white, female employees.   Plaintiff was the only black employee in the Town Clerk's Office.  (Exhibit L).  Plaintiff had more educational experience than the Town Clerk, Kathleen Quin.  When plaintiff was hired, she had her Bachelor's degree, Associate Degree, Paralegal Certificate, and had attended school to study a foreign language (Plaintiff's Deposition pp. 51 to 54).  Kathleen Quinn, the Town Clerk at the time, was studying for her Bachelors' degree, which she finally obtaining from St. Joseph's College in May 1999.  (Exhibit L).  Despite her qualifications for the position plaintiff was subjected to intense and severe scrutiny which white females in the Town Clerk's Office were not subjected to.  Specifically, the   other Deputy Town Clerk, Alice Williams was not overloaded with additional job responsibilities,  neither  was she assigned the role of mail

clerk, micro-managed for errors or had rules, regulations and procedures arbitrarily enforced against her. (Exhibit L).

At the end of plaintiff's six month probationary period, she received an outstanding letter of recommendation, from the Town Clerk, Quin, accompanied with a Performance Rating of "Exceeds Standards." (Exhibits A & B). Even with this outstanding reference from her immediate supervisor, plaintiff was given additional job duties and placed on a second six month probationary by the same supervisor. Plaintiff had more job responsibilities than other similarly situated white females in the Town Clerk's office, and plaintiff was the only one in the Town Clerk's office with deadlines. No other employee in the office had the kind of workload that plaintiff had. (Plaintiff's Continued Deposition pp. 65-67). Plaintiff was the only employee subjected to bi-weekly appraisals. (Plaintiff's Continued Deposition p. 66). Plaintiff repeatedly requested additional help with processing the work. (Plaintiff's Continued Deposition p. 66). Plaintiff complained about being discriminated against, and being treated differently. (Plaintiff's Continued Deposition p. 13). Plaintiff complained about the Town violating Chapter 8 and Chapter 14 of the Personnel Rules, pertaining to the terms and conditions of her employment relative to having her probationary period extended. (Plaintiff's Continued Deposition p. 15). Defendants challenged plaintiff's application for unemployment compensation and flat out lied to the

27

Department of Labor.   Although defendants *articulated business reason* for terminating plaintiff's employment was, *'poor performance'* (Exhibit I), defendants claimed *'Willful Misconduct'* before the Department of Labor (Exhibit O) and challenged plaintiff's receipt of unemployment compensation (Exhibit J). Plaintiff received unemployment compensation.

Defendant Quin went so far as to imply that plaintiff stole ten dollars from the copier money, and proceeded to change the procedure to empty the copy machine, using the finance department to do so. (Plaintiff's Continued Deposition p. 33) The implication that plaintiff or another Black employee in the Town Hall took the money, caused plaintiff great emotional distress.  Similarly situated white employees with as much access to the copier money, were not implicated by Quin. (Plaintiff's Continued Depo. pp 41-45) In November 2000, defendant Quin placed an advertisement in the Municipal Clerk's <u>News Digest</u> periodical, advertising plaintiff's position.  (Exhibit L).   No reasonable person would have placed such an advertisement without discussing the issue with the affected employees.  Incredibly, in a building not known to be infested with vermin, plaintiff found a dead rat in her desk drawer at her workstation,  which was never reported or investigated by the  Health Department.   Plaintiff had to move the rodent herself. Defendant Quin and the other three women in the office did not express alarm, did not run, did not scream, and calmly walked over to her

28

workstation to look at the rat. This incident was not reported to the health department, no extermination of the facility took place; there were no rodent feces anywhere in the vicinity, there had never been a rodent problem in Town Hall before; and no one that plaintiff talked to had ever seen a rodent in Town Hall. (Plaintiff's Continued Deposition pp 179-183)

The adverse action taken against plaintiff in December 2001, occurred under circumstances giving rise to a strong inference of discrimination, both as to the treatment of the plaintiff between the period September 1999 and October 2001 and December 2001; and, the fact that none of the policies and/or procedures in place for the keeper of public records were followed to address the rodent find in plaintiff's desk draw. It is not unreasonable to infer and indeed to argue that the reason that no one called for extermination, and implemented measures to secure the records, is that defendants *knew* that the building was not rat infested, and that the rat had been placed in plaintiff's drawer.

Plaintiff told the Town Manager that as a Black female, she believed that she was being subjected to different terms and conditions of employment. Plaintiff advised the Town Manager that she was the only one being subjected to bi-weekly appraisals; that she was inundated with memos that she would have to respond to and still meet deadlines; that if plaintiff left the office to attend Town

29

Clerk School, she would come back and there would be no less than five memos which she would have to respond to. The Town Manager promised relief, using the Personnel Director to intervene and handle it. (Plaintiff's Deposition Continued pp. 94 and 95). Nothing was ever resolved, plaintiff never received any relief, and ultimately, plaintiff was terminated in December 2001, *exactly five months* after she received her Town Clerk Certification from the Secretary of State, on July 10, 2001. (Exhibit H). Given plaintiff's qualifications for the position of Town Clerk, one could reasonable argue that the micro-management and close-quarter treatment to which plaintiff was subjected was motivated by defendants intent to treat plaintiff differently due to her race and color (Black).

### THE PLAINTIFF'S ADA CLAIM MUST SURVIVE BECAUSE THE PLAINTIFF HAS ESTABLISHED A PRIMA FACIE CASE OF DISABILITY DISCRIMINATION.

The Americans with Disabilities Act of 1990, 42 U.S.C. 12101, et seq. ("ADA"), prohibits employment discrimination against qualified individuals with disabilities. See 42 U.S.C. §12112(a). Claims under the ADA are also analyzed under the McDonnell Douglas burden-shifting paradigm. See Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2nd Cir. 1998), citing, EEOC v. Amego, Inc., 110 F.3d 135, 145, n. 7 (1st Cir. 1997).   To establish a prima facie case of discrimination under the ADA, the plaintiff must show that: (1) she has a disability

under the ADA; (2) she was qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) she suffered an adverse employment action under circumstances giving rise to an inference of discrimination on account of her disability.  See <u>Reeves v. Johnson Controls World  Svcs</u>., 140 F.3d 144, 149-50 (2nd Cir. 1998).

The ADA defines a "disability" as:  (a) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment.  See <u>Colwell v. Suffolk County Police Dept</u>., 158 F.3d 635, 641 (2nd Cir. 1998), citing, 42 U.S.C. §12102 (1994).

In order to establish a disability under the first subsection, the plaintiff must prove: (i) that she suffers from a physical or mental impairment; (ii) that her impairment  impacted a "major life activity;" and (iii) that the impairment in fact "substantially limits"  the identified major life activity. <u>Colwell</u>, 158 F.3d at 641; <u>Muller v. Costello</u>, 187  F.3d 298, 312 (2nd Cir. 1999); <u>Toyota Motor Mfg., KY, Inc. v. Williams</u>, 534 U.S. 184,  195 (2002).

In this case, the plaintiff suffers from depression and generalized anxiety. Defendant Quin knew that plaintiff had been hospitalized, and was out of work for significant periods of time.  She was aware that she was ill, and that this illness

31

was affecting one of her major life activities-her ability to work. (Plaintiff's

Continued Deop. p p. 188-189).  Plaintiff states that defendant Quin knew that

she was ill.  Plaintiff "brought her the initial medical excuse from the doctor, and,

as a matter of fact, [I] plaintiff brought her two medical excuses from the doctors."

Plaintiff believes that her illness impacted her major life activities as

follows: "I wasn't able to help my children with their homework."  I wasn't able to

maintain a relationship between my husband and myself.  "I was mentally

drained and stressed as a result of the treatment that I received, the different

treatment that I received from the Town...I missed time [from work] that was

excused by my doctor."  Plaintiff was hospitalized and received psychological

treatment for her illness.

Defendant Quin was personally advised that plaintiff was under the

doctor's care.  Ms. Quinn discriminated against plaintiff because she would not

provide her with help or assistance with the workload or the arbitrary deadlines.

(Plaintiff's Continued Deposition p. 64).

Defendant Quin knew of plaintiff's medically-related absences, and plaintiff

claims that defendant Quin did nothing to help ease the workload.  Plaintiff

further claims that defendant Quin knew plaintiff was overworked, and that the

signs of her overwork included working 11 to 12 hour days, and the fact that no

one else had that type of schedule but plaintiff. (Plaintiff's Continued Depo. pp.

190-191).

### THE PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIM MUST SURVIVE BECAUSE THE ALLEGED CONDUCT WAS SEVERE OR PERVASIVE AS A MATTER OF LAW and WAS CARRIED OUT ON ACCOUNT OF THE PLAINTIFF'S RACE OR COLOR.

In order to prevail on a hostile work environment claim, the plaintiff must prove that her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment. Schwapp v. Town of Avon, 118 F.3d 106 (2 nd Cir. 1997), citing, Van Zan v. KLM Royal Dutch Airlines, 80 F.3d 708, 715 (2 nd Cir. 1996); see also, Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65-66 (1986). The workplace must be "so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [the plaintiff's] employment were thereby altered." Alfano, 294 F.3d at 373. A "'mere utterance of an...epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." Schwapp, supra, quoting, Harris, 510 U.S. at 21. "For racist comments, slurs, and jokes to constitute a hostile work environment, there must by 'more than a few isolated incidents of racial enmity.'" Schwapp, supra, citing, Snell v. Suffolk County, 782 F.2d 1094, 1101 (2nd Cir. 1986). As a general rule, the alleged unlawful incidents must be sufficiently continuous, as opposed to episodic, in order to be found pervasive. See Alfano,

33

294 F.3d at 374, citing, Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2nd Cir. 1997).

Factors to be considered in determining whether the alleged conduct is sufficiently severe or pervasive to create a hostile work environment include: the frequency of the conduct; the severity; whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and whether the conduct unreasonably interferes with an employee's work performance. See Harris, 510 U.S. at 23.

Defendants took no action to investigate, or to remedy a very stressful and humiliating experience, which was also a health threat and caused plaintiff to confer with staff at the health department to find out the consequences of her having had that dead rat in her workstation drawer, and the health consequences of having come into contact with it in order to dispose of it. (Plaintiff's Deposition Continued p. 89) This rodent incident was discriminatory intimidation that was sufficiently severe to alter the conditions of plaintiff's work environment. Plaintiff had to fear opening her drawers, opening cabinets, and generally coming into a workplace that is clearly unprotected, hostile and unsafe.(Plaintiff's Continued Depo. p. 89).

In addition the rate and frequency of new job responsibilities assigned to

plaintiff serve to compound, exacerbate and illustrate the unreasonable work conditions plaintiff was experiencing at the hands of Quinn. Between September 1999 and October 2001, plaintiff performs the duties and responsibilities within the Town Clerk's office almost single handedly with occasional support from part-time and contractual employees. Even with this outstanding letter of recommendation, accompanied with a Performance Rating of "Exceeds Standards," plaintiff was placed on another six-month probationary period. (Exhibit G).

The Town Manager provided plaintiff with no protection, giving defendant Quin a green light to continue to harass plaintiff and create a hostile and discriminatory work environment for plaintiff. This type of discriminatory intimidation is severe and pervasive enough to have altered plaintiff's terms and conditions of work. Defendant's termination of plaintiff, is simply pretextual, and false. The impact of management recreating history and making false statements in order to justify plaintiff's termination certainly gives rise to an inference of discrimination. Defendants conduct was severe, pervasive, and without a doubt altered the terms and conditions of plaintiff's work environment, in a manner wholly different to that of the white employees in the Town Clerk's office. The white Deputy Town Clerk was simply not subjected to this level of

35

intimidation, harassment and humiliation in the workplace. (Plaintiff's Continued Depo. pp. 125-126).

It appears that defendants were not only treating plaintiff differently from her white colleagues, but the African American public were also treated differently than the white public. (Plaintiff's Continued Depo. pp. 125-126). Plaintiff illustrates this point with the incident of the African American couple (the Parkinson's) who needed a notary, but who was asked to wait until she returned from lunch to take care of them, despite the fact that both Quin and Alice Williams are notaries.  Defendant Quin, that the Notary was out to lunch and that they would have to come back.  They pointed out defendant Quin when plaintiff asked who they spoke with.  (Defendant's Deposition Continued pp. 125-126). This type of racial animus by an employer, who allows this to extend to members of the public, is another form of discriminatory intimidation that severely alters the terms and conditions of plaintiff's employment.

Defendants expected plaintiff as the Black Town Clerk  to serve African Americans who came into the Town Clerk's office.  This expectation created a level of intimidation and anxiety for plaintiff who watched daily as the African American public were treated differently to the white public. (Plaintiff's Continued Depo. pp. 125-126).   This type of treatment of Black members of the public, in

36

the presence of plaintiff serves to confirm the level of discriminatory intimidation and pervasive hostility and contempt based solely on the race of plaintiff and others that look like plaintiff, that is present and pervasive in the work environment under defendant Quin's leadership. Defendant Quin, demonstrated her contempt for the African American public, in her institution and support of a practice which called for the Black Deputy Town Clerk to serve the Black public. (Plaintiff's Continued Depo. pp. 125-126). This attitude necessarily must be pervasive and would necessarily permeate plaintiff's work environment. Little wonder Quin, felt comfortable to tell plaintiff she, "...didn't belong there" following plaintiff's complaint of privacy/confidentiality violation. (Plaintiff's Continued Depo. p. 152). This type of statement certainly contributes to the creation of hostile work environment. . Plaintiff is qualified for the position of Deputy Town Clerk, by education, training and work background, therefore Quin in pointing out to plaintiff that perhaps she was out of place in the Town Clerk's office could only have been referring to plaintiff's race. This of course is and expression of racial animus, which is not only unacceptable, it is a violation of both State and Federal law.

Plaintiff worked eleven and twelve hour days, she arrived at work at around 7:30 a.m. and she left as late as 7:00 p.m. or 7:30 p.m. at night. She worked

37

long, hard hours because the workload was so overwhelming.  She did not have

help, she did not have any support, and  the deadlines that were given to her,

included her having to process the in-coming and out-going mail for the entire

Municipality, and numerous other activities that were not within the realm of the

Town Clerk's Office.  No other employee in the Town Clerk's office had a

workload similar to plaintiff's and no other Deputy Town Clerk, not Alice Williams

or any other before her had to  process the mail.  Processing the mail consisted

of mail from all of the various town departments,  which includes, the Recreation

Department; Public Works; Discovery Center; all of the Town properties with mail

that needed to be sorted;  run through the machine;  and,  placed in their boxes.

This was done twice a day, in the mornings and the afternoon.  (Plaintiff's

Continued Depo. pp. 155-166).  Quin, ostensibly assigned plaintiff any job which

came across her desk, whether or not it was the responsibility of the Town

Clerk's office.  The nature of the work heaped on plaintiff in addition to her Town

Clerk responsibilities was severe, and unreasonable.  This type of work

environment was nothing less than hostile.  Plaintiff was a professional salaried

employee of the Town of Windsor.  Plaintiff was treated differently than similarly

situated white employees in the Town Clerk's Office.   This different treatment

was intimidating, and pervasive enough to alter the terms and conditions of

plaintiff's work environment.

38

## THE PLAINTIFF'S FOURTEENTH AMENDMENT EQUAL PROTECTION
## CLAIM MUST SURVIVE

Intentional discrimination on the basis of race or sex by a government employer may be covered by section 1983 as an Equal Protection violation. Quinn v. Nassau County Police Dept., 53 F.Supp.2d 347, 356 (E.D.N.Y.1999). Section 1983 imposes liability on persons who, under color of law, deprive United States citizens of the "rights, privileges, and immunities secured by the Constitution and laws." 42 U.S.C. § 1983.  Denial of equal protection requires purposeful discrimination. General Building Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982).

"[W]here a plaintiff seeks to make out her prima facie case by pointing to the disparate treatment of a purportedly similarly situated employee, the plaintiff must show that she shared sufficient employment characteristics with that comparator so that they could be considered similarly situated....In Shumway v. United Parcel Service, Inc., 118 F.3d 60 (2d Cir. 1997), the Court explained that such an employee 'must be similarly situated in all material respects' - not in all respects.  118 F.3d at 64 (emphasis added).  A plaintiff is not obligated to show disparate treatment of an identically situated employee.  To the contrary, Shumway holds that in those cases in which a plaintiff seeks to establish her minimal prima facie case by pointing to disparate treatment of a similarly situated

39

employee, it is sufficient that the employee to whom the plaintiff points be similarly situated in all material respects....In other words, where a plaintiff seeks to establish the minimal prima facie case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to sup0port at least a minimal inference that the difference of treatment may be attributable to discrimination." <u>McGuinness v. Lincoln Hall</u>, 263 F.3d 49, 53-54 (2d Cir. 2001).  The <u>McGuinness</u> court added in a footnote, at p. 54: "[B]ecause a Title VII plaintiff may establish a prima facie case of discrimination in a number of different ways depending on the specific facts of a given case, <u>Shumway</u> does not require that a plaintiff always be able to show disparate treatment of an otherwise similarly situated employee as a necessary prerequisite to a prima facie case under Title VII."

In the instant case, Alice Williams, who is similarly situated to plaintiff in all material respects, was never subjected to  bi-weekly performance evaluations; Williams never found a rate in her desk drawer; she was never assigned to perform the duties of a mail clerk for the entire Municipal authority; and, neither was her job advertised while she was  sick.

### KATHLEEN QUIN IS NOT ENTITLED TO QUALIFIED IMMUNITY.

As the defendants correctly recount, in a §1983 action, a public officer may be shielded from liability in his individual capacity based on qualified immunity if his

conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); Shechter v. Comptroller of the City of New York, 79 F.3d 265, 268 (2d Cir.1996). However, the Second Circuit has, as with other aspects of summary judgment, severely limited the ability of the trial courts to act. See Castro, 34 F.3d at 112; Oliveira v. Mayer, 23 F.3d 642, 649 (2d Cir.1994) (holding that the immunity issue should be decided by the court only where the facts concerning its availability are undisputed; otherwise, jury consideration is required), cert. denied, 513 U.S. 1076, 115 S.Ct. 721, 130 L.Ed.2d 627 (1995); Frank v. Relin, 1 F.3d 1317 (2d Cir.), cert. denied, 510 U.S. 1012, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993); Warren v. Dwyer, 906 F.2d 70, 74 (2d Cir.), cert. denied, 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990)

As the defendants correctly recount, in a §1983 action, a public officer may be shielded from liability in his individual capacity based on qualified immunity if his conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); Shechter v. Comptroller of the City of New York, 79 F.3d 265, 268 (2d Cir.1996). However, the Second Circuit has, as with other aspects of summary judgment, severely limited the ability of the trial courts to act. See Castro, 34 F.3d at 112; Oliveira v. Mayer, 23 F.3d 642,

41

649 (2d Cir.1994) (holding that the immunity issue should be decided by the court only where the facts concerning its availability are undisputed; otherwise, jury consideration is required), *cert. denied,* 513 U.S. 1076, 115 S.Ct. 721, 130 L.Ed.2d 627 (1995); Frank v. Relin, 1 F.3d 1317 (2d Cir.), *cert. denied,* 510 U.S. 1012, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993); Warren v. Dwyer, 906 F.2d 70, 74 (2d Cir.), *cert. denied,* 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990).

Here defendant Quin used the authority vested in her by her position as Town Clerk to engage in specific type of treatement towards plaintiff, which she knew or should have known would cause plaintiff to become emotionally and psychological distressed. Quin used her position to increase plaintiff's workload to an unworkable and untenable place, possibly causing the episodes of mental anguish and depression with which plaintiff was subsequently diagnosed. The extension of plaintiff's probation could only have been done by an individual in authority with the power and the clout to do so. The unreasonable bi-weekly performance evaluations were used as the justification to extend plaintiff's probation, which ultimately resulted in plaintiff's termination. Only an official with the power and authority to make decisions and act could have disregarded the announcement of a dead rat in one of the work stations. In this case when plaintiff told Quinn and the other white females of the presence of the rat in the draw, they all nonchalantly disregarded plaintiff's alarm and did not report the

incident to the Health Department.   Only a public official with an inordinate

amount of power could   otherwise shirk his/her responsibility to follow Municipal

policies, procedures and processes to respond to and incident of vermin

infestation.  Quin did nothing.

### THE PLAINTIFF'S FOURTEENTH AMENDMENT EQUAL PROTECTION CLAIM MUST SURVIVE  BECAUSE THERE IS EVIDENCE OF AN OFFICIAL POLICY OR CUSTOM THAT CAUSED  THE PLAINTIFF TO BE DEPRIVED A CONSTITUTIONAL RIGHT AND THERE IS EVIDENCE OF DELIBERATE INDIFFERENCE ON THE PART OF THE TOWN.

"In order to establish the liability of a municipality in an action under Section

1983 for unconstitutional acts by a municipal employee below the policymaking

level, a plaintiff must establish that the violation of his constitutional rights

resulted from a municipal custom or policy....This does not mean that the plaintiff

must show that the municipality had an explicitly stated rule or regulation....A

Section 1983 plaintiff injured by a police officer may establish the pertinent

custom or policy by showing that the municipality, alerted to the possible use of

excessive force by its police officers, exhibited deliberate indifference....To prove

such deliberate indifference, the plaintiff must show that the need for more or

better supervision to protect against constitutional violations was obvious.  ... An

obvious need may be demonstrated through proof of repeated complaints of civil

rights violations; deliberate indifference may be inferred if the complaints are

followed by no meaningful attempt on the part of the municipality to investigate or

to forestall further incidents.... Deliberate indifference may also be shown through expert testimony that a practice condoned by the defendant municipality was 'contrary to the practice of most police departments' and was 'particularly dangerous' because it presented an unusually high risk that constitutional rights would be violated." <u>Vann v. City of New York</u>, 72 F.3d 1040, 1049 (2d Cir. 1995).

The questions (1) whether the city inadequately trained its officers, (2) whether the injury in question occurred in circumstances constituting a usual and recurring situation with which officers must deal, (3) whether the inadequate training demonstrated deliberate indifference, and (4) whether there was a causal connection between the constitutional violation and the inadequate training all are questions which must be decided not by the court but by the jury. <u>Brown v. Gray</u>, 227 F.3d 1278 (10th Cir. 2000).

Defendant has shown deliberate indifference to plaintiff and others in plaintiff's protected class. Specifically, defendant  Quinn and others in the Town Clerk's Office have consistently left African American members of the public to be served by plaintiff; disregarding   plaintiffs right to privacy by giving plaintiffs home telephone number to  a member of the public, a total stranger; and, plaintiff brought complaints to Quin and the Town Manager alike about  her work overload without there being any steps to remedy the situation.  Rather, defendants intensified plaintiff's work load,   provided her no support, accused

44

her of poor performance, and terminated her employment allegedly for poor performance, only to later tell the Department of Labor that their real reason for terminating plaintiff's employment was her 'willful mis-conduct.' Defendant's policy for its interaction with African American people whether as employees or as members of the public is to stereotype them and an expose them to any and all treatment related to the stereotyping of Black people. It is not unreasonable to liken plaintiff's treatment to that of a 'slave.'

## CONCLUSION

For the reasons stated above, the plaintiff respectfully requests that the motion for summary judgment be denied.

THE PLAINTIFF

BY: _____

Cynthia R. Jennings, Esquire
The Barrister Law Group, LLC
211 State Street
Bridgeport, CT 06604
Her Attorney

56

## CERTIFICATION OF SERVICE

On September 27, 2004, the original of plaintiff's Memorandum of Law and Local

Rule 56 Statement for Patricia Massey, was hand delivered to all parties of

record as shown below:

David Monastersky
Alexandria L. Voccio,
Howd & Ludorf
65 Wethersfield Avenue
Hartford, CT 06114-1190

CYNTHIA JENNINGS

57