UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

*FILED*

PATRICIA ANN MASSEY

v.

TOWN OF WINDSOR AND
KATHLEEN QUIN IN HER
INDIVIDUAL CAPACITY

NO.: 3:03CV55(PCD)

2004 OCT 26 P 12: 12

U.S. DISTRICT COURT
NEW HAVEN, CT

JULY 1, 2004

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

### I.  BACKGROUND

The plaintiff began working for the Town of Windsor on a part-time basis in the Building and Land Department in February 1996. See Plaintiff's Deposition Transcript dated April 2, 2004, p. 29, attached as **Exhibit A**. On September 6, 1998, she was hired for the Deputy Town Clerk position. See **Exhibit A**, pp. 31, 53; and Affidavit of Kathleen Quin, ¶5, attached as **Exhibit B**. As part of the hiring process, the plaintiff, and five other candidates, interviewed with Kathleen Quin, Nicole LaFortune and Dede Moore (human resources director). See **Exhibit A**, p. 52; and **Exhibit B**, ¶6. Kathleen Quin recommended the plaintiff. See **Exhibit B**, ¶7. Quin was the Town Clerk, and the plaintiff's immediate supervisor. See **Exhibit A**, p. 53; and **Exhibit B**, ¶4.

A copy of Deputy Town Clerk job description was provided to the plaintiff during the hiring process and is attached hereto. See **Exhibit A**, p. 54; Plaintiff's Deposition Transcript dated April 15, 2004, p. 120, attached as **Exhibit C**; and Job description, attached as **Exhibit D**.

At the time of the plaintiff's hire as Deputy Town Clerk, five other women, all Caucasian, worked in the Town Clerk's Office: June Cameron, Alice Williams, Elka

Peck, Thelma London, and Kathleen Quin. See **Exhibit A**, p. 55; and **Exhibit B**, ¶8. Only Quin and London were full time employees of the Town of Windsor. See **Exhibit B**, ¶9; and Plaintiff's CHRO Complaint, No. 6, attached as **Exhibit E**. London retired in December 1998, but returned to work as a part-time employee two days a week in January 1999. See **Exhibit A**, pp. 60-61; and **Exhibit B**, ¶9. Williams and Cameron were retained on a contractual basis to work 20-40 hours a week as needed. See **Exhibit B**, ¶10; and **Exhibit E**, No. 6. Both Williams and Cameron were Certified Town Clerks. See **Exhibit B**, ¶10. When the Town hired the plaintiff, the intention was to eliminate Williams and Cameron's positions. See **Exhibit B**, ¶11. Cameron remained working through mid-November to train the plaintiff on land records. See **Exhibit A**, p. 58; and **Exhibit B**, ¶12. Williams continues to work in the Town Clerk's Office. See **Exhibit B**, ¶13. As of January 2000, Williams also began functioning as the outside auditor - a function that could only be performed by a non-employee. See **Exhibit A**, p. 132; and **Exhibit B**, ¶14. Peck was a part-time student employee who worked during school vacations and the summer. See **Exhibit B**, ¶15; and **Exhibit E**, No. 6.

The plaintiff was initially hired as a probationary employee for a period of six months. See **Exhibit A**, pp. 74-75; and **Exhibit B**, ¶21. After receiving a marginal evaluation for the first six months, her probationary period was extended an additional six months. See **Exhibit A**, p.75; **Exhibit B**, ¶21; and Evaluation dated March 15, 1999, attached as **Exhibit F**. Despite continued concerns regarding her performance, the plaintiff was retained after the expiration of the second probationary period. See **Exhibit B**, ¶21. She was advised, however, of the need for improvement. See Evaluation dated September 21, 1999, and Quin Letter, attached as **Exhibit G**. The

plaintiff claims that her probationary period should have ended on September 7, 1999, but continued another two weeks until September 21, 1999. See **Exhibit A**, pp. 77-78; and Plaintiff's Interrogatory Responses, attached as **Exhibit H**, No. 3(1).

After her hire, the Town sent the plaintiff to Town Clerk School to become certified as a Town Clerk. See **Exhibit A**, pp. 55, 66; and **Exhibit B**, ¶16. The plaintiff attended classes, passed the exam and received the State of Connecticut designation of Certified Town Clerk in June 2001. See **Exhibit A**, p. 106; **Exhibit B**, ¶16; **Exhibit C**, p. 96; and **Exhibit H**, No. 3(5). Kathleen Quin had also become a Certified Town Clerk after being hired by the Town. See **Exhibit B**, ¶17. Neither Quin, or the plaintiff, or any other employee, received monetary recognition for obtaining this certification. See **Exhibit A**, p. 106; **Exhibit B**, ¶18; and **Exhibit H**, No. 3(5).

No one in the Town Clerk's Office, including the plaintiff, was eligible to function as a moderator during the election process. See **Exhibit B**, ¶19; and **Exhibit C**, p. 20. As such, Kathleen Quin did not send anyone to the moderator training. See **Exhibit B**, ¶19; and **Exhibit C**, p. 20. High performance management model training was offered in June 2002. See **Exhibit B**, ¶20; and **Exhibit C**, pp. 23-24. Quin signed the plaintiff up for the training, and the plaintiff attended the training. See **Exhibit B**, ¶20; and **Exhibit C**, pp. 23-26. The plaintiff and Quin are the only individuals from the Town Clerk's Office who received this training. See **Exhibit B**, ¶20; and **Exhibit C**, pp. 21-22.

In October 1999, Kathleen Quin gave a physician who had called the office the plaintiff's home telephone number. See **Exhibit A**, pp. 79-80; and **Exhibit B**, ¶21. Thelma London had advised Quin that the plaintiff had not been feeling well that day and that she had been trying to contact her doctor all day. See **Exhibit B**, ¶21. When

the physician called, he said that it was important for him to reach the plaintiff and asked for her phone number. See **Exhibit B**, ¶21. In an effort to help the plaintiff, Quin looked in the phone book and provided the physician with her number. See **Exhibit B**, ¶21.

Later that month, Kathleen Quin met with the plaintiff to discuss continued performance issues. See **Exhibit B**, ¶22. During that meeting, the plaintiff brought up the incident with the phone number, as well as other issues between her and Quin. See **Exhibit A**, pp. 84-87; **Exhibit C**, p. 110. After that meeting, Quin met with the Town Manager, Leon Churchill, to advise him both that the plaintiff continued to make an excessive number of errors and that the plaintiff was angry with her. See **Exhibit B**, ¶23; and **Exhibit C**, p. 110. The plaintiff claims that she also approached Churchill to ask him to intervene. See **Exhibit A**, p. 80; and **Exhibit C**, pp. 93-94. She claims that she told Churchill that she believed she was being treated differently because she was a black female. See **Exhibit C**, pp. 93-94.

Leon Churchill held a meeting with the plaintiff, Kathleen Quin and the Human Resources Director, Dede Moore. See **Exhibit B**, ¶24. During that meeting, Quin addressed the plaintiff's poor performance. See **Exhibit B**, ¶25. In response, the plaintiff noted that there was nothing in her file documenting such poor performance. See **Exhibit B**, ¶25. **Exhibit C**, pp. 93-95. Churchill then instructed the plaintiff, Quin and Moore to meet on a regular basis. See **Exhibit B**, 26; and **Exhibit C**, pp. 95-96. The three met on a weekly basis for approximately 2-4 months. See **Exhibit A**, pp. 94-96, 101, 105; **Exhibit B**, ¶27; and **Exhibit H**, No. 3(4).

During this time, Quin remained at work each day until 7:00 p.m. to review and edit the plaintiff's work. See **Exhibit B**, ¶31. Quin returned the documents that

contained mistakes to the plaintiff the following day for her to learn from and to make the necessary corrections. See **Exhibit B**, ¶30. The plaintiff exhibited only 40% accuracy. See **Exhibit B**, ¶31.

In January 2000, in order to have more time to review the documents, Quin implemented the practice of having all land records recorded and indexed by 4:00 p.m. each day. See **Exhibit A**, pp. 136-37; **Exhibit B**, ¶32; and **Exhibit H**, No. 12. According to Quin, this practice applied to both the plaintiff and Quin, the only two individuals in the office who entered land records. See **Exhibit B**, ¶33. The plaintiff and Quin were the only two full-time employees at this time. See **Exhibit A**, pp. 55, 58, 60-61, 132; **Exhibit B**, ¶¶8-15; and **Exhibit E**, No. 6. Quin's land records were completed by 4:00 p.m. each day for the plaintiff to review. See **Exhibit B**, ¶33.

Accuracy in the Town Clerk's Office is essential. See **Exhibit B**, ¶34. All errors found had to be corrected. See **Exhibit A**, p. 140. All land records were reviewed by someone else. See **Exhibit A**, pp. 81-82; and **Exhibit B**, ¶34.

At the end of January or early February 2000, Churchill called another meeting with the plaintiff, Kathleen Quin and Dede Moore in October 1999. See **Exhibit A**, pp. 93, 101; **Exhibit B**, ¶35; and **Exhibit C**, p. 93. At this meeting, Quin produced a box of documented errors that the plaintiff had committed, and reported that the plaintiff's performance had not improved. See **Exhibit A**, pp. 79-80; and **Exhibit B**, ¶35.

Processing tax conveyance forms, fish and game licensing, and vital statistics are all functions of the Town Clerk's Office. See **Exhibit A**, pp. 187-88; and **Exhibit B**, ¶36. In an effort to improve the plaintiff's accuracy with land records, however, she was not initially asked to perform these functions. See **Exhibit B**, ¶37. Beginning in May or

June 2000, Kathleen Quin did ask the plaintiff to help out with these responsibilities. See **Exhibit A**, pp. 183-85; **Exhibit B**, ¶37; and **Exhibit E**, No. 28. These functions did not require a significant amount of time. See **Exhibit B**, ¶38.

Processing town wide mail was primarily the responsibility of the town manager's secretary. See **Exhibit B**, ¶39. The Town Clerk's Office was the fourth in line for the job. See **Exhibit B**, ¶39. As needed, the plaintiff was required to process the town wide mail. See **Exhibit A**, p. 184; **Exhibit B**, ¶41; and **Exhibit H**, No. 13. Kathleen Quin likewise processed mail on occasion. See **Exhibit B**, ¶40; and **Exhibit C**, p. 85.

The plaintiff was shown how to perform all of the responsibilities of the Town Clerk's Office, and was provided form instructions regarding each of the jobs. See **Exhibit A**, pp. 190-94; **Exhibit B**, ¶42; and Job instructions, attached as **Exhibit I**. She received more instruction than any of the other individuals in the office. See **Exhibit A**, pp. 191-94; and **Exhibit B**, ¶42.

In 2000, the plaintiff missed 120 days of work. See **Exhibit B**, ¶44. Kathleen Quin did not know the health condition which kept the plaintiff out of work or when she would return. See **Exhibit B**, ¶44. Toward the end of 2000, Quin decided that she needed assistance in the office and therefore advertised for a *second* Deputy Town Clerk. See **Exhibit A**, p. 35; **Exhibit B**, ¶¶45, 46; and E-mail, attached as **Exhibit J**.

When the plaintiff returned to work in December 2000, Quin advised her that she had interviewed for another Deputy Town Clerk and that they needed to establish performance standards. See **Exhibit B**, ¶48. The plaintiff agreed. See **Exhibit B**, ¶48. In fact, according to Quin, the plaintiff suggested the 95% accuracy standard for land records. See **Exhibit B**, ¶49. The plaintiff admits only that she had requested on

occasion that performance standards be established.  <u>See</u> **Exhibit A**, p. 135; and Massey letter dated May 15, 2000, attached as **Exhibit K**.

On January 1, 2001, the following performance standards were implemented: 90% accuracy on indexing land records for the first two or three months and then 95% accuracy.[1]  <u>See</u> **Exhibit A**, pp. 133-34, 139; **Exhibit B**, ¶50; **Exhibit C**, pp. 116-17; and **Exhibit H**, No. 3(2).  The plaintiff contends that these standards did not apply to other employees in the office.  <u>See</u> **Exhibit A**, pp. 133-34.  Kathleen Quin contends otherwise.  <u>See</u> **Exhibit B**, ¶¶51-52.

In September 2001, Kathleen Quin instituted bi-weekly performance evaluations for the plaintiff with respect to the accuracy of land records.  <u>See</u> **Exhibit A**, pp. 128-29; and **Exhibit B**, ¶55.  No other employees in the office were subject to such bi-weekly evaluations.  <u>See</u> **Exhibit A**, pp. 128-29.

The plaintiff's accuracy remained unacceptable, while she conceded that being detail oriented was a skill that could not be trained.  <u>See</u> **Exhibit B**, ¶56; Bi-weekly performance evaluations, attached as **Exhibit L**; and Annual evaluation dated October 20, 2000, attached as **Exhibit M**.  She consistently fell below the performance standards established for accuracy of land records.  <u>See</u> Performance ratings, attached as **Exhibit N**.  And Kathleen Quin had advised her both verbally and in writing of her ongoing performance issues and her need to improve.  <u>See</u> Quin letters dated October 15, 2001, May 27, 2000, May 9, 2000, and May 5, 2000, attached as **Exhibit O**.

On December 7, 2001, a pre-termination hearing was held with the plaintiff, Peter Sousa (acting human resources director and assistant town manager) and Elvira

---

[1] The plaintiff also claims that a 100% performance standard was implemented for indexing maps.

Napoleone (human resources generalist).  See **Exhibit A**, pp. 146-48.  Sousa explained that he wanted "to hear [the plaintiff's] side of the story."  See **Exhibit A**, p. 147.  He also told her that he had been trying to reach her attorney, but that the attorney was not returning his calls.  See **Exhibit A**, pp. 147-48.  Sousa asked the plaintiff if she wanted to resign.  See **Exhibit A**, p. 149.  The plaintiff declined.  See **Exhibit A**, p. 147.

The plaintiff again met with Sousa and Napoleone the following Monday, December 10, 2001.  See **Exhibit A**, p. 149; and **Exhibit C**, p. 6.  At said meeting, the plaintiff received notice that her employment was being terminated effective December 14, 2001.  See **Exhibit A**, p. 149; and Souza letter dated December 10, 2001," attached as **Exhibit P**.  The reason given was poor performance over the last three years.  See **Exhibit C**, p. 7; **Exhibit H**, No. 4; and **Exhibit P**.

On December 13, 2001, the plaintiff filed a notice of appeal of her termination to the Town Manager.  See **Exhibit A**, pp. 150-51; **Exhibit C**, p. 7; and Appeal dated December 13, 2001, attached as **Exhibit Q**.  Leon Churchill held a hearing for the plaintiff's appeal on December 20, 2001.  See **Exhibit A**, p. 151; and **Exhibit C**, p. 8.  Kathleen Quin was in attendance.  See **Exhibit A**, p. 151; **Exhibit B**, ¶58; and **Exhibit C**, p. 8.  The plaintiff does not recall what happened at the hearing.  See **Exhibit A**, pp. 151-53.  It is undisputed that she did not raise any issues or defenses at the December 10th meeting or the December 20th hearing, stating that she had already set forth her concerns in writing.  See **Exhibit B**, ¶58; **Exhibit C**, pp. 8-9; and **Exhibit Q**.  Similarly, at neither time did the plaintiff tell Sousa or Churchill that she felt that she was being discriminated against because of her race, disability or age.  See **Exhibit C**, pp. 12-14.

The plaintiff subsequently received a letter from Churchill indicating that he was upholding the plaintiff's termination. See **Exhibit A**, pp. 153-54; and Churchill letter dated December 28, 2001, attached as **Exhibit R**. The letter also informed the plaintiff of her right to arbitrate her termination. See **Exhibit A**, p. 164; and **Exhibit R**. The plaintiff knew that she had the right to arbitrate her termination under the Town rules, but chose not to do so. See **Exhibit A**, p. 164; and **Exhibit C**, p. 11.

Immediately after her termination on December 10th, the plaintiff filed for unemployment compensation. See **Exhibit A**, pp. 156, 167. The Town of Windsor did not contest her claim and she received unemployment. See **Exhibit A**, pp. 159, 164. The plaintiff does not know what information the Town provided to the State of Connecticut Department of Labor. See **Exhibit A**, pp. 160, 169-70. However, the Department of Labor form indicated that she was terminated for willful misconduct. See **Exhibit A**, pp. 157-58; and **Exhibit H**, No. 4. The plaintiff has no evidence to show that Kathleen Quin advised the Department of Labor that she was terminated for willful misconduct. See **Exhibit A**, p. 170. Quin attests that she never spoke with or contacted anyone at the DOL regarding the plaintiff's termination. See **Exhibit B**, ¶59.

The plaintiff alleges that Kathleen Quin subjected her to a hostile work environment throughout her employment. For instance, on November 20, 1999, the plaintiff found a rat in a supply cabinet drawer underneath her desk. See **Exhibit A**, pp. 179-83; and **Exhibit H**, No.15. The plaintiff, however, does not know who, if anyone, placed the rat there. See **Exhibit A**, p. 182. Quin attests that she had no involvement in the placement of a mouse or a rat in the plaintiff's desk drawer. See **Exhibit B**, ¶64. When Quin learned of the mouse, she told the plaintiff to leave it there and that she

would call building management.  See **Exhibit B**, ¶64.  The plaintiff immediately

grabbed the mouse and discarded it herself.  See **Exhibit B**, ¶64.

The plaintiff alleges further hostility by Kathleen Quin in the form of

communicating with notes, the silent treatment, interjecting herself into conversations,

and violating the plaintiff's workspace.  See **Exhibit A**, pp. 86-87; **Exhibit C**, pp. 186-

87; and **Exhibit H**, No. 15.  It is undisputed that Quin regularly communicated with

everyone in the office via notes.  See **Exhibit A**, pp. 140-41; and **Exhibit B**, ¶65.  Quin

did, on a couple of occasions, interject into the plaintiff's conversations with the public if

she heard the plaintiff giving out misinformation.  See **Exhibit B**, ¶67.  The plaintiff's

workstation was located at the front counter, a very busy area next to the cash register.

See **Exhibit A**, pp. 91-92; and **Exhibit B**, ¶68.  Quin would sometimes stand next to the

plaintiff in order to access the register or assist customers.  See **Exhibit B**, ¶68.  The

plaintiff never asked to have her workstation relocated.  See **Exhibit A**, p. 92.

The plaintiff further complains that Kathleen Quin asked her for medical

documentation for her use of sick leave in August 2001.  The plaintiff had told Quin that

she was taking a couple days at the end of the week to go to Washington with a group.

See **Exhibit B**, ¶69.  Afterward, Quin learned that the plaintiff had asked payroll how

many vacation days she had remaining.  See **Exhibit B**, ¶69.  The answer was two,

plus six sick days.  See **Exhibit B**, ¶69.  The following Monday, Quin received a

message from the plaintiff stating that her daughter, who lived in Maryland, had been

stung by a bee, and she remained out of work for the entire week.  See **Exhibit B**, ¶69.

According to the plaintiff, her daughter is allergic to bees and could not be left alone.

See **Exhibit A**, pp. 110-11; and **Exhibit C**, pp. 18-19.  Despite Quin's request, the

plaintiff never provided any documentation to the Town substantiating her daughter's condition or the fact that her daughter reportedly could not be alone. See **Exhibit A**, pp. 111-13; and **Exhibit B**, ¶70. Nonetheless, the time was counted as sick time. See **Exhibit B**, ¶71. The plaintiff has not submitted any evidence that the Town treated other individuals differently with respect to this issue. See **Exhibit A**, pp. 119-21.

The plaintiff was fifty-one years old at the time of the filing of this lawsuit. See Complaint, ¶8. All of the other staff in the Town Clerk's Office were older than the plaintiff with the exception of the part-time student employee, Elka Peck. See **Exhibit B**, ¶61. The plaintiff's position was filled in March 2002 by Agnus Pier, a 57 year-old woman. See **Exhibit A**, pp. 178-79; **Exhibit B**, ¶60. The plaintiff has no evidence that her age played a role in the actions taken against her. See **Exhibit A**, pp. 55-57, 179.

The plaintiff is African American. It is undisputed that Kathleen Quin never directed any racial slurs toward her. See **Exhibit B**, ¶72; and **Exhibit C**, pp. 151-52. The plaintiff alleges, however, that Quin did say, on October 21, 1999, that, "anyone of color is a problem." See **Exhibit C**, p. 142. Quin denies making such a statement. See **Exhibit B**, ¶72.

The plaintiff suffers from depression and generalized anxiety. See **Exhibit A**, p. 198. She was diagnosed on August 22, 2000. See **Exhibit A**, p. 198; and **Exhibit H**, No. 19. She first provided medical documentation of her illness to the Town, via Kathleen Quin, in September 2000. See **Exhibit C**, pp. 38-39; and Medical documentation, attached as **Exhibit S**. That note simply indicated that the plaintiff was to be excused from work for two weeks due to medical reasons; the medical condition was not identified; and the physician's specialty was noted to be gastroenterology and

internal medicine.  <u>See</u> **Exhibit B**, ¶62; **Exhibit C**, pp. 39-41; and **Exhibit S**.  The only other note that she submitted to Quin likewise did not identify her medical condition.  <u>See</u> **Exhibit B**, ¶62; **Exhibit C**, pp. 62-64; and **Exhibit S**.  She never informed Quin that she was suffering from depression and general anxiety.  <u>See</u> **Exhibit B**, ¶62; and **Exhibit C**, p. 62.  The only documentation provided to anyone at the Town indicating that the plaintiff suffered from depression is dated May 30, 2001.  <u>See</u> **Exhibit S**.

The plaintiff never requested an accommodation.  <u>See</u> **Exhibit A**, p. 203; **Exhibit B**, ¶63; and **Exhibit H**, No. 19.  She was never denied medical leave.  <u>See</u> **Exhibit A**, p. 203.

The plaintiff's depression and anxiety can be controlled with medication; she has not, however, taken any medication for either condition since 2002.  <u>See</u> **Exhibit A**, pp. 199-200.  She can now "handle" the depression and anxiety and sees her doctor only on an as-needed basis.  <u>See</u> **Exhibit A**, p. 200.

The plaintiff filed a complaint with the Commission on Human Rights & Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC") on March 7, 2002.  <u>See</u> **Exhibit E**.  She received a Notice of Right to Sue from the EEOC on October 11, 2002.  <u>See</u> Plaintiff's Document Production, No. 10, attached as **Exhibit T**.  She did not, however, receive a release of jurisdiction or right to sue notice from the CHRO.  <u>See</u> **Exhibit T**, No. 10.

In Count One, the plaintiff alleges that the Town of Windsor discriminated against her in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. 2000e, *et seq.*, the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. 621, *et seq.*, and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. 12101, *et seq.*.

In Count Two, the plaintiff alleges that both defendants deprived her of her Fourteenth Amendment rights to due process and equal protection as guaranteed by 42 U.S.C. §1983.[2]

In Count Three, the plaintiff alleges that the Town of Windsor discriminated against her pursuant to Conn. Gen. Stat. §46a-60(a)(1), and that both defendants discriminated against her in violation of Conn. Gen. Stat. §46a-60(a)(5).[3]

Counts Four and Five were dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

The defendants hereby move for summary judgment as to the plaintiff's complaint in its entirety.

## II.    **LEGAL STANDARD**:

The court shall render summary judgment when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56c; Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986).  A factual dispute is "genuine" when the evidence is such that a reasonable jury can return a verdict for the non-moving party.  See Anderson, 477 U.S. at 247-48.  A "material fact" is one whose resolution will effect the ultimate determination of a case.  See id.

In determining whether a material issue of fact exists, the court must resolve all ambiguities and draw all inferences against the moving party.  See Anderson, 477 U.S.

---

[2] The Court dismissed the plaintiff's Fourteenth Amendment claims to the extent they were brought pursuant to Title VII, 42 U.S.C. 2000e, et seq..

[3] The Court dismissed the plaintiff's claims under Conn. Gen. Stat. §§46a-58(a) and 46a-60(a)(8) as against both defendants, as well as the plaintiff's claim under §46a-60(a)(1) as to Kathleen Quin.  Further, the plaintiff is not pursuing a retaliation claim under §46a-60(a)(4).  See **Exhibit H**, No. 20.

at 255.  However, "[t]he mere existence of a scintilla of evidence in support of the non-movant's position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  Hayut v. State University of New York, 352 F.3d 733, 743 (2nd Cir. 2003).  "[T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Caldarola v. Calabrese, 298 F.3d 156, 160 (2nd Cir. 2002), quoting, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (underline in original).  A non-moving party may not rely on mere allegations, legal conclusions, unsupported statements, or a denial of the pleadings. See Celotex Corp. v. Catrett , 477 U.S. 317, 327 (1986).

III.    **LAW AND ARGUMENT**:

    A.    **The Plaintiff's Claims Set Forth In Counts One And Three Are, In Part, Time-Barred By The Applicable Statute Of Limitations.**

       A person claiming to be aggrieved by an unlawful employment practice must file a complaint with the appropriate state administrative agency, in this case the Commission on Human Rights & Opportunities ("CHRO"), within 180 days of the alleged discriminatory act.  See Conn. Gen. Stat. §46a-82(e).  An employee has 300 days to file a complaint with the Equal Employment Opportunity Commission ("EEOC") for claims brought under federal law.  These time limits are mandatory.  See Williams v. Commission on Human Rights and Opportunities, 54 Conn. App. 251, 255 (1999).

       Therefore, any discriminatory act under the Connecticut Fair Employment Practices Act ("CFEPA") that occurred more than 180 days before the plaintiff filed her discrimination charge with the CHRO is not actionable.  See Martin v. Kroger Co., 65 F. Supp.2d 516, 548 (S.D. Tex. 1999).  Likewise, any discriminatory act under federal law that occurred more than 300 days before the plaintiff filed her charge is not actionable.

"Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice,'" and must occur within the 180 or 300 day time period. National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002).

The plaintiff filed her complaint with the CHRO on March 7, 2002. See **Exhibit E**. As such, any alleged incidents of discrimination under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, or the Americans with Disabilities Act of 1990, that occurred prior to May 7, 2001 (300 days prior to the filing of the complaint) are time-barred. Any alleged incidents of discrimination under the CFEPA that occurred prior to September 8, 2001 (180 days prior to the filing of the complaint) are likewise time-barred.

**B.    The Town of Windsor Is Entitled To Summary Judgment As To The Plaintiff's Claims Of Discrimination Under Title VII (Count One).**

**1.    Analysis Of Disparate Treatment Claim**

In Count One, the plaintiff alleges that the Town of Windsor discriminated against her on account of her race and color in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.* ("Title VII"). Title VII forbids an employer from intentionally discriminating against an employee with respect to the compensation, terms, conditions or privileges of employment because of that employee's race or color. See 42 U.S.C. §2000e-2(a). A claim of disparate treatment, which is the plaintiff's claim in this lawsuit, requires proof of a discriminatory motive.

Disparate treatment claims under Title VII are analyzed under the burden shifting paradigm set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this paradigm, the plaintiff bears the initial burden of production to establish that she

was treated differently than her white, Caucasian counterparts in those elements prescribed by statute. In order to establish a *prima facie* case of disparate treatment, the plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) said adverse employment action occurred under circumstances giving rise to an inference of discrimination. See Shumway v. United Parcel Serv. Inc., 118 F.3d 60 (2nd Cir. 1997); McDonnell Douglas, 411 U.S. at 802. The plaintiff bears the burden of "offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." International Brotherhood of Teamsters v. United States, 431 U.S. 324, 358 (1997).

If the plaintiff presents a *prima facie* case of discrimination, then the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its action. See McDonnell Douglas, 411 U.S. at 802. The employer satisfies its burden if the reason asserted "taken as true" would permit the conclusion that there was a non-discriminatory reason for the adverse action. See Abdu-Brisson v. Delta Airlines, 239 F.3d 456, 469 (2nd Cir. 2001). Once the employer has set forth a legitimate, non-discriminatory reason for its action, then the burden "returns to the plaintiff, who ultimately must establish by a preponderance of the evidence that the non-discriminatory reasons proffered by the defendant are a pretext for discrimination." Lopez v. Metropolitan Life Ins. Co., 930 F.2d 157 (2nd Cir. 1991). To show pretext, the plaintiff must either persuade the Court that the employer was motivated by an unlawful animus (i.e. racial bias) or that the employer's explanation is unworthy of credence. See Texas Dept of Community Affairs v. Burdine, 450 U.S. 248 (1981); see also,

Reeves v. Sanderson Plumbing Inc., 530 U.S. 133 (2000). The plaintiff need only show that her race or color was a *motivating factor* for the employment practice. See 42 U.S.C. §2000e(m).

"An adverse employment action is a requisite of a claim alleging disparate treatment or retaliation." Weeks v. New York State, 273 F.3d 76, 85 (2nd Cir. 2001), *citing*, McDonnell-Douglas, 411 U.S. at 802. An adverse employment action has been interpreted as a "materially adverse change in the terms and conditions of employment." Weeks, 273 F.3d at 85, *quoting*, Galabya v. New York City Bd. of Ed., 202 F.3d 636, 640 (2nd Cir. 2000). "To be 'materially adverse,' a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Id. Actions that constitute a 'materially adverse change' in the employee's working conditions include termination, demotion or a reduction in wages or benefits. See Wilburn v. Fleet Financial Group, Inc., No. 3 99cv1542 (JBA) (D. Conn. 2001), *citing*, Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 446 (2nd Cir. 1999) (internal citations omitted). "[E]mployment actions are not adverse where pay, benefits, and level of responsibility remain the same." Martin v. Kroger Co., 65 F. Supp.2d 516, 557 (S.D. Tex. 1999).

In Weeks, the plaintiff alleged that she was transferred to another office, that she was issued a "notice of discipline" and a "counseling memo," and that her cases were transferred to other officers. The district court dismissed the plaintiff's disparate treatment claim pursuant to Rule 12(b)(6). The Second Circuit Court of Appeals affirmed, holding that the alleged conduct did not amount to an adverse employment action. Id. at 86-87, 91. The Court noted: "[i]t hardly needs saying that a criticism of an

employee (which is part of training and necessary to allow employees to develop, approve and avoid discipline) is not an adverse employment action." Id. at 86, *citing*, Smart v. Ballstate Univ., 89 F.3d 437, 442-43 (7th Cir. 1996).

Other actions such as placing an employee on probation, monitoring an employee's work and conduct closely, frequently criticizing an employee's work, issuing an employee a negative performance evaluation, issuing reprimands, verbally threatening an employee that she may be fired, and denying an employee's attendance at a training conference have likewise been held not to constitute adverse employment actions. See Martin, 65 F. Supp. 2d at 577-78, *citing*, Messer v. Meno, 130 F.3d 130, 135 (5th Cir. 1997); Mattern v. Eastman Kodak Co, 104 F.3d 702, 707-08 (5th Cir. 1997).

Pursuant to Weeks, the only adverse employment action in this case was the termination of the plaintiff's employment. Assuming *arguendo* that the plaintiff can establish a *prima facie* case of discrimination based on said termination, her claim must nonetheless fail because the Town of Windsor had a legitimate, non-discriminatory reason for terminating her employment and there is no evidence of pretext.

### 2.    The Town Of Windsor Had A Legitimate, Non-Discriminatory Reason For Terminating The Plaintiff's Employment

The Town of Windsor had a legitimate, non-discriminatory reason for terminating the plaintiff's employment - her continued poor work performance.

The plaintiff was hired as a probationary employee for the Deputy Town Clerk position on September 6, 1998. See **Exhibit A**, pp. 31, 53, 74-75; **Exhibit B**, ¶21. Due to performance issues, her probation was extended for an additional six-month period. See **Exhibit A**, p. 75; **Exhibit B**, ¶21; and **Exhibit F**. Of prime concern at this time was the lack of accuracy in the plaintiff's work, a quality that is essential to the Town Clerk's

Office.  <u>See</u> **Exhibit B**, ¶34; and **Exhibit F**.  Over the next six months, Kathleen Quin

continued to have concerns regarding the plaintiff's performance; nonetheless, the

Town retained the plaintiff after her probationary period expired in September 1999.

<u>See</u> **Exhibit B**, ¶21; and **Exhibit G**.

Unfortunately, despite receiving more instruction than any of the others who

worked in the office, the plaintiff's performance and accuracy did not improve.  <u>See</u>

**Exhibit B**, ¶¶22, 25, 30-31, 35, 43, 53, 56; **Exhibit I**; **Exhibit L**; **Exhibit M**; **Exhibit N**;

and **Exhibit O**.  In January 2000, Kathleen Quin implemented the practice of having all

land records recorded and indexed by 4:00 p.m. each day in order to allow sufficient

time to review and edit the documents.  <u>See</u> **Exhibit B**, ¶¶30-33; and **Exhibit O**.  This

deadline applied to both the plaintiff and Quin, the only two who entered land records.

<u>See</u> **Exhibit B**, ¶33.  On January 1, 2001, a performance standard was set for the

accuracy of land record data entry.  <u>See</u> **Exhibit B**, ¶50; and **Exhibit O**.  For the first

two or three weeks, the plaintiff performed very well; unfortunately the trend ended and

she returned to her prior performance level.  <u>See</u> **Exhibit B**, ¶53.  Absent signs of

improvement, Quin instituted bi-weekly performance evaluations on September 4, 2001.

<u>See</u> **Exhibit B**, ¶55; and **Exhibit O**.  Over the next six weeks, the plaintiff failed to meet

the performance standard for land records even once.  <u>See</u> **Exhibit N**; and **Exhibit O**.

On October 15, 2001, Kathleen Quin advised the plaintiff that if she did not show any

improvement within the next month that further disciplinary action, including dismissal,

would be necessary.  <u>See</u> **Exhibit O**.  By the end of November, the plaintiff had not

improved.  <u>See</u> **Exhibit B**, ¶56.  As such, the Town of Windsor terminated her

employment effective December 10, 2001.  <u>See</u> **Exhibit A**, p. 149; and **Exhibit P**.

### 3.    The Plaintiff Has Submitted No Evidence Of Pretext

Where the defendant employer has submitted a legitimate, non-discriminatory reason for the plaintiff's termination, the employer is entitled to summary judgment absent evidence of pretext.  See Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 94 (2nd Cir. 2001).  In this case there is no such evidence.

Evidence of stray remarks, *even by a decision maker*, will not defeat a properly supported motion for summary judgment.  See Woroski v. Nashua Corp., 31 F.3d 105, 109-10 (2nd Cir. 1994).  In this case, the plaintiff identifies only one racially derogatory remark made by Kathleen Quin over the course of her 3-year employment.  See **Exhibit C**, pp. 142, 151-52.  The plaintiff claims that Quin said, on October 21, 1999, more than two years before her termination, that, "anyone of color is a problem."[4]  See **Exhibit C**, p. 142.  The context of the comment is unknown.  Less than one year before the alleged comment, Quin had interviewed the plaintiff for the position, and recommended her. See **Exhibit A**, p. 52; and **Exhibit B**, ¶¶6-7.

In order to constitute evidence of discrimination, remarks must be: (1) related to plaintiff's protected status; (2) proximate in time to the employment decision at issue; (3) made by an individual with authority over the employment decision at issue; and (4) related to the specific employment decision challenged.  See Krystek v. University of Southern Miss., 164 F.3d 251, 256 (5th Cir. 1999).  "If the comments do not meet these criteria, they are merely 'stray remarks' without probative value when offered either in connection with the plaintiff's *prima facie* case or to demonstrate pretext."  Martin, 65 F. Supp. 2d at 549, *citing*, Boyd v. State Farm Ins. Co., 158 F.3d 326, 329-30 (5th Cir. 1998).  The fact that a comment is made by the employee's supervisor is not sufficient

---

[4] Quin denies making the comment.  See **Exhibit B**, ¶72.

to show pretext absent evidence linking the statement to the employment decision. <u>See</u> <u>Shorter v. ICG Holdings, Inc.</u>, 188 F.3d 1204, 1210 (10th Cir. 1999).

In this case, the alleged comment by Kathleen Quin amounts to nothing more than a "stray remark." The comment was not proximate in time, nor related to, the employment decision at issue - the plaintiff's termination two plus years later.

The burden is on the plaintiff to establish a causal link between the alleged discriminatory remark(s) and the conduct complained of. <u>See</u> <u>Boyd</u>, 158 F.3d at 330; <u>see also</u>, <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 277 (1989) ("stray remarks in the workplace...cannot justify requiring the employer to prove that its decisions were based on legitimate criteria"). In this case, the plaintiff fails to satisfy her burden. As there is no evidence of discrimination based on the plaintiff's race or color, the Town of Windsor is entitled to summary judgment.

**C.    The Town Of Windsor Is Entitled To Summary Judgment As To The Claim Of Age Discrimination Under The Age Discrimination In Employment Act (Count One)**

**1.    Analysis Of Age Discrimination Claim**

Pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. §621, et seq. ("ADEA"), an employer may not discharge an employee between the age of 40 and 70 on account of her age. <u>See</u> 29 U.S.C. §§623(a)(1), 631(a). Age discrimination claims are analyzed under the *McDonnell Douglas* framework set forth above. <u>See</u> <u>Woroski v. Nashua Corp.</u>, 31 F.3d 105, 108 (2nd Cir. 1994).

**2.    The Plaintiff Has Failed To Establish A *Prima Facie* Case Of Age Discrimination**

In order to establish a *prima facie* case of discrimination under the ADEA, the plaintiff must show that: (1) she is a member of the protected age group; (2) she was